UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| RICKEY R. WALKER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>L BRANDS, INC., et al.,<br><br>Defendants. | ) | No. 2:19-cv-03186-SDM-CMV<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>Judge Sarah D. Morrison<br>Magistrate Judge Chelsey M. Vascura |

CONSOLIDATED AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

BRENNAN, MANNA & DIAMOND, LLC
DAVID M. SCOTT (0068110)
KRISTA D. WARREN (0097842)
250 Civic Center Drive, Suite 300
Columbus, OH 43215
Telephone: 614/246-7514
614/246-7515 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

[Additional counsel appear on signature page.]

## TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ....................1

JURISDICTION AND VENUE ....................4

PARTIES ....................5

CLASS ACTION ALLEGATIONS ....................6

BASIS OF ALLEGATIONS ....................7

SUBSTANTIVE ALLEGATIONS ....................8

- The Company and Its Business ....................8
- L Brands' Consistent and Large Dividend Supported Its Stock Price ....................9
- The Company's Business Was in Free-Fall Prior to and During the Class Period and Its Hefty Dividend Was Not Sustainable ....................11
- Defendants Refused to Disclose the Substantial Risk that the Company's Large Dividend Would Need to Be Reduced During the Class Period ....................16
- The Company's Board Was Not Independent and Served as a Rubber Stamp for Defendant Wexner ....................19

MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS ....................21

- L Brands' Class Period SEC Filings Omitted Known Trends, Events and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results ....................31
- L Brands' Class Period SEC Filings Omitted to Include Significant Risk Factors Required to Be Disclosed Therein ....................34
- L Brands' Class Period SEC Filings Falsely Represented that the Company's Disclosure Controls Were Operating Effectively ....................36

Post Class Period Disclosures ....................38

- L Brands Cuts Its Dividend in Half and Announces Substantial Changes to Its Business ....................38
- L Brands' Business Continues to Deteriorate After the End of the Class Period and L Brands Restructures Its Board of Directors ....................42

**Page**


ADDITIONAL SCIENTER ALLEGATIONS ....................................................47

LOSS CAUSATION/ECONOMIC LOSS ....................................................51

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....................................................52

APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* DOCTRINE ....................................................53

NO SAFE HARBOR ....................................................54

COUNT I ....................................................54

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ....................................................54

COUNT II ....................................................57

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ....................................................57

PRAYER FOR RELIEF ....................................................58

JURY DEMAND ....................................................59

Lead Plaintiff Daniel B. O'Leary ("Plaintiff"), by his undersigned attorneys, on behalf of himself and the class he seeks to represent, for his Consolidated Amended Complaint for Violation of the Federal Securities Laws (the "Complaint"), alleges the following upon knowledge as to his own acts, and upon the investigation conducted by Plaintiff's counsel as detailed below.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all purchasers, other than Defendants (defined below), of L Brands, Inc. ("L Brands" or the "Company") common stock between May 31, 2018 and November 19, 2018, inclusive, (the "Class Period") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2. Defendant L Brands is a specialty retailer of women's intimate apparel and personal care, beauty and home fragrance products. The Company's brands included Victoria's Secret, PINK, and Bath & Body Works. Historically, L Brands issued a large dividend to investors. This dividend was attractive to income seeking investment funds and investors, particularly retirees, and thereby helped to support L Brands' stock price.

3. Prior to and during the Class Period, L Brands' Victoria's Secret and PINK business lines experienced a protracted deterioration in operating performance. Competition intensified and Victoria's Secret and PINK engaged in heavy promotional activities and offered consumers steep discounts in an attempt to mitigate rapidly declining market share. This strategy negatively impacted the Company's margins, operating income and cash flow from operations. Since Victoria's Secret and PINK account for more than half of L Brands' total business, their deteriorating operating performance, coupled with the Company's promotional initiatives, eroded L Brands' liquidity. For example, while the combined annual sales of Victoria's Secret and PINK declined by only 5% between fiscal 2016 and 2018, from $7.8 billion to $7.4 billion, their

combined annual operating income declined by approximately 61% during the same period, from $1.2 billion to $462 million.

4. These factors made it increasingly difficult for Defendants to maintain the Company's credit ratings, which were premised on L Brands' ability to pay down its high debt level. The annual cash flows generated by L Brands' operations declined from $2.0 billion in fiscal year 2016 to $1.4 billion in fiscal year 2018, while its net debt (defined as total debt minus cash and cash equivalents) increased from $7.0 billion at the end of fiscal year 2016 to $7.6 billion at the end of fiscal year 2018.

5. Recognizing the Company's rapidly deteriorating operating performance and financial condition, and the Company's need to maintain its credit ratings by materially reducing existing debt, securities analysts directly questioned Defendants about the sustainability of the Company's dividends during the Class Period. Instead of disclosing that the Company's declining financial condition had increased the risk that the Company would need to reduce the dividend amount, Defendant Burgdoerfer (defined below) repeatedly misled investors by reassuring them that the full dividend would be sustained. According to Defendant Burgdoerfer, L Brands: (i) had sufficient cash flow and cash on hand to sustain its dividends; (ii) the Company "in its history, has never reduced the dividend"; and (iii) the deterioration in the Company's liquidity and operating performance had no effect on the risk to the dividend.

6. For example, during the Class Period, Defendant Burgdoerfer stated, in pertinent part, as follows:[1]

- **May 31, 2018**:

> So we have returned capital through regular dividends. ***The company, in its history, has never reduced the dividend.*** We believe that a large number of

[1] Emphasis added unless otherwise indicated herein.

> shareholders place high value on the dividend. That's implicit to the question you're asking. ***We have the cash flow needed and cash balances, et cetera, to sustain the dividend.*** It is a very high payout ratio right now, I realize that, and a very high yield. But again, ***we believe that the dividend is important to shareholders and that we're able to, with current year cash flow, sustain our dividend***.

- **<u>June 6, 2018</u>**:

> . . . ***we're confident that we can maintain the dividend.*** As you've looked at our cash flow results, ***the free cash flow of the business is sufficient to pay the dividend.*** And we've been carrying excess cash as a business beyond what's needed for the day-to-day working capital needs and financing needs of the business. So we're comfortable with our cash position, our liquidity position, our capital structure. And ***we're comfortable with the current dividend level in the business***.

- **<u>August 23, 2018</u>**:

> ***We look at it [the dividend] regularly.*** Management does. ***We have the appropriate conversations with our board***. Obviously, a lot of our earnings and our cash come in the fourth quarter. We have conversations about this regularly. But importantly, as ***we have more insight into holiday results, we're comfortable with the dividend today, have the free cash flow to support it***. But it's obviously something that should be looked at periodically, and we do. ***We're comfortable with it***.

7. Contrary to the above statements, as well as others, made by Defendants during the Class Period, Defendants knew and recklessly failed to disclose that there was a substantial risk that the Company would need to cut its dividends. In fact, during a November 20, 2019 conference call with analysts and investors related to the Company's financial results for the third quarter of 2018, Defendant Burgdoerfer admitted that the decision to cut the dividend was made during the third quarter of 2018. According to Defendant Burgdoerfer, "***[w]e made some important decisions in the [third] quarter***, including the decision to…***reduc[e] our dividend and commit[] to deleverage*** to enable us to increase our focus on our core businesses and strengthen our company in the long term." Therefore, Defendants' has actual knowledge of the materially false and

misleading statements that were made during and after the third quarter that were made after the decision to cut the dividend.

8. Just weeks after Defendants issued false and misleading statements and omitted material information about the Company's dividend L Brands announced that it was cutting its dividend in half so that it could pay down existing debt.

9. In response to this news, the price of L Brands common stock declined approximately 18% on extremely heavy trading volume, from $34.55 per share on November 19, 2018, to $28.43 per share on November 20, 2018, causing losses to Plaintiff and the Class.

**JURISDICTION AND VENUE**

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Sections 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission (the "SEC"), 17 C.F.R. Section 240.10b-5. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. Section 78aa, and 28 U.S.C. Section 1331, because this is a civil action arising under the laws of the United States of America.

11. Venue is proper in this District under Section 27(c) of the Exchange Act, 15 U.S.C. Section 78aa(c), and 28 U.S.C. Section 1391(b)-(d). The Company maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

12. In connection with the acts alleged in this Complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

## PARTIES

13. Lead Plaintiff Daniel B. O'Leary, as set forth in the certification previously filed with the Court and incorporated by reference herein, purchased L Brands common stock during the Class Period and was damaged thereby.

14. Defendant L Brands operates as a specialty retailer of women's intimate and other apparel, beauty and personal care products, home fragrance products and accessories. The Company maintains its principal executive offices in Columbus, Ohio and its common stock is listed and trades on the NYSE under the ticker symbol "LB." Defendant L Brands' fiscal year ends on the Saturday nearest to January 31.

15. Defendant Leslie H. Wexner ("Wexner") is, and was at all relevant times, L Brands' Chairman of the Board of Directors and Chief Executive Officer ("CEO"). During the Class Period, Defendant Wexner owned approximately 46.9 million shares of L Brands common stock valued at more than $1.6 billion on November 19, 2018, representing nearly 17% of the Company's total outstanding shares.

16. Defendant Stuart B. Burgdoerfer ("Burgdoerfer") is, and was at all relevant times, L Brands' Executive Vice President and Chief Financial Officer ("CFO"). Defendant Burgdoerfer owned approximately 102,000 shares of L Brands common stock during the Class Period valued at more than $3.5 million on November 19, 2018.

17. Defendants Wexner and Burgdoerfer are collectively referred to hereinafter as the "Individual Defendants." Unless otherwise noted, L Brands and the Individual Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

18. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all purchasers of L Brands common stock during the Class Period (the "Class").

19. Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assignees of any such excluded party.

20. The members of the Class are so numerous that joinder of all members is impracticable. L Brands common stock is actively traded on the NYSE. There were approximately 275 million shares of L Brands common stock outstanding as of August 31, 2018. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of L Brands or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

21. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and intends to prosecute this action vigorously.

22. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same

false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

24. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of the Company;

(c) whether the price of L Brands common stock was artificially inflated during the Class Period; and

(d) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

**BASIS OF ALLEGATIONS**

25. The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiff's counsel in order to obtain the information necessary to plead Plaintiff's claims with particularity where necessary. Plaintiff's counsel's investigation included examining

and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LexisNexis , Dow Jones and Bloomberg, Inc.) – including, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, investor presentations, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services.

26. Additionally, in the course of Plaintiff's counsel's ongoing investigation, a number of former Company employees and other individuals who possessed direct knowledge of the Company were interviewed. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

27. L Brands, which was founded by Defendant Wexner in 1963, operates in three segments: Victoria's Secret, Bath & Body Works, and Victoria's Secret and Bath & Body Works International. During the Class Period, the Company's portfolio of brands included Victoria's Secret, PINK, Bath & Body Works, La Senza and Henri Bendel. Victoria's Secret, PINK and La Senza are brands that are primarily associated with women's intimate apparel. Bath & Body Works is a specialty retailer of body care, home fragrance products, soaps and sanitizers. Henri Bendel was a seller of handbags, jewelry and other accessory products.

28. The Victoria's Secret segment sells women's intimate and other apparel, personal care and beauty products under the Victoria's Secret and PINK brand names. The Bath & Body Works segment sells body care, home fragrance products, soaps and sanitizers under the Bath & Body Works, White Barn, C.O. Bigelow and other brand names. The Victoria's Secret and Bath & Body Works International segment includes the Victoria's Secret and Bath & Body Works

company-owned and partner-operated stores located outside of the U.S. and Canada, as well as the online business in Greater China.

29. Prior to and during the Class Period, Victoria's Secret and Bath & Body Works were the Company's two principal business segments, accounting for more than one-half and approximately one-third of L Brands total revenue, respectively. The Victoria's Secret and Bath & Body Works International segment, on the other hand, accounted for less than five percent of the Company's total sales.

**L Brands' Consistent and Large Dividend Supported Its Stock Price**

30. Leading up to the Class Period, L Brands had a long history of issuing a lucrative and often increasing dividend to investors. In fact, L Brands had touted in November 2018 that it issued a dividend for 176 consecutive quarters. Below is a chart that lists the Company's regular dividend between 2012 and 2018:

| Year | Annual Dividend (Per Share) | Total Dividend (in $ Millions) |
|---|---|---|
| 2012 | $1.00 | $290 |
| 2013 | $1.2 | $349 |
| 2014 | $1.36 | $399 |
| 2015 | $2.00 | $583 |
| 2016 | $2.40 | $686 |
| 2017 | $2.40 | $666 |

31. Since the Company's dividend provided an ongoing stream of income to investors, it supported and helped limit the downside of the Company's stock price. The safety of the dividend, as represented by Defendants, attracted investment into L Brand's common stock as well. As described by an analyst from Wells Fargo Securities on May 24, 2018, "[w]ith a current dividend yield of 7-8% (the highest in our coverage), the dividend offers a backstop to

LB shares. . . ." Defendant Burgdoerfer has also echoed this view, stating on June 6, 2018, during a Robert W. Baird Conference that the "dividend is a very important source of return for many shareholders, we believe."

32. During the years leading up to the Class Period, however, the Company's business began to decline significantly, which negatively impacted L Brands' financial condition. Nonetheless, L Brands chose to maintain and increase its dividend.

33. In 2016, 2017 and 2018, L Brands' dividend payout ratio was 109%, 70% and 103%, respectively. The dividend payout ratio is defined as dividends paid per share divided by average price per share. During those same years, L Brands' dividend yield was 9%, 6.8% and 8.9%, respectively. By both measures, L Brands' dividend was extremely high compared to other companies.

34. For example, the median dividend payout ratio in 2017 for all publicly traded U.S. firms was 41.58%, and companies in the 75th percentile had payout ratios of greater than 74.93%. The median dividend yield in 2017 of all publicly traded U.S. firms was 2.12%, and companies in the 75th percentile had dividend yields of greater than 3.47%. Therefore, in the years leading up to the Class Period, L Brands had one of the highest dividend payout ratios and dividend yields of any publicly traded U.S. company.

35. Earnings before interest tax depreciation amortization, referred to as "EBITDA," is often considered a proxy for the cash flow derived from a company's operations and can be useful when comparing companies because it excludes the impact of a company's capital expenditures and non-cash items such as depreciation and amortization. A company's debt-to-EBITDA ratio is often used to evaluate its financial stability.

36. In the years leading up to the Class Period, L Brands had one of the highest debt-to-EBITDA ratios of any U.S. retailer. For example, in 2016, 2017 and 2018, L Brands' debt-to-EBITDA ratio was 2.3, 2.6 and 2.9, respectively. An April 16, 2019 Jefferies analyst report stated that L Brands "has one of the highest net leverage ratios in retail (even before counting for leases). . . ."

37. Therefore, by a large number of common measures, the Company's dividend was placing a financial strain on the Company. In the period leading up to the start of the Class Period the Company's key business, Victoria's Secret, had been deteriorating rapidly with little expectation of reversal. As a result, there was a substantial risk the dividend would need to be reduced, particularly because L Brands needed to reduce its high debt level – in order to maintain its credit rating. Nevertheless, in an effort to artificially inflate L Brands common stock, Defendants misleadingly trivialized the risk that the Company may need to cut its dividend. In stark contrast to the reality of the dividend's burden on the Company's liquidity, Defendants falsely represented that the dividend was safe for the foreseeable future.

**The Company's Business Was in Free-Fall Prior to and During the Class Period and Its Hefty Dividend Was Not Sustainable**

38. In the few years leading up to the beginning of the Class Period, the Victoria's Secret and PINK lines of business experienced a significant decline in financial performance as new lingerie brands, such as Aerie, ThirdLove and Savage X Fenty, and emerging direct-to-consumer intimate apparel brands, became more popular.

39. Compounding the adverse financial effects competition was having on these lines of business, in 2016, L Brands announced a strategic decision to exit certain non-core Victoria's Secret categories, including swim and apparel. Securities analysts estimate that this decision resulted in the loss of more than $400 million in annual sales. In addition, L Brands eliminated

the Victoria's Secret catalog, with an annual circulation to nearly 250 million households, which also resulted in the loss of a material amount of business.

40. The combined effect of these events resulted in significant customer base and market share losses within L Brands' most financially significant business segment, Victoria's Secret. For example and as illustrated in the following chart, from at least 2015 comparable store sales at Victoria's Secret and PINK were roughly flat to down, while Aerie's were skyrocketing:




41. Comparable store sales, also known as same store sales, is a financial metric commonly used by retailers to evaluate the performance of existing stores by measuring the difference in revenue generated at a particular location during a given period compared to an identical period in the past, usually the prior year. By comparing the performance at an existing location during a particular period to the same period in the previous year, sales generated by new or closed stores and seasonal variations are eliminated, allowing business trends to be measured more meaningfully. According to the Corporate Finance Institute, a financial analyst education and certification organization for finance and investment professionals, over time, comparable

store sales trends is a "strong predictor of the health of retail operations and future success of a company."

42. Since the Victoria's Secret business segment accounted for more than half of L Brands total revenue prior to and during the Class Period, the forays by competitors into key Victoria's Secret and PINK product lines coupled with the strategic decisions to exit Victoria's Secret and PINK swim and apparel categories and cancel the Victoria's Secret catalog caused L Brands revenue and income growth rates to plummet in the years leading up to the Class Period, as reflected in the below graph:



43. In an attempt to drive sales and retain market share in the face of increasing competition, Victoria's Secret and PINK engaged in heavy promotional activities by offering consumers large discounts and even giving away items free of charge. Even though this marketing strategy may have helped to mitigate sales declines, it adversely impacted the Company's profit margins and cash flows.




44. The cumulative effect of increasing competition, the strategic decisions to exit swim and apparel categories and cancel the Victoria's Secret catalog, coupled with the cost of increasing Victoria's Secret's heavy promotional initiatives, lead to a distinct and material decline

in L Brands' profitability and operating cash flow in the years prior to the Class Period, as reflected in the below graph:




45. As a result, L Brands' Shareholders' Deficit ***nearly tripled***, from $259 million on January 30, 2016, to $753 million on February 3, 2018, and its working capital declined by ***nearly half***, from $2.28 billion on January 30, 2016, to $1.26 billion on February 3, 2018.[2]

---

[2] Shareholders' equity represents the stockholders residual claim in a corporation's assets after debts have been paid. When total liabilities are greater than total assets, stockholders have negative equity, which is also referred to as the shareholders' deficit.

**Defendants Refused to Disclose the Substantial Risk that the Company's Large Dividend Would Need to Be Reduced During the Class Period**

46. The adverse trends experienced by the Company between 2015 and 2017 – the three fiscal years leading up to the start of the Class Period – caused the amount of cash flow available to finance L Brands' operations after the payment of ordinary dividends to decline by more than ***50%***, from $1.44 billion in 2015 to only $720 million in 2017:



47. Thus, after the payment of dividends, L Brands was left with limited financial ability to fund its ongoing operations, finance its capital expenditure requirements and manage its $8.9 billion debt level.

48. As of February 3, 2018, the Company's credit ratings were as follows:

| | Moody's | S&P | Fitch |
|---|---|---|---|
| Corporate | Ba1 | BB+ | BB+ |
| Senior Unsecured Debt with Subsidiary Guarantee | Ba1 | BB+ | BB+ |
| Senior Unsecured Debt | Ba2 | BB- | BB |

According to innvestopedia.com, junk bonds are typically rated 'BB' or lower by Standard & Poor's and 'Ba' or lower by Moody's, and issuers of junk bonds normally experience difficulty in acquiring capital at an inexpensive cost. Given L Brands' debt was junk bond grade, Defendants were focused on improving, or at least maintaining, the Company's credit ratings by lowering its high debt levels entering the Class Period.

49. Even though by the start of the Class Period L Brands' financial condition had deteriorated to the point at which its dividend was not sustainable, Defendants were adamant that the dividend was secure based on the then-current financial performance of the Company. Defendants, however, knew or recklessly disregarded, that competition to Victoria's Secret and PINK was increasing and negatively impacting the Company's business, and that the financial performance of Victoria's Secret and PINK were rapidly deteriorating with no clear end in sight. As a result, Defendants lacked any reasonable basis to believe the Company's financial performance would enable it to reduce its large debt level and fund its operations, while maintaining its existing dividend. Therefore, contrary to their misleadingly positive statements, Defendants knew and recklessly trivialized the risk, which in realty was substantial, that the Company's dividend would need to be cut.

50. As the Company acknowledged in its SEC filings, the Company's ability to pay dividends "will depend on our ability to generate sufficient cash flows from operations in the future." In response to the Company's steep decline in financial performance, securities analysts closely covering L Brands common stock questioned Defendants about the sustainability of L Brands' dividend during the Class Period. In response to these inquires during the Class Period, Defendants issued a series of statements that falsely and misleadingly minimized the risk of a reduction of the Company's coveted dividend, which artificially inflated the price of L Brands common stock during the Class Period.

51. For example, securities analysts repeatedly underscored how the financial distress within the Victoria's Secret business segment was adversely impacting the Company's overall financial performance. In early 2018, securities analysts noted that the Victoria's Secret business segment continued to generate negative comparable store sales and significantly lower margins during the crucial 2017 holiday season and that the results were disconcerting compared with a stronger holiday season experienced by the industry generally.

52. Then, in the weeks immediately before the start of the Class Period, securities analysts observed that intensifying low-priced competition, increasing industry pricing pressure, declining merchandise margins, market share losses, intense promotional activity and weak comparable store sales continued to plague the Company even though store and mall traffic generally continued as expected.

53. As a result of these adverse conditions, securities analysts questioned Defendants during the Class Period about the safety and sustainability of L Brands' dividend, especially since, as they had noted, the Company's attractive dividend yield provided a "backstop" to L Brands' stock price. Instead of acknowledging the reality that the decline – and expected continued decline

– in Victoria's Secret's business put substantial pressure on the sustainability of the Company's dividend, Defendants denied that there were any irregular risks to the payment of the full dividend and issued a series of materially false and misleading statements in response to questions about the dividend.

**The Company's Board Was Not Independent and Served as a Rubber Stamp for Defendant Wexner**

54. The Company's board of directors set its dividend. As described by the Company in its Form 10-Q for the quarter ended May 5, 2018:

> **Dividend Policy and Procedures**
>
> Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restrictions placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time. We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities and financing activities to fund our special dividends.

55. The board, however, was not independent during the Class Period and merely served as a rubber stamp to the desires of the Individual Defendants because it was comprised of people with close affiliations to Defendant Wexner. As such, the Individual Defendants had substantial influence over the sustainability of the dividend.

56. During the Class Period, a majority of the Company's twelve directors were not independent of Defendant Wexner, including his wife, Abigail S. Wexner, Stephen D. Steinour, Dennis S. Hersch, Donna A. James, Michael G. Morris, Robert H. Schottenstein and E. Gordon Gee.

57. Abigail Wexner has been married to Defendant Wexner since 1993 and is clearly not independent. She also serves on the Wexner Medical Center ("WMC") Board of Trustees and the Columbus Downtown Development Corporation ("CDDC") Board of Directors.

58. Steinour is not independent because he serves on the WMC and CDDC boards with Abigail Wexner. Hersch is not independent because while he was president of N.A. Property, Inc., he served as a business advisor to Defendant Wexner and Abigail Wexner, and because he was a trustee of various Wexner family trusts.

59. James is not independent because she has served on the Wexner Center for the Arts Board of Trustees and because she is the co-founder of a nonprofit entity that helps parenting teens, The Center for Healthy Families, whose key partner is a nonprofit entity founded by Abigail Wexner.

60. Morris is not independent because he serves on the CDDC Board with Abigail Wexner. Schottenstein is not independent because he sits on three boards with Abigail Wexner – the WMC Board, the Ohio State University Board, and the Pelotonia Board, which is a nonprofit organization.

61. Gee is not independent because of his long-time, close friendship with Defendant Wexner. For example, a March 30, 2018 article in Columbus Monthly titled *Stealing a President: The Story Behind Gordon Gee's Return to Ohio State*, stated that Gee is Wexner's "close friend." Additionally, Defendant Wexner served on Ohio State University's ("OSU") Board of Trustees during Gee's two tenures as president of OSU, and he played a central role in recruiting Gee to serve a second term. In June 2007, Defendant Wexner even travelled to Gee's home in Nashville, where Gee was then serving as Vanderbilt University's president, to convince Gee to return to OSU.

62. In addition to their close relationships with the Wexners, many of the directors were conflicted because they had served for extremely long periods of time on the Company's board.

For example, three of the purported "independent directors" had an average tenure of 36 years, which raises serious doubts about their independence.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS**

63. The Class Period commences on May 31, 2018. On that day, Defendant Burgdoerfer, on behalf of L Brands, presented at the RBC Capital Markets Consumer and Retail Conference. During the conference, Defendant Burgdoerfer described the payment of the dividend as "safe" and reassured investors about the sustainability of the Company's dividend, claiming that: (i) L Brands had the "cash flow needed and cash balances, *et cetera*, to sustain the dividend"; (ii) "the dividend is important to shareholders and that we're able to, with current year cash flow, sustain our dividend"; and (iii) "[t]he [C]ompany, in its history, has never reduced the dividend." The following exchange, in pertinent part, transpired:

> **Brian Jay Tunick** – *RBC Capital Markets, LLC, Research Division – MD and Analyst*
>
> I guess there's a lot of dividend and yield investors in the room, and we've been getting a lot of calls on the 7% dividend yield. Can you maybe talk about, when you reduced your cash flow and you reduced your CapEx guidance for the year, how important is the dividend? And how do you guys think about capital allocation?
>
> **Stuart B. Burgdoerfer** – *L. Brands, Inc. – Executive VP and CFO*
>
> Well, we think that -- thanks for the question, Brian. ***We think that dividend is very important***. So we have returned capital through regular dividends. ***The company, in its history, has never reduced the dividend***. ***We believe that a large number of shareholders place high value on the dividend***. That's implicit to the question you're asking. ***We have the cash flow needed and cash balances, et cetera, to sustain the dividend***. It is a very high payout ratio right now, I realize that, and a very high yield. ***But again, we believe that the dividend is important to shareholders and that we're able to, with current year cash flow, sustain our dividend***. Certainly, we get questions from other investors and have debate as we should about the magnitude of our share repurchase program. We are buying back some stock. You are aware we authorized a program, and we update every quarter about the activity there. But one could say that, that's a modest program in relation to the capitalization of the company, but we think a balanced approach makes sense.

> We do believe there is a long record of companies that thought that they knew for sure it was a good buy, and time proved them wrong. We do believe that the value of the company is substantially greater than where it's trading at today, but we have to prove it. The company would seem -- has really -- and folks have written about this. The only thing that management really focuses on is performance. When you look at valuation, I mean, it's at the very low end of a lot of ranges. ***So back to the dividend, the dividend is very safe***.

64. The statements referenced in ¶63 above were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a) that the Victoria's Secret and PINK businesses were having, and would continue to have, a material adverse effect on the Company's cash flow, liquidity and net debt levels;

(b) that the financial strain put on the Company due to the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to cut its dividend;

(c) that there was a substantial risk the Company would need to reduce its dividend to pay down debt and finance operations;

(d) that the positive statements about the ability of the Company to sustain its dividend lacked a reasonable basis; and

(e) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects.

65. Furthermore, the statements referenced above in ¶63 that "[w]e have the cash flow needed and cash balances, *et cetera*, to sustain the dividend," and that "we're able to, with current year cash flow, sustain our dividend," were materially false and misleading because: (i) the dividend was putting substantial pressure on the Company's financial condition due to its reduced

cash flow; (ii) Defendant Burgdoerfer lacked a reasonable basis to believe the Company's cash flow would improve; and (iii) there was a substantial risk that the Company would need to reduce its dividend to pay down debt and fund operations. Additionally, the statements referenced above in ¶63 that "the company, in its history, has never reduced the dividend," "[w]e think that [sic] dividend is very important," and that "a large number of shareholders place high value on the dividend" were materially misleading when viewed in context of Defendant Burgdoerfer's other positive statements about the security of the dividend because they supported those other false and misleading statements and added to the impression that the dividend would be sustained.

66. On June 6, 2018, Defendant Burgdoerfer, on behalf of L Brands, presented at the Robert W. Baird Global Consumer, Technology and Services Conference. During the conference, Defendant Burgdoerfer again reassured investors that the Company's dividend was sustainable, stating, in pertinent part, as follows:

> ***The dividend is a very important source of return for many shareholders***, we believe. ***Our ability to maintain the dividend***, even in this time period where the payout ratio is very high and the yield is very high, ***we're confident that we can maintain the dividend. As you've looked at our cash flow results, the free cash flow of the business is sufficient to pay the dividend***. And we've been carrying excess cash as a business ***beyond what's needed for the day-to-day working capital needs and financing needs of the business***. ***So we're comfortable with our cash position, our liquidity position, our capital structure. And we're comfortable with the current dividend level in the business***. And we believe we're in an operating period where we're going to turn this business, and specifically the lingerie and PINK businesses within Victoria's. And those relationships would normalize to more typical levels that we've seen historically and that you'd see in most major companies on a broad basis, but ***we're very comfortable with the dividend***.

67. The statements referenced above in ¶66 were materially false and misleading when made because of the reasons set forth in ¶64.

68. Furthermore, the statements referenced above in ¶66 that "we're confident that we can maintain the dividend," "our cash flow results, the free cash flow of the business is sufficient to pay the dividend," "we're comfortable with the current dividend level in the business," and

"we're very comfortable with the dividend" were materially false and misleading because: (i) the dividend was putting substantial pressure on the Company's financial condition due to its reduced cash flow; (ii) Defendant Burgdoerfer lacked a reasonable basis to believe the Company's cash flow would improve; and (iii) there was a substantial risk that the Company would need to reduce its dividend to pay down debt and fund operations. Additionally, the statements referenced above in ¶66 that the "dividend is a very important source of return for many shareholders," "beyond what's needed for the day-to-day working capital needs and financing needs of the business," and "[s]o we're comfortable with our cash position, our liquidity position, our capital structure," were materially misleading when viewed in context of Defendant Burgdoerfer's other positive statements about the security of the dividend because they supported those other false and misleading statements, minimized the risk that the dividend would be reduced, and added to the impression that the dividend would be sustained.

69. Also during the June 6, 2018 Robert W. Baird Conference, Defendant Burgdoerfer minimized the threat that competition posed to Victoria's Secret's business. The following exchange, in pertinent part, transpired:

> **Mark R. Altschwager** - *Robert W. Baird & Co. Incorporated, Research Division - Senior Research Analyst*
>
> Digging into Victoria's Secret a bit. On the Q1 call, management acknowledged that the recovery at VS is taking a bit longer than anticipated. How much of this is related to some of the internal disruptions or in terms of the changes that you've made versus some intensifying competitive pressures?
>
> **Stuart B. Burgdoerfer** - *L Brands, Inc. - Executive VP & CFO*
>
> It's a very hard question to answer. I understand the spirit of the question, and I'll do my -- ***I think most of the majority of the result we're seeing at Victoria's Secret is a function of our own execution***, changes we've made and challenges or opportunities that we have in our own execution. ***Are there more competitors out there? There are. When you look at the size and significance of those competitors and really do the math on it, they're not that large at this time. And not suggesting from that, that we should be arrogant about competition or not***

> ***pay attention to competition. We do, but I would have a view -- we have a view that most of our opportunity in performance is through executing our game plan more effectively***. And due to the near-term impact, which has sustained longer than we expected, there are a lot of changes that we made in the spring of 2016: the category exits, the change in promotion, the reorganization of the business, reduction in headcount, elimination of the catalog. The combination of all those things, intended to focus the business on core categories and ultimately accelerate growth in the near term, had put a lot of pressure on the business.

70. The statements referenced above in ¶69 were materially false and misleading when made because they minimized the negative impact competitors were having on the Company and its margins, profitability and cash flow.

71. On June 7, 2018, L Brands filed with the SEC its Form 10-Q for the quarter ended May 5, 2018, (the "Q1 2018 Form 10-Q") signed by Defendant Burgdoerfer. The Q1 2018 Form 10-Q contained materially false and misleading Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") and risk factor disclosures as alleged in ¶¶88-96 below. As a result, the control disclosures in the Q1 2018 Form 10-Q, as well as Defendant Wexner's and Burgdoerfer's certifications thereon, as alleged in ¶¶98-100 below were materially false and misleading.

72. Additionally, the Q1 2018 Form 10-Q contained a "Dividend Policy and Procedures" section which discussed the Company's dividend, stating in pertinent part, as follows:

> **Dividend Policy and Procedures**
>
> Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restrictions placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time. We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities and financing activities to fund our special dividends.
>
> Under the authority and declaration of our Board of Directors, we paid the following dividends during the first quarter of 2018 and 2017:

| | **Ordinary Dividends (per share)** | **Total Paid (in millions)** |
|---|---|---|
| **2018** | | |
| First Quarter | $0.60 | $168 |
| **2017** | | |
| First Quarter | $0.60 | $172 |

73. The statements referenced above in ¶72 were materially false and misleading when made because of the reasons set forth in ¶63. Additionally, the statements referenced above in ¶72 were materially false and misleading when made because they created the false impression that the Company's dividend was safe and consistent and because they failed to disclose that there was a substantial risk that the dividend was not sustainable and that the Company would need to reduce the dividend to pay down debt and fund operations.

74. The third quarter of 2018 began on August 5, 2018. As alleged below, Defendants made the decision to cut the dividend starting in March 2019 during this quarter.

75. On August 22, 2018, the Company announced its financial and operational results for the second quarter 2018 (the period ended August 4, 2018) in a press release (the "8/22/18 Press Release"), which it filed with the SEC on Form 8-K. The 8/22/18 Press Release, among other things, reported earnings of $0.36 per share compared to $0.48 per share for the quarter ended July 29, 2017, and operating income of $228.1 million compared to $300.9 million the prior year. The Company also reduced guidance for 2018 full-year earnings per share from $2.70-$3.00/share to $2.45-$2.70/share, and issued guidance for third quarter earnings per share of between $0.00 and $0.05. The press release also announced that Denise Landman, the CEO of PINK, had decided to retire at the end of 2018.

76. Additionally, the 8/22/18 Press Release revealed that Victoria's Secret comparable sales during the 2018 second quarter continued to decline, from the already depressed 2017 second

quarter level, on a year-over-year basis:[3]

**L BRANDS**
**SECOND QUARTER 2018**

**Comparable Sales Increase (Decrease) (Stores and Direct):**

| | Second Quarter 2018 | Second Quarter 2017 | Year-to-Date 2018 | Year-to-Date 2017 |
|---|---|---|---|---|
| Victoria's Secret[1] | (1%) | (14%) | —% | (14%) |
| Bath & Body Works[1] | 10% | 6% | 9% | 4% |
| **L Brands[2]** | **3%** | **(8%)** | **3%** | **(9%)** |

[1] - Results include company-owned stores in the U.S. and Canada and direct sales.
[2] - Results include company-owned stores in the U.S., Canada, the U.K. and Greater China and direct sales.

**Comparable Sales Increase (Decrease) (Stores Only):**

| | Second Quarter 2018 | Second Quarter 2017 | Year-to-Date 2018 | Year-to-Date 2017 |
|---|---|---|---|---|
| Victoria's Secret[1] | (5%) | (11%) | (5%) | (11%) |
| Bath & Body Works[1] | 7% | 4% | 6% | 2% |
| **L Brands[2]** | **(1%)** | **(6%)** | **(2%)** | **(7%)** |

[1] - Results include company-owned stores in the U.S. and Canada.
[2] - Results include company-owned stores in the U.S., Canada, the U.K. and Greater China.

77. On August 23, 2018, L Brands held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, a securities analyst questioned management about L Brands' dividend. In response, Defendant Burgdoerfer again reassured investors about the sustainability of the Company's dividend - noting that much of L Brands' earnings and cash flow are generated during the fourth quarter of the year and that because "we have more insight into holiday results, we're comfortable with the dividend today, [and] have the free cash flow to support it." The following exchange, in pertinent part, transpired:

---

3 According to L Brands' SEC filings, a store is typically included in the calculation of comparable sales when it has been open or owned 12 months or more and it has not had a change in selling square footage of 20% or more. Additionally, stores of a given brand are excluded from the comparable sales calculation if total selling square footage for the brand in the mall changes by 20% or more through the opening or closing of a second store.

**Michael Charles Binetti** – *Crédit Suisse AG, Research Division – Research Analyst*

***You guys have remained very committed to a very, very high dividend yield despite, I think, the operating results coming in below some of your hopes for a bit here***. I know you've worked hard to moderate CapEx down a few times here along the way. But could you help us with how you think about holding steady the approach to the capital deployment in contrast to the variances you've seen in the operating plans?

**Stuart B. Burgdoerfer** – *L Brands, Inc. – Executive VP and CFO*

Important subject, obviously, important source of return for shareholders. Obviously, the payout ratio is abnormally high. The yield is very high. ***We look at it regularly. Management does. We have the appropriate conversations with our board***. ***Obviously, a lot of our earnings and our cash come in the fourth quarter***. We have conversations about this regularly. . . . But it's obviously something that should be looked at periodically, and we do. ***We're comfortable with it***. We expect to -- one way to deal with the payout ratio is obviously to increase earnings. That's what we're focused on. ***Earnings increases would drive obviously an increase in the share price and get dividend yields and relationships like that in a more normal range***. But with that said, our operating performance has lagged our expectations over the last several years. So we look at it periodically in a rigorous way. That will continue. ***We're comfortable with it based on what we know at this point, and we'll continue to look at it***. Thank you.

78. The statements referenced above in ¶77 were materially false and misleading when made because of the reasons set forth in ¶63.

79. Furthermore, the statements referenced above in ¶77 that "as we have more insight into holiday results, we're comfortable with the dividend today, have the free cash flow to support it," and "[w]e're comfortable with it based on what we know at this point, and we'll continue to look at it," were materially false and misleading because: (i) the dividend was putting substantial pressure on the Company's financial condition due to its reduced cash flow; (ii), Defendant Burgdoerfer lacked a reasonable basis to believe the Company's cash flow would improve; and (iii) there was a substantial risk that the Company would need to reduce its dividend to pay down debt and fund operations. Additionally, the statements referenced above in ¶77 that "[w]e look at it regularly," "[w]e have the appropriate conversations with our board," and "a lot of our earnings

and our cash come in the fourth quarter," were materially misleading when viewed in context of Defendant Burgdoerfer's other positive statements about the security of the dividend because they supported those other false and misleading statements, minimized the risk that the dividend would be reduced, and added to the impression that the dividend would be sustained.

80. On September 7, 2018, L Brands filed with the SEC its Form 10-Q for the quarter ended July 29, 2018 (the "Q2 2018 Form 10-Q") signed by Defendant Burgdoerfer. The Q2 2018 Form 10-Q contained materially false and misleading MD&A and risk factor disclosures as alleged in ¶¶88-96 below. As a result, the control disclosures in the Q2 2018 Form 10-Q, as well as Defendant Wexner's and Burgdoerfer's certifications thereon, were materially false and misleading as alleged in ¶¶98-100 below.

81. The Q2 2018 Form 10-Q also contained a "Dividend Policy and Procedures" section which discussed the Company's dividend, stating in pertinent part, as follows:

> **Dividend Policy and Procedures**
>
> Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restrictions placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time. We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities and financing activities to fund our special dividends.
>
> Under the authority and declaration of our Board of Directors, we paid the following dividends during year-to-date 2018 and 2017:

| | **Ordinary Dividends (per share)** | **Total Paid (in millions)** |
|---|---|---|
| **2018** | | |
| Second Quarter | $0.60 | $167 |
| First Quarter | $0.60 | $168 |
| **2017** | | |
| Second Quarter | $0.60 | $172 |
| First Quarter | $0.60 | $172 |

82. The statements referenced above in ¶81 were materially false and misleading when made because of the reasons set forth in ¶63. Additionally, the statements referenced above in ¶81 were materially false and misleading when made because they created the false impression that the Company's dividend was safe and consistent, and because they failed to disclose that there was a substantial risk that the dividend was not sustainable and that the Company would need to reduce the dividend to pay down debt and fund operations.

83. The Q2 2018 Form 10-Q contained a "Credit Ratings" section which discussed the weakening of the Company's credit rating, stating, in pertinent part, as follows:

> **Credit Ratings**
>
> Our borrowing costs under our Revolving Facility and Secured Foreign Facilities are linked to our credit ratings. If we receive an upgrade or downgrade to our corporate credit ratings, the borrowing costs could decrease or increase, respectively.
>
> * * *
>
> Subsequent to August 4, 2018, S&P downgraded our Corporate rating to BB, our Senior Unsecured Debt with Subsidiary Guarantee rating to BB and our Senior Unsecured Debt rating to B+, and also updated our Outlook to Negative. Additionally, for commercial reasons, Fitch withdrew our ratings on August 29, 2018. In conjunction with the withdrawal, Fitch issued final ratings that downgraded our Corporate rating to BB, our Senior Unsecured Debt with Subsidiary Guarantee rating to BB and our Senior Unsecured Debt rating to BB-.

84. The statements referenced above in ¶83 were materially false and misleading when made because they failed to disclose that the worsening condition of the Company's credit rating increased the risk that the Company's dividend amount was not sustainable.

85. On September 13, 2018, L Brands issued a press release announcing it was closing all Henri Bendel stores and the Henri Bendel e-commerce website in January 2019. Defendant Wexner stated L Brands was taking such action "to improve [C]ompany profitability and focus on our larger brands that have greater growth potential."

86. On November 8, 2018, L Brands issued a press release stating that it expected to report losses per share of approximately $0.17 during the 2018 third quarter. The expected losses per share included a pretax cash charge of $20 million related to the closure of the Company's Henri Bendel business and an approximate pretax non-cash impairment charge of $80 million related to certain Victoria's Secret store assets. The press release also announced the declaration of the Company's regular quarterly dividend of $0.60 per share, which the Company characterized as "the company's 176th consecutive quarterly dividend."

87. The statements referenced above in ¶86 were materially false and misleading when made because of the reasons set forth in ¶63. Additionally, the declaration of the $0.60 dividend and statement that it would be the 176th consecutive dividend, even if literally true, created the false impression that the Company's dividend was safe going forward. The statements referenced above were also materially false and misleading because, as admitted by Defendant Burgdoerfer during the November 20, 2018 Conference Call (*see* ¶104 below), "[w]e made some important decisions in the [third] quarter, including . . . ***reducing our dividend and committing to deleverage*** to enable us to increase our focus on our core businesses and strengthen our company in the long term." The third quarter was completed by the time the statements referenced above in ¶86 were made, so Defendants had actual knowledge by this time that the Company made the decision to reduce the Company's dividend and commit to deleverage. Defendants, however, failed to disclose these material facts to investors.

**L Brands' Class Period SEC Filings Omitted Known Trends, Events and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results**

88. Pursuant to Item 2 of Form 10-Q, L Brands' Class Period SEC filings were required to furnish the information required under Item 303 of Regulation S-K [17 C.F.R. §229.303],

including any known trends, events or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

89. In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation. *See* MD&A, SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release"). In the 1989 Interpretive Release, the SEC stated, in pertinent part, that:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. . . . A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

90. Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*Id*. at *6.

91. In 2003, the SEC issued additional interpretative guidance associated with the requirements of Item 303 of Regulation S-K. Concerning, in particular, an entity's liquidity, such guidance states, in pertinent part, as follows:

> Our rules require companies to provide disclosure in the related categories of liquidity and capital resources. This information is critical to an assessment of a company's prospects for the future and even the likelihood of its survival. A company is required to include in MD&A the following information, to the extent material:
>
> - historical information regarding sources of cash and capital expenditures;
> - an evaluation of the amounts and certainty of cash flows;
> - the existence and timing of commitments for capital expenditures and other known and reasonably likely cash requirements;
> - discussion and analysis of known trends and uncertainties;
> - a description of expected changes in the mix and relative cost of capital resources;
> - indications of which balance sheet or income or cash flow items should be considered in assessing liquidity; and
> - a discussion of prospective information regarding companies' sources of and needs for capital, except where otherwise clear from the discussion.

[Footnotes omitted.]

92. During the Class Period, the MD&A that L Brands filed with the SEC on Forms 10-Q contained materially false and misleading disclosures about the Company's liquidity and failed to disclose material events and uncertainties associated with L Brands' cash requirements, liquidity and/or capital resources, which were then known to management and were reasonably likely to have a material effect on the Company's future cash requirements, liquidity and/or capital resources.

93. The following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the Q1 2018 Form 10-Q and Q2 2018 Form 10-Q, but were not:

(a) that the Victoria's Secret and PINK businesses were having, and would continue to have, a material adverse effect on the Company's cash flow, liquidity and debt levels;

(b) that the financial strain put on the Company due to the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to cut its dividend;

(c) that there was a substantial risk the Company would need to reduce its dividend to pay down debt and finance operations;

(d) that the positive statements about the ability of the Company to sustain its dividend lacked a reasonable basis; and

(e) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects.

**L Brands' Class Period SEC Filings Omitted to Include Significant Risk Factors Required to Be Disclosed Therein**

94. Pursuant to Item 1A of Form 10-Q, L Brands' Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in L Brands' 2017 Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503]. L Brands' 2017 Form 10-K contained the following purported risk disclosures related to dividends:

> **If we are unable to pay quarterly dividends at intended levels, our reputation and stock price may be harmed.**
>
> Our dividend program requires the use of a portion of our cash flow. Our ability to pay dividends will depend on our ability to generate sufficient cash flows from operations in the future. This ability may be subject to certain economic, financial, competitive and other factors that are beyond our control. Our Board of Directors may, at its discretion, decrease the level of dividends or entirely discontinue the payment of dividends at any time. Any failure to pay dividends after we have announced our intention to do so may negatively impact our reputation, investor confidence in us and our stock price.

95. Defendants failed to comply with Item 503 by failing to disclose risk factors or material changes in risk factors in these SEC filings. Specifically, Defendants failed to disclose the following in L Brands' Q1 2018 Form 10-Q and Q2 2018 Form 10-Q, as required under Item 503:

(a) that the Victoria's Secret and PINK businesses were having, and would continue to have, a material adverse effect on the Company's cash flow, liquidity and debt levels;

(b) that the financial strain put on the Company due to the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to cut its dividend;

(c) that there was a substantial risk the Company would need to reduce its dividend to pay down debt and finance operations;

(d) that the positive statements about the ability of the Company to sustain its dividend lacked a reasonable basis; and

(e) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects.

96. Even though the 2017 Form 10-K contained purported warnings that the Company's board may decrease the dividend, the warnings were general and boilerplate and not specifically tailored to the risks facing L Brands during the Class Period. The language did not warn investors that there existed, during the Class Period, a substantial risk that L Brands would need to decrease its dividend.

**L Brands' Class Period SEC Filings Falsely Represented that the Company's Disclosure Controls Were Operating Effectively**

97. Item 4 of Form 10-Q required L Brands to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures*. Item 307 of Regulation S-K required L Brands' Forms 10-Q during the Class Period to disclose Defendant Wexner's and Burgdoerfer's conclusions about the effectiveness of L Brands' disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

98. During the Class Period, L Brands falsely and misleadingly represented in its Forms 10-Q that its disclosure controls were operating effectively when they were not, as alleged herein. L Brands' Q1 2018 Form 10-Q and Q2 2018 Form 10-Q, in all material respects, falsely and misleadingly represented, in pertinent part, that:

> **CONTROLS AND PROCEDURES**
>
> *Evaluation of disclosure controls and procedures.* As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective and designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act*** is (1) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.
>
> *Changes in internal control over financial reporting.* The adoption of ASC 606, Revenue from Contracts with Customers, required the implementation of new controls and the modification of certain accounting processes related to revenue recognition. There were no other changes in our internal control over financial

> reporting that occurred in the first quarter 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

99. These false and misleading representations were then falsely certified by Defendants Wexner and Burgdoerfer.

100. During the Class Period, defendants Wexner and Burgdoerfer falsely attested, among other things, that: (i) the Forms 10-Q did not omit material facts; and (ii) the Company's internal and disclosure controls were effective. Defendants Wexner's and Burgdoerfer's certifications, in all material respects, falsely represented:

> I . . . . certify that:
>
> 1. I have reviewed this report on Form 10-Q of L Brands, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

101. Accordingly, Defendants Wexner and Burgdoerfer issued materially false and misleading statements during the Class Period.

## POST CLASS PERIOD DISCLOSURES

### L Brands Cuts Its Dividend in Half and Announces Substantial Changes to Its Business

102. After the market closed on November 19, 2018, the Company announced its financial and operational results for the third quarter 2018, for the period ended November 3, 2018, in a press release (the "11/19/18 Press Release"), which it filed with the SEC on Form 8-K. Among other things, the 11/19/18 Press Release also announced that L Brands intended to reduce its annual ordinary dividend from $2.40 to $1.20, beginning with the quarterly dividend to be paid in March 2019 in order to deleverage the Company's balance sheet. The 11/19/18 Press Release stated, in pertinent part, as follows:

> **Dividend**
>
> ***After extensive review, the Board of Directors plans to reduce the company's annual ordinary dividend to $1.20 from $2.40 currently, beginning with the quarterly dividend to be paid in March 2019.*** The planned reduction will result in a dividend payout ratio that is more consistent with the company's past practice, and a ***dividend yield in line with relevant comparisons***. The approximately $325 million in cash made available from the ***dividend reduction will be utilized primarily to contribute to the deleveraging of the company's balance sheet*** over time. The Board was assisted in its assessment by its financial advisors BridgePark Advisors and PJT Partners.

103. Additionally, the 11/19/18 Press Release announced a change in the leadership of Victoria's Secret Lingerie, including that Jan Singer had resigned from her position as Chief Executive Officer, stating, in pertinent part, as follows:

> **Victoria's Secret Lingerie Leadership Change**
>
> The company also announced today that John Mehas has been named CEO of Victoria's Secret Lingerie, effective early 2019, replacing Jan Singer, who has resigned.
>
> "John is an outstanding retail merchant and we could not be more excited for him to lead Victoria's Secret Lingerie to a new phase of success," said Wexner. "Our number one priority is improving performance at Victoria's Secret Lingerie and PINK. In doing so, our new leaders are coming in with a fresh perspective and looking at *everything* . . . our marketing, brand positioning, internal talent, real estate portfolio and cost structure. *Most importantly*, we are focused on our merchandise assortment - it all starts with the customer saying 'I'll take it.' I am confident that, under John's leadership, Victoria's Secret Lingerie, the world's leading lingerie brand, will continue to be a powerhouse and will deliver products and experiences that resonate with women around the globe."
>
> Mehas is currently serving as President of Tory Burch, the iconic lifestyle brand. Previously he led Club Monaco, a Polo Ralph Lauren brand, for 13 years as President and CEO. Mehas gained his early retail and merchandising experience at The Gap and Bloomingdales . . .

104. On November 20, 2018, before the opening of the market for trading, L Brands held a conference call with analysts and investors to discuss the Company's operations and earnings release (the "11/20/18 Conference Call"). During the 11/20/18 Conference Call, Defendant

Burgdoerfer discussed the importance of the reduction of the dividend and L Brands' "commit[ment] to a full review of the business," stating, in pertinent part, as follows:

> ***We made some important decisions in the quarter***, including the decision to close the Henri Bendel business, pursuing alternatives for La Senza and ***reducing our dividend and committing to deleverage to enable us to increase our focus on our core businesses and strengthen our company in the long term***. Our #1 priority is improving performance at Victoria's Secret Lingerie and PINK.
>
> * * *
>
> ***We're committed to a full review of the business. Everything is on the table***, including our brand positioning, marketing, talent, real estate, cost structure and, most importantly, our merchandise assortments. By executing against our strategy, focusing on the fundamentals, staying close to our customers and leveraging the strength of our brands, we will deliver on our commitments for our stakeholders, customers, associates and shareholders.

105. In response to a question from an analyst on the 11/20/18 Conference Call about putting "everything[] on the table" to try to fix the business, Defendant Burgdoerfer responded in pertinent part, as follows:

> **Paul Lawrence Lejuez -** *Citigroup Inc., Research Division - MD and Senior Analyst*
>
> ***You mentioned everything's on the table. I'm curious where you're putting your emphasis currently, spending your time***. How is Les spending his time? And I'm also curious if all of this work is happening now on the Victoria's Secret side or if we have to wait until John gets there before we start to see maybe some changes. And also curious just about the decision for Les to not be on the call today.
>
> **Stuart B. Burgdoerfer** - *L Brands, Inc. - Executive VP & CFO*
>
> ***Sure. So Paul, in terms of just taking a fresh, hard look at everything, I mean, it starts with decisions that we've announced.*** So eliminating losses related to noncore businesses, Bendel and La Senza previously announced. But important and aggregating to about $85 million of annual operating income, a big decision in part of "everything." ***The re-setting of the dividend to better match the operating results of the business in consultation and approved by the Board with outside advice, also a very important decision.*** But most importantly, as shared in the remarks and circulated remarks and even already this morning, the most important thing that we can do and that we're focused on is addressing the opportunities in the Victoria's Secret Lingerie and PINK businesses.

106. Also on the 11/20/18 Conference Call, Defendant Burgdoerfer provided additional information about the reduction in the dividend in response to a question from an analyst, stating in pertinent part, as follows:

> **Brian Jay Tunick** - *RBC Capital Markets, LLC, Research Division - MD and Analyst*
>
> . . . And then secondly, maybe, Stuart, talk about the balance sheet and maybe whether a leverage ratio. But sort of like what are the contexts that you're looking at here, before maybe equity shareholders might get any of the free cash flow after the debt paydown?
>
> * * *
>
> **Stuart B. Burgdoerfer** - *L Brands, Inc. - Executive VP & CFO*
>
> And with respect to balance sheet, we're not formulaic about it, Brian. ***But obviously, the ratios, whether it's the dividend payout ratio, the yield, the adjusted leverage ratios, have gone out of the historic ranges for us***. And so the Board, again, with outside advice and very deliberately considered by the Board and approved by the Board, we made an important decision to reduce the dividend from $2.40 annually to $1.20. In terms of the cash freed up -- and some of this will be dynamic, obviously, as operating results play out over the next few years, but deliberate discussion about what we'll do with that cash. And as indicated in our commentary, in the release and in our circulated commentary, ***that freed-up cash will be used principally to reduce debt in the near term. We're more comfortable with a leverage ratio in the mid-3s. Again, not formulaic about it, but it's risen meaningfully as the operating result in the business has declined and made an important decision to re-set those things over the next few years with the decision, beginning in March, to reduce the dividend***. As to how and when some of that freed-up cash gets back to shareholders, obviously, our long history has been to return excess cash to shareholders, as you know, through a combination of regular dividends, special dividends and share repurchase activity but, at this time, felt it appropriate to make the adjustments we've made. Thanks.

107. In response to the Company's announcements on November 19 and 20, the price of L Brands common stock declined approximately *18%* on extremely heavy trading volume, from $34.55 per share on November 19, 2018, to $28.43 per share on November 20, 2018.

108. Analysts attributed the decline in L Brands common stock on November 20, 2018 to the reduction in the dividend. For example, on November 20, 2018, an analyst at Morgan

Stanley wrote that the "[r]isk of a dividend cut was a key tenant of the Bear thesis and appears to be the primary driver of the stock's -18% decline today, in our view." Similarly, on November 21, 2018, an analyst from Barclays Equity Research stated that L Brands' "share price underperformance yesterday (-18% vs. -3% for the XRT) is an understandable reaction to reduced dividend support. . . ."

**L Brands' Business Continues to Deteriorate After the End of the Class Period and L Brands Restructures Its Board of Directors**

109. After the end of the Class Period, Victoria's Secret's financial performance continued to deteriorate.

110. For example, the decline in comparable store sales more than tripled, from -2% during the Class Period to -7% in the third quarter of 2019:




111. As a result, L Brands' earnings per share continued to decline after the end of the Class Period:[4]

[4] Earnings per share data is presented on a year-over-year basis due to the seasonality of L Brands business.




112. On March 5, 2019, institutional investor and L Brands shareholder Barington Capital Group, L.P. ("Barington") sent a letter to the Company. Among other things, Barington expressed "significant concerns regarding the composition of the L Brands Board." According to Barington, the Company's board "lacks the independence necessary to perform its oversight functions on behalf of shareholders." The Barington letter stated, in pertinent part, as follows:

> **We Believe Independence and Diversity Should Be Improved on the L Brands Board of Directors**
>
> ***We have significant concerns regarding the composition of the L Brands Board, as we believe that it lacks the independence necessary to perform its oversight functions on behalf of shareholders***. We also believe that the Board lacks directors with a diversity of backgrounds, skills and perspectives sufficient to meet the strategic needs of the Company and ensure that it remains competitive in today's challenging marketplace.
>
> ***The Board has determined that eight of the Company's twelve directors are "independent" in accordance with applicable New York Stock Exchange standards. However, a review of their backgrounds reveals that a majority of these directors have strong ties to you and your wife (and to each other)*** through the Columbus, Ohio community where the Company is headquartered or The Ohio State University, which is home to the Wexner Center for the Arts and the Wexner Medical Center. ***The existence of these social and business relationships raises***

> ***serious questions as to the true independence of these directors. Furthermore, three of the directors that the Board has determined to be independent have a lengthy average tenure of 36 years, 8 which also raises concerns regarding their actual independence from you.*** These directors include Allan R. Tessler, the Lead Independent Director and Chair of the Nominating & Governance Committee, who has served as a director for over 31 years, and David Kollat, the Chair of the Compensation Committee and a former Company executive, who has served as a director for over 42 years. Lengthy director tenure and social and business ties with the CEO can compromise a director's independence and weaken board oversight and decision-making. Given that you are the Chairman of the Board and your wife and your personal business advisor also serve as directors, it is unclear that the Board as currently comprised has the independence to effectively oversee you as Chief Executive Officer.
>
> *　　*　　*
>
> It is our belief that the effectiveness of the Board would be greatly enhanced if the Board looked outside of its members' personal and professional networks to identify new director candidates.
>
> *　　*　　*
>
> . . . We also recommend that the Chairman and the CEO roles be held by separate individuals to further improve corporate governance and operating execution.

113. A March 22, 2019, article in *The Wall Street Journal* titled "L Brands Answers Calls To Seek Broader Board," also discussed the lack of independence on the Company's board, stating in pertinent part, as follows:

> "It's an old-style board with the kinds of interrelationships you saw many years ago, particularly in certain localities," said Charles Elson, director of the Weinberg Center for Corporate Governance at the University of Delaware. "It's surprising that this kind of board continues to exist in today's climate."
>
> The average age for L Brands' directors is 71, the youngest being 57, and seven of them have been on the board for more than a dozen years. The median age of a director at S&P 500 firms is 63.3, while the median tenure is 7.8 years. Three L Brands directors are women.
>
> "When more than a third of directors have served for more than nine years, that's when we start to have a little bit of concern," said John Roe, head of ISS Analytics, the data intelligence arm of Institutional Shareholder Services. "The danger is groupthink, or the reluctance to consider new opinions."

114. On April 1, 2019, Jefferies LLC issued a research report noting that the Victoria's Secret brand "has been giving up [market] share for years, but it was masked by PINK['s] growth. Now PINK sales are declining and share losses are accelerating. . . . We believe PINK sales may be cut in half or more within the next 12-24 months creating further EPS cuts for [L Brands] so sell shares."

115. In 2019, L Brands' debt-to-EBITDA ratio ballooned to 3.6. On April, 9, 2019, Moody's downgraded L Brands' Rating Outlook from stable to negative, and warned that L Brands' Corporate Family Rating (a rating that gauges a company's ability to honor all of its financial obligations) could be downgraded in the event that its debt-to-EBITDA ratio reaches 4.0.

116. On April 18, 2019, L Brands announced in a press release its slate of directors for election to the Company's board at the 2019 Annual Meeting of Stockholders. According to the press release, the slate "includes three independent directors with considerable expertise in business, finance, governance and leadership." The press release also announced that the Company entered into an agreement with Barington under which Barington has agreed to vote all of its shares in favor of L Brands' nominees for the 2019 Annual Meeting.

117. On August 5, 2019, *CNBC* reported that L Brands' Chief Marketing Officer, Edward Razek, who had been with the Company since the early 1980s, was resigning.

118. On August 21, 2019, UBS Securities LLC issued a research report stating "Victoria's Secret's [sic] 2Q19 results show the brand's sales and margin trends continue to deteriorate. Victoria's Secret (VS) same store sales growth fell 6% and its EBIT margin dropped 560 bps y/y to just 1.0%. This was well below our expectations. LB guidance incorporates a 2H19 VS improvement, but we think there is a good chance this may not happen and thus 2H19 EPS miss risk is high."

119. On October 10, 2019, *CNBC* reported that the head of L Brands' store and store operations, April Holt, was leaving the Company after 16 years of service and that the Company's Victoria's Secret business unit had laid off fifty people within its home office.

**ADDITIONAL SCIENTER ALLEGATIONS**

120. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding L Brands and their control over, and/or receipt and/or modification of L Brands' allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

121. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

122. The Individual Defendants were executive officers of L Brands and, at a minimum, should have been aware of key facts related to the Company's operations, sales trends, weakening financial condition, and the substantial risk that the Company would need to reduce its dividend.

123. Additionally, the fraud alleged herein relates to the core business of L Brands, so knowledge of the fraud may be imputed to Defendants. Given Defendants' knowledge of the truth

concerning the ongoing problems with the business and the likely continued downward trajectory of the Company's financial performance, the misleadingly positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading. Furthermore, these facts were known by Company employees in senior positions and their knowledge can be imputed to L Brands itself.

124. Defendant Wexner's scienter is also supported by the fact that he was a member of the Company's board of directors and had close connections with its members. Defendant Wexner would have been present at meetings in which the dividend was discussed and was aware of the factors that the board considered when evaluating the dividend amount, as well as the risk that the dividend may need to be reduced. Additionally, Defendant Burgdoerfer's scienter is supported by the fact that he was the Company's CFO and would have been directly involved in recommendations about the size of the dividend to the Company's board of directors.

125. Defendant Burgdoerfer's responses to direct questions from analysts about the sustainability of the Company's dividend also support scienter. Analysts expressed repeated concern about the sustainability of the Company's dividend. Instead of admitting the obvious, that there was a substantial risk to payment of the full dividend going forward, Defendant Burgdoerfer trivialized the risk and made extremely positive statements in an effort to reassure investors that the dividend was safe. Without a reasonable basis, Defendant Burgdoerfer falsely represented that the Company's operations were sufficient to maintain the dividend.

126. Defendants possessed knowledge of facts or had access to information contradicting their public statements. As alleged above, Defendants were clearly aware of the substantial problems facing the Company, the intense competition from other companies, the worsening financial condition of the Company, and the significant risk that the Company would

be unable to sustain payment of its huge dividend. The Individual Defendants were aware of both the need to materially reduce the Company's large debt, and the simultaneous sharp decline in free cash flow from operations which was caused by the Company's regular discounts and other promotions. Therefore, the Individual Defendants were aware, or recklessly disregarded, that Defendant Burgdoerfer's positive statements about the dividend were materially false and misleading. The Individual Defendants were also aware, or recklessly disregarded, that the failure to disclose the true risk that the dividend would need to be reduced in the Company's SEC filings, earnings press releases and conference calls, caused statements made therein misleading.

127. Furthermore, Defendants were aware that the Company's stock price was being supported by the Company's generous dividend and that any statements casting doubt on the payment of the full dividend would cause a steep decline in L Brands common stock. It was reckless for the Individual Defendants to fail to warn investors that there was a substantial risk the dividend could be reduced.

128. The temporal proximity of Defendants statements about the sustainability of the dividend and their failure to warn investors of the substantial risk the dividend would need to be reduced, also supports scienter. Indeed, the Company announced the dividend would be cut in half merely weeks after many of Defendants false statements and material omissions about the dividend. In fact, Defendant Burgdoerfer admitted on the 11/20/18 Conference Call that the Company had made the decision to reduce the dividend during the third quarter of 2018, which was before some of the misleading statements alleged above. As such, Defendants had actual knowledge at the time of those statements that the 2019 dividend would be reduced to pay down debt but failed to disclose those facts to investors.

129. The scienter of the Individual Defendants is further evidenced by their SOX mandated certifications on L Brands' disclosure controls, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about L Brands was made known to them.

130. Moreover, Defendants possessed substantial motives for misrepresenting the sustainability of the dividend and the expected performance of the Company. Defendant Wexner owned nearly 17% of the Company's outstanding shares, worth approximately $1.59 billion on the first day of the Class Period and more than $1.61 billion on the last day of the Class Period. Defendant Burgdoerfer owned more than 102,000 of the Company's outstanding shares, worth approximately $3.48 million on the first day of the Class Period and more than $3.54 million on the last day of the Class Period. Defendants Wexner and Burgdoerfer were motivated to hide the true risk of the sustainability of the dividend from investors to maintain the artificially inflated price of the Company's stock, since such a large amount of their personal assets were tied up in Company stock. Indeed, as a result of the decline in L Brands common stock on November 20, 2018, Defendant Wexner's L Brands shares lost more than $280 million in value, and Defendant Burgdoerfer's L Brands shares lost more than $628,000 in value.

131. Additionally, Defendant Wexner's scienter is further supported by the fact that his shares in the Company represent a substantial portion of his total assets. According to Forbes.com, Defendant Wexner's net worth as of October 2018 was approximately $4.7 billion, so approximately 34% of his net worth was connected to the price of L Brands common stock. Upon information and belief, a large portion of Defendant Burgdoerfer's net worth was also connected to the price of L Brands common stock.

## LOSS CAUSATION/ECONOMIC LOSS

132. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of L Brands common stock and operated as a fraud or deceit on Class Period purchasers of L Brands common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of L Brands common stock fell precipitously, as the prior artificial inflation came out. As a result of their purchases of L Brands common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

133. Defendants' false and misleading statements had the intended effect and caused L Brands common stock to trade at artificially inflated levels throughout the Class Period.

134. As a direct result of Defendants' disclosures set forth above, and as a materialization of the undisclosed risk of investing in L Brands common stock, the price of L Brands common stock fell precipitously. This drop removed the inflation from the price of L Brands common stock, causing real economic loss to investors who had purchased L Brands common stock during the Class Period.

135. On November 19 and 20, 2018, among other things, Defendants announced that L Brands would be cutting its dividend from $0.60 per share to $0.30 per share principally to free up cash to reduce debt and would be "taking a fresh, hard look at [the business]" due to the Company's ongoing problems.

136. In response to the Company's announcements in its press release on November 19 and related conference call on November 20, 2018, the price of L Brands common stock fell. It declined $6.12 per share, or nearly 18%, from a close of $34.55 per share before the announcements, to close at $28.43 per share on November 20, 2018, on extremely heavy trading

volume of 21.48 million shares. This drop removed the inflation from the price of L Brands common stock, causing real economic loss to investors who had purchased L Brands common stock during the Class Period.

137. The decline in the price of L Brands common stock after the November 19 and 20 disclosures came to light was a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market and as the risk of Defendants' fraud materialized.

138. The timing and magnitude of the price decline in L Brands common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of L Brands common stock and the subsequent significant decline in the value of L Brands common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

139. At all relevant times, the market for L Brands common stock was an efficient market for the following reasons, among others:

(a) L Brands common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, L Brands filed periodic public reports with the SEC and the NYSE;

(c) L Brands regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) L Brands was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

140. As a result of the foregoing, the market for L Brands common stock promptly digested current information regarding L Brands from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of L Brands common stock during the Class Period suffered similar injury through their purchase(s) of L Brands common stock at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* DOCTRINE

141. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because Defendants' material omissions during the Class Period caused harm to Plaintiff and the Class. Because the Complaint alleges Defendants' failure to disclose material adverse information regarding the sustainability of L Brands' dividend and the trajectory of the Company's business, business operations, financial condition and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

142. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**NO SAFE HARBOR**

143. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of L Brands who knew that those statements were false when made.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

144. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

145. This Count is asserted against L Brands and the Individual Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

146. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

147. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

148. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of L Brands common stock during the Class Period in an effort to maintain artificially high market prices for L Brands common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

149. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or a director of the Company were privy to and participated in the creation, development and reporting of the Company's financial results and guidance; (iii) each of the Individual Defendants was advised of and had access to other members of the Company's management team, internal reports and other data and information at all relevant

times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

150. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public both the significant problems L Brands experienced and the unsustainability of its dividend, and for the effect of supporting the artificially inflated price of L Brands common stock. As demonstrated by Defendants' misstatements of the Company's business and operations during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

151. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of L Brands common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of L Brands common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired L Brands common stock

during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

152. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class, and the marketplace, known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their L Brands common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

153. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

154. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of L Brands common stock during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

155. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

156. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.

157. The Individual Defendants acted as controlling persons of L Brands within the meaning of Section 20(a) of the Exchange Act.

158. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

159. As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of L Brands common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: December 20, 2019

BRENNAN, MANNA & DIAMOND, LLC
DAVID M. SCOTT (0068110)
KRISTA D. WARREN (0097842)

*/s/ David M. Scott*
DAVID M. SCOTT

250 Civic Center Drive, Suite 300
Columbus, OH 43215
Telephone: 614/246-7514
614/246-7515 (fax)
dscott@bmdllc.com
kdwarren@bmdllc.com

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

*Local Counsel*

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

*Lead Counsel for Lead Plaintiff and the Class*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
www.johnsonfistel.com

*Additional Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 20, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

BRENNAN, MANNA & DIAMOND, LLC
DAVID M. SCOTT (0068110)

*/s/ David M. Scott*
DAVID M. SCOTT

250 Civic Center Drive, Suite 300
Columbus, OH 43215
Telephone: 614/246-7514
614/246-7515 (fax)
dscott@bmdllc.com