UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| RICKEY R. WALKER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:19-cv-03186-SDM-CMV **(Consolidated)** |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | Judge Sarah D. Morrison Magistrate Judge Chelsey M. Vascura |
| L BRANDS, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

LEAD PLAINTIFF DANIEL B. O'LEARY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

[Additional counsel appear on signature page.]

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| **SUMMARY OF PRINCIPAL ARGUMENTS AND PRELIMINARY STATEMENT** | | | 1 |
| **I.** | **STATEMENT OF FACTS** | | 4 |
| | A. | **The Company and Its Business** | 4 |
| | B. | **L Brands' Consistent and Large Dividend Supported Its Stock Price** | 4 |
| | C. | **The Company's Business Was in Free-Fall Leading Up to the Class Period and Its Hefty Dividend Was Not Sustainable** | 5 |
| | D. | **Defendants Denied and Refused to Disclose the Substantial Risk that the Company's Large Dividend Would Need to Be Reduced During the Class Period** | 6 |
| | E. | **Defendants' Materially False and Misleading Statements and Omissions** | 7 |
| | F. | **L Brands Announces a Fifty Percent Reduction in Its Dividend and Substantial Changes to Its Business** | 9 |
| | G. | **L Brands' Business Continues to Deteriorate After the End of the Class Period and L Brands Restructures Its Board of Directors** | 10 |
| **II.** | **LEGAL STANDARD** | | 11 |
| **III.** | **ARGUMENT** | | 12 |
| | A. | **The Complaint Alleges Defendants' Fraud with Particularity** | 12 |

Plaintiff successfully pled actionable statements because the Complaint alleges facts showing that Defendants made materially false and misleading statements and omitted material information. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014).

| | | 1. | **Defendants Issued Materially False and Misleading Statements and Omissions** | 12 |
|---|---|---|---|---|

The Complaint particularizes Defendants' materially false and misleading statements and omissions in accordance with Rule 9(b) and the PSLRA by specifically identifying "what" statements are alleged to be false and misleading; "who" made the statements; "when" and "where" they were made; and "why" the statements were materially false and misleading or what material information was omitted. *In re Miller Energy Res. Sec. Litig.*, No. 3:11-cv-386-TAV-CCS, 2014 WL 415730, at *7 (E.D. Tenn. Feb. 4, 2014).

| | | 2. | **Defendant Burgdoerfer's Materially False and Misleading Statements to Analysts and Investors** | 14 |
|---|---|---|---|---|

Defendant Burgdoerfer issued materially false and misleading statements about the sustainability of L Brands' dividend by stating, among other things, that the dividend amount was "very safe" and refusing to acknowledge there existed a substantial risk

**Page**

the dividend would need to be reduced. *In re Miller Energy Res. Sec. Litig.*, No. 3:11-cv-386-TAV-CCS, 2014 WL 415730, at *7 (E.D. Tenn. Feb. 4, 2014); *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017).

3.      **Defendants' Arguments Directed at Defendant Burgdoerfer's**      16
        **Statements Are Without Merit**

Defendants argument that the Complaint does not allege actionable statements because the payment of the first reduced dividend was in March 2019 is without merit because Defendants conflate the date of the announcement of the reduction to the dividend with the date of the payment of the reduced dividend. Plaintiff alleges Defendant Burgdoerfer's statements were materially false and misleading at the time they were made, which is all that is required under Rule 9(b) and the PSLRA. *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1148 (D. Ariz. 2017).

Defendant Burgdoerfer's statements are not merely "expressions of corporate optimism" or "puffery." *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70 (S.D. Ohio 2006). Puffery is an attack on materiality, often raising fact-based contentions not susceptible to resolution on the pleadings, and the sustainability of the Company's dividend was clearly material. *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005).

Defendant Burgdoerfer's statements are not "soft" forward-looking statements but verifiable statements of fact. *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 WL 8199124, at *18 (S.D. Ohio Jan. 21, 2016).

4.      **Defendants' Materially False and Misleading Statements and**      24
        **Omissions in L Brands' SEC Filings and Press Release**

Defendants made materially false and misleading statements and omitted material information. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005). A defendant that chooses to speak on an issue must provide complete and non-misleading information. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004).

5.      **Defendants Minimized the Negative Impact of Competition**      26

Defendant Burgdoerfer minimized the impact of competition. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004).

**Page**

6.  **Defendants Had a Duty to Disclose the Omitted Material Information** ...27

The securities laws proscribe both affirmatively false statements and statements that are rendered misleading by the omission of facts that create an impression of a state of affairs that differs in a material way from the one that actually exists. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005); *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011).

7.  **Defendants' Materially False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor** ...29

None of Defendants' alleged misstatements and omissions fall within the PSLRA's Safe Harbor provision, as: (1) Defendants' statements were not forward-looking; (2) Defendants failed to provide meaningful cautionary language; and (3) Defendants had actual knowledge that those statements were false and misleading when made. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001).

a.  **Defendants' Statements Were Not Forward Looking** ...29

Statements about "events that were currently occurring" or expressing "the speaker's current belief" are not forward-looking. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1014-15 (S.D. Ohio 2008).

b.  **Defendants' Boilerplate Cautionary Language Was Neither Meaningful nor Adequate** ...31

Defendants' use of boilerplate risk disclosures failed to provide the "*meaningful* cautionary language" necessary to "convey substantive information about factors that realistically could cause results to differ materially from those projected." 15 U.S.C. §78u-5(c)(1)(A); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001); *In re Cardinal Health Sec. Litig.*, 426 F. Supp. 688, 749 (S.D. Ohio 2006).

8.  **L Brands' SEC Filings Failed to Include Significant Risk Factors Required to Be Disclosed Therein** ...33

L Brands' Class Period Forms 10-Q failed to disclose the significant risk that the dividend would not be sustained as required by Item 503 of Regulation S-K [17 C.F.R. §229.503].

**Page**

9.    **L Brands Omitted Material Facts Required to Be Disclosed Under Item 303**    34

The potential reduction in the dividend in order to deleverage the Company was a "known uncertaint[y]" that Defendants were required to but failed to disclose under Item 303. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101-02 (2d Cir. 2015)..

B.    **The Complaint Pleads a Strong Inference of Scienter**    35

A plaintiff pleads the requisite "strong inference" of scienter where the "facts argued collectively . . . give rise to a strong inference of at least recklessness." 15 U.S.C. §78u-4(b)(2); *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007)). To review scienter pleadings "holistically," the Sixth Circuit held that district courts can no longer "sort[] through each allegation individually before concluding with a collective approach," as such a method "risks losing the forest for the trees." *Frank v. Dana Corp.* ("*Dana II*"), 646 F.3d 954, 961 (6th Cir. 2011). Not all *Helwig* factors need to be met and Plaintiff has met four factors. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005); *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018).

1.    **While Unnecessary, the Complaint Pleads Defendants' Actual Knowledge**    37

A "plaintiff may use circumstantial evidence to support an inference of actual knowledge." *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1015 (S.D. Ohio 2007). The Complaint sufficiently alleges actual knowledge.

2.    **Defendants Knew During the Third Quarter of 2018 that L Brands Had Decided to Reduce Its Dividend for the Period Starting March 2019**    38

Defendant Burgdoerfer admitted on November 20, 2018 that L Brands had decided – during the third quarter of 2018 – to cut its dividend in half beginning in March 2019, so Defendants were aware of this fact at some point between August 5, 2018 and November 3, 2018. Therefore, Defendants had actual knowledge the dividend would be cut prior to the November 8, 2018 press release, if not earlier. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018); *In re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, at *160 (M.D. Tenn. Mar. 31, 2009).

**Page**

3.    **Defendants' Positions at the Company and Involvement with the Review and Setting of the Dividend Support Scienter**    40

The involvement of the Individual Defendants with the review and setting of the Company's dividend supports scienter. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018), *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).

4.    **The Importance of the Dividend Supports Scienter**    41

The importance of the dividend to investors and analysts supports a strong inference of scienter. ¶63, 66. *In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001); *In re Miller Energy Res. Sec. Litig.*, No. 3:11-cv-386-TAV-CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014).

5.    **The Temporal Proximity of Defendants' Statements to the Reduction of L Brands' Dividend Supports Scienter**    42

The November 8 statements were less than two weeks before the November 19 announcement, which supports scienter. The rest of the statements were close enough to the end of the Class Period to support scienter. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018); *In re Grand Casinos, Inc., Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997); *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *22 (M.D. Tenn. Apr. 26, 2011).

6.    **Defendants' Motives Support Scienter**    43

The Individual Defendants were motivated to perpetrate the fraud because of their large interest in L Brands common stock. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018).

IV.    **IF THE COURT GRANTS DEFENDANTS' MOTION IN ANY RESPECT, LEAD PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND**    44

The Sixth Circuit has held that "leave to amend is 'freely given when justice so requires.'" *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).

V.    **CONCLUSION**    45

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Young Touchstone Co.*,
735 F. Supp. 2d 831 (W.D. Tenn. 2010)................................................................45

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................11

*Beach v. Healthways, Inc.*,
No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809
(M.D. Tenn. Mar. 9, 2009)................................................................37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................11

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................28

*Cagan v. Anchor Savs. Bank FSB*,
No. CV-88-3024, 1990 WL 73423
(E.D.N.Y. May 22, 1990) ................................................................38

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)................................................................37

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ................................................ *passim*

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132 (CM), 2013 WL 1197755
(S.D.N.Y. Mar. 25, 2013) ................................................................31

*Cmty. Health Sys., Inc. v. New York City Emps. Ret. Sys., Inc.*,
139 S. Ct. 310 (2018)................................................................11

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ........................................................ *passim*

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................12

*Fidel v. AK Steel Holding Corp.*,
No. C-1-00-320, 2002 WL 31545952
(S.D. Ohio Sept. 19, 2002)................................................................25, 30, 33

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ................................................................36

**Page**

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ...............................................................35, 36, 37, 39

*Garden City Emps.' Ret. Sys. Ret. Sys. v. Psychiatric Sols., Inc.*,
No. 3:09-00882, 2011 WL 1335803
(M.D. Tenn. Mar. 31, 2011)................................................................................41

*Genna v. Potts*,
No. HAR-94-3260, 1995 WL 222043
(D. Md. Apr. 13, 1995) .................................................................................19, 20

*Grae v. Corr. Corp. of Am.*,
No. 3:16-cv-2267, 2017 WL 6442145
(M.D. Tenn. Dec. 18, 2017)......................................................................17, 18, 19, 37

*Graff v. Prime Retail, Inc.*,
172 F. Supp. 2d 721 (D. Md. 2001) ....................................................................20

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)..................................................................39

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .................................................................... *passim*

*In re Am. Serv. Grp., Inc.*,
No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237
(M.D. Tenn. Mar. 31, 2009).................................................................................39

*In re Cardinal Health Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................................ *passim*

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004).................................................................32

*In re Duane Reade, Inc. Securities Litigation*,
No. 02 Civ. 6478 (NRB), 2003 WL 22801416
(S.D.N.Y. Nov. 25, 2003) ...............................................................................21, 30

*In re Envoy Corp. Sec. Litig.*,
133 F. Supp. 2d 647 (M.D. Tenn. 2001)................................................................41

*In re Faro Techs. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007)................................................................44

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004).............................................................25, 32

**Page**

*In re Ford Motor Co. Sec. Litig.*,
  184 F. Supp. 2d 626 (E.D. Mich. 2001)................................................................22

*In re General Electric Co. Securities Litigation*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................23

*In re Grand Casinos, Inc. Sec. Litig.*,
  988 F. Supp. 1273 (D. Minn. 1997)......................................................................42

*In re Huffy Corp. Sec. Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ...........................................................29, 30

*In re International Business Machines Corp. Securities Litigation*,
  163 F.3d 102 (2d Cir. 1998).....................................................................16, 22, 23

*In re Lason, Inc. Sec. Litig.*,
  143 F. Supp. 2d 855 (E.D. Mich. 2001)................................................................30

*In re MF Global Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................28

*In re Miller Energy Res. Sec. Litig.*,
  No. 3:11-cv-386-TAV-CCS, 2014 WL 415730
  (E.D. Tenn. Feb. 4, 2014) ...............................................................................12, 41

*In re Nat'l Century Fin. Enters. Inc. Inv. Litig.*,
  541 F. Supp. 2d 986 (S.D. Ohio 2007) .................................................................38

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) .........................................................................12, 17

*In re Prison Realty Sec. Litig.*,
  117 F. Supp. 2d 681 (M.D. Tenn. 2000).................................................................42

*In re Proquest Sec. Litig.*,
  527 F. Supp. 2d 728 (E.D. Mich. 2007).................................................................42

*In re Seadrill Ltd. Securities Litigation*,
  No. 14 Civ. 9642 (LGS), 2016 WL 3461311
  (S.D.N.Y. June 20, 2016)................................................................................19, 20

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
  124 F. Supp. 2d 527 (S.D. Ohio 2000) ........................................................30, 33, 35

*In re Sofamor Danek Group, Inc.*,
  123 F.3d 394 (6th Cir. 1997) ...............................................................................34

**Page**

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
No. 3:09-cv-1293 (CFD), 2011 WL 494753
(D. Conn. Feb. 7, 2011) ...........................................................................................26, 27

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
No. 12-5281, 2013 WL 2248970
(6th Cir. May 23, 2013) ...........................................................................................11

*Inst. Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)......................................................................................40

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ....................................................................................36

*Lomingkit v. Apollo Educ. Grp. Inc.*,
275 F. Supp. 3d 1139 (D. Ariz. 2017) ......................................................................16

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) ....................................................................................19

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ....................................................................................39

*Malin v. XL Capital Ltd.*,
499 F. Supp.2d 117 (D. Conn. 2007)........................................................................44

*Masel v. Villarreal*,
924 F.3d 734 (5th Cir. 2019) ....................................................................................17

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011)...............................................................................................36

*Miller v. Champion Enters. Inc.*,
346 F.3d 660 (6th Cir. 2003) ....................................................................................30

*Morse v. McWhorter*,
290 F.3d 795 (6th Cir. 2002) ....................................................................................45

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687, 694 (6th Cir. 2017) ............................................................................11

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortgage Corp.*,
830 F.3d 376, 383-84 (6th Cir. 2016)........................................................................11

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)......................................................................................35

**Page**

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ......................................................................................36

*Shah v. Zimmer Biomet Holdings, Inc.*,
2019 WL 762510, at *5-6 (N.D. Ind. Feb. 20, 2019) (adopting the *Stratte-McClure* holding)...............................................................................................................35

*S.E.C. v. Gabelli*,
653 F.3d 49 (2d Cir. 2011)...........................................................................................28

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)...........................................................................................35

*Tefft v. Seward*,
689 F.2d 637 (6th Cir. 1982) .......................................................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................35, 36, 37, 38

*Warren v. Prison Health Servs. Inc.*,
576 F. App'x 545 (6th Cir. 2014) ................................................................................38

*Willis v. Big Lots, Inc.*,
No. 2:12-cv-604, 2016 WL 8199124
(S.D. Ohio Jan. 21, 2016) ...........................................................................................21

*Winslow v. BancorpSouth, Inc.*,
No. 3:10-00463, 2011 WL 7090820
(M.D. Tenn. Apr. 26, 2011).........................................................................................42

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78j(b)................................................................................................. *passim*
§78u-4(b)(1)-(2)...........................................................................................11
§78u-4(b)(2)..................................................................................................35
§78u-5 .........................................................................................................31
§78u-5(c)(1)(A)............................................................................................31

17 C.F.R.
§229.503......................................................................................................33
§240.10b-5(b)...............................................................................................24

**Page**

Federal Rules of Civil Procedure
    Rule 8(a)............................................................................................................11
    Rule 9(b) .........................................................................................11, 12, 16, 45
    Rule 10b-5....................................................................................................23, 35
    Rule 12(b)(6)..............................................................................................11, 22

Federal Securities Laws ...................................................................................................1

Private Securities Litigation Reform Act of 1995 ............................................... *passim*

Securities Exchange Act of 1934...........................................................2, 5, 6, 7, 12, 45

## SUMMARY OF PRINCIPAL ARGUMENTS AND PRELIMINARY STATEMENT[1]

Lead Plaintiff Daniel B. O'Leary ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss the Consolidated Amended Complaint of defendants L Brands, Inc., ("L Brands" or the "Company"), Leslie H. Wexner, and Stuart B. Burgdoerfer (collectively, "Defendants").

L Brands had a long history of paying an attractive and steady dividend, which acted to support the price of L Brands common stock. ¶30. This case focuses on Defendants' refusal to admit to public shareholders that L Brands' business had deteriorated to the point at which there was a substantial undisclosed risk that the Company's large dividend would need to be reduced. ¶49. The Class Period (May 31, 2018 to November 19, 2018) begins after L Brands had already suffered from a protracted decline in operating performance from its key Victoria's Secret and PINK business lines. ¶3. By this time, fierce retail competitors had forced L Brands to offer heavy discounts and promotions, negatively impacting the Company's margins, operating income and cash flow from operations. *Id*. These business and financial problems made it increasingly more difficult for the Company to service its massive $9 billion in debt, which had been downgraded by the rating agencies to junk bond status. ¶¶48-49.

The Company's bleak condition and outlook caused the sustainability of its dividend to become a hot topic of interest during L Brands' investor conferences and analyst calls during the Class Period. But, instead of answering those questions honestly and fully, Defendant Burgdoerfer denied there was any reason to believe the Company's poor liquidity and operating performance increased the risk that L Brands would not continue to pay its $2.40 per share annual dividend for the

---

[1] "¶__" refers to paragraphs in Plaintiff's Consolidated Amended Complaint for Violation of the Federal Securities Laws filed on December 20, 2019 (ECF 25) (the "Complaint"). "MTD" refers to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint filed on February 18, 2020 (ECF No. 31). All emphasis is added and internal citations and quotes are omitted unless otherwise indicated.

foreseeeabnle future.  ¶5.  Defendant Burgdoerfer falsely and misleadingly made statements such as, the "dividend is very safe;" "[w]e have the cash flow needed and cash balances, et cetera, to sustain the dividend" (¶63); and "we're very comfortable with the dividend."  ¶66.  Contrary to his statements, however, Defendant Burgdoerfer knew, or recklessly disregarded, that the dividend was not "very safe" because there was a substantial risk the dividend amount would need to be reduced due to the weak cash flow of the business and the need to pay down debt.  ¶¶63-64.  In addition to Defendant Burgdoerfer's statements, the Company's SEC filings and a November 8, 2018 press release contained materially false and misleading statements and omitted material information about the risk to the dividend.  ¶¶86-96.

On November 19 and 20, 2018, Defendants announced that L Brands had decided to cut its dividend in half, beginning in March 2019, in order to bring its "dividend yield in line with relevant comparisons" and that the freed-up cash from the reduction will primarily be used to pay down debt. ¶102.  Defendants also revealed that the decision to cut the dividend was made during the third quarter of 2018, so Defendants' knew about the reduction at some point between August 5, 2018 and November 3, 2018.  Therefore, while Defendants announced the declaration of the Company's dividend payable on December 7, 2018 and bragged it was "the company's 176th consecutive quarterly dividend," in the November 8, 2018 press release (¶86), they hid from investors that L Brands had already decided to reduce the dividend by 50% beginning in March 2019.  ¶105.

In response to the Company's announcements on November 19 and 20, the price of L Brands common stock declined approximately 18% on extremely heavy trading volume, from $34.55 per share on November 19, 2018, to $28.43 per share on November 20, 2018.  ¶107.

The Complaint satisfies the requirements for pleading a securities fraud claim as set forth by the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  Defendants'

motion to dismiss is limited to the two issues of whether the Complaint adequately alleges (i) materially false and misleading statements and omissions; and (ii) scienter.

*First*, Defendants seek to distort the timeline of events by attempting to lengthen the time between Defendants' statements and the reduction in L Brands' dividend by focusing on the date the dividend *was paid* in March 2019 as opposed to the date the Company *announced* the reduction in the dividend.  MTD at 33.  L Brands disclosed the reduction in the dividend on November 19, 2018, which was less than two weeks after the Company's November 8, 2018 press release discussing the Company's dividend.  ¶¶86-87, 102.  Defendants other statements are only several months before the announcement.  ¶¶63, 66, 69.

*Second*, the Complaint adequately alleges Defendants issued materially false and misleading statements and omitted material information.  Defendant Burgdoerfer's positive and false statements about the sustainability of the dividend in direct response to questions from analysts are actionable and are not puffery or soft information.  His statements were objectively false when made and he failed to disclose the substantial risk faced by L Brands at the time that the dividend would need to be reduced.  Defendants' statements were not protected by the PSLRA's Safe Harbor.  Their statements were not forward-looking because they referred to facts as they existed at the time of the statements, and in any event, Defendants did not issue meaningful cautionary language.

*Third*, Defendants were under a duty to disclose the omitted information, including the negative impact of competition and the Company's debt on L Brand's dividend.  Once Defendants spoke about these topics, they were under a duty to speak truthfully and fully and the information was required pursuant to Items 303 and 503 of Regulation S-K.

*Finally*, Defendants argue that the Complaint fails to plead scienter with the requisite particularity.  MTD at 32. Defendants' argument ignores much of the Complaint, including allegations showing that Defendants omitted material information from the November 8, 2018 press

- 3 -

release even though they already knew the dividend would be reduced. ¶86-87. When viewed holistically, as they must be, the Complaint's well-pled allegations create a strong inference of scienter that is much more compelling than any inference of Defendants' innocence.

Defendants' motion is without merit and Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.

## I. STATEMENT OF FACTS

### A. The Company and Its Business

L Brands operates in three segments, Victoria's Secret, Bath & Body Works, and Victoria's Secret and Bath & Body Works International. The Victoria's Secret segment sells women's intimate and other apparel, personal care and beauty products under the Victoria's Secret and PINK brand names. ¶28. Prior to and during the Class Period, Victoria's Secret and Bath & Body Works were the Company's two principal business segments, accounting for more than one-half and approximately one-third of L Brands' total revenue, respectively. ¶29.

### B. L Brands' Consistent and Large Dividend Supported Its Stock Price

As L Brands regularly highlighted to investors, it had a long history of issuing a lucrative and often increasing dividend. ¶30. Investors were attracted to the Company's high dividend and analysts commented that it supported the Company's stock price. As described by a Wells Fargo Securities Analyst on May 24, 2018, "[w]ith a current dividend yield of 7-8% (the highest in our coverage), the dividend offers a backstop to LB shares. . . ." Defendant Burgdoerfer echoed this view, stating on June 6, 2018, during a Robert W. Baird Conference that the "dividend is a very important source of return for many shareholders, we believe." ¶31.

In fact, even though the Company's business had begun to decline significantly in the years leading up to the Class Period, L Brands maintained and even increased its dividend. ¶32. This caused L Brands' dividend yield and dividend payout ratio to increase and become extremely high

relative to other public companies.[2] ¶33. For example, during 2017, L Brands' dividend yield was nearly 7% compared with the mean yield of 2.12%, and only 25% of companies had a yield greater than 3.47%. ¶¶33-34. That same year, L Brands' dividend payout ratio was 70%. In comparison, the median dividend payout ratio for all publicly traded U.S. firms was 41.58%. *Id.* During 2018, L Brands' dividend yield was nearly 9% and its payout ratio increased to 103%. *Id.*

### C. The Company's Business Was in Free-Fall Leading Up to the Class Period and Its Hefty Dividend Was Not Sustainable

At the same time L Brands was paying such a high dividend, its financial performance was worsening and the Company's dividend was placing a financial strain on the Company. ¶37. In the few years leading up to the start of the Class Period, the Victoria's Secret and PINK lines of business experienced a significant decline in financial performance as new lingerie brands, such as Aerie, ThirdLove and Savage X Fenty, and emerging direct-to-consumer intimate apparel brands, became more popular. ¶38.

Compounding the adverse financial effects of competition, in 2016 L Brands announced a strategic decision to exit certain non-core Victoria's Secret categories, including swim and apparel, which caused L Brands to lose approximately $400 million in annual sales. ¶39. L Brands also lost a material amount of business because it eliminated the Victoria's Secret catalog, with an annual circulation to nearly 250 million households. ¶39. These events resulted in significant customer base and market share losses by Victoria's Secret. ¶40 (see chart showing comparable store sales at Victoria's Secret and PINK were roughly flat to down, while competitor Aerie's were skyrocketing). ¶42. And L Brands' revenue and net income growth rates plummeted from approximately 6.1% and 14% in 2015 to approximately 0.5% and -16% in 2017, respectively. ¶42 (see graph of falling income growth and revenue growth rates).

---

[2] A dividend payout ratio is defined as dividends paid per share divided by average price per share. ¶33.

- 5 -

Victoria's Secret and PINK engaged in heavy promotional activities by offering consumers large discounts and giving away free items in an attempt to drive sales and retain market share in the face of increasing competition.  ¶43.  This adversely impacted the Company's profit margins and cash flows.  ¶¶43-44.  As a result, L Brands' Shareholders' Deficit nearly *tripled*, from $259 million on January 30, 2016, to $753 million on February 3, 2018, and its working capital declined by *nearly 50%*, from $2.28 billion on January 30, 2016, to $1.26 billion on February 3, 2018.[3]  ¶45.

The adverse trends experienced by the Company between 2015 and 2017 caused the amount of cash flow available to finance L Brands' operations after the payment of ordinary dividends to decline by more than 50%, from $1.44 billion in 2015 to only $720 million in 2017.  ¶46 (see graph showing steep drop in operating cash flow available after ordinary dividends).  After the payment of dividends, L Brands was left with limited financial ability to fund its ongoing operations, finance its capital expenditure requirements and manage its $8.9 billion debt level.  ¶47.  L Brands' poor financial condition caused the Company's debts to be rated at the junk bond level.  ¶48.  This, in turn, pressured L Brands to reduce its high debt level to maintain or improve its credit ratings.  *Id*.

**D.      Defendants Denied and Refused to Disclose the Substantial Risk that the Company's Large Dividend Would Need to Be Reduced During the Class Period**

By the start of the Class Period, L Brands' financial condition had deteriorated to the point at which the annual $2.40 dividend amount was not sustainable.  Nevertheless, Defendants were adamant the dividend was secure based on the then-current financial performance and condition of the Company.  ¶49.  Defendants, however, knew or recklessly disregarded, that competition to Victoria's Secret and PINK was increasing and negatively impacting the Company's business, and that the financial performance of Victoria's Secret and PINK were rapidly deteriorating with no clear

---

[3]      Shareholders' equity represents the stockholders residual claim in a corporation's assets after debts have been paid.  When total liabilities are greater than total assets, stockholders have negative equity, which is also referred to as the shareholders' deficit.

end in sight.  *Id.*  As a result, Defendants lacked any reasonable basis to believe the Company's financial performance would enable it to maintain its existing dividend, and at the same time, reduce its large debt level and fund its operations.  *Id.*  Contrary to their misleadingly positive statements, Defendants knew or recklessly trivialized the risk, which in realty was substantial, that the Company's dividend would need to be reduced.  *Id.*

In early 2018, securities analysts noted the Victoria's Secret business segment continued to generate negative comparable store sales and significantly lower margins during the crucial 2017 holiday season and that the results were disconcerting compared with a stronger holiday season experienced by the industry generally.  ¶51.  Then, in the weeks immediately before the start of the Class Period, securities analysts observed that intensifying low-priced competition, increasing industry pricing pressure, declining merchandise margins, market share losses, intense promotional activity and weak comparable store sales continued to plague the Company even though store and mall traffic generally continued as expected.  ¶52.

### E.  Defendants' Materially False and Misleading Statements and Omissions

By the start of the Class Period, as a result of the Company's steep decline in financial performance, securities analysts closely covering L Brands common stock questioned Defendants about the sustainability of L Brands' dividend.  ¶¶50, 53.  Their questions underscored how the financial distress within the Victoria's Secret business segment was adversely impacting the Company's overall financial performance.  ¶51.

Instead of acknowledging the reality that the decline in Victoria's Secret's business put substantial pressure on the sustainability of the Company's dividend, Defendants denied there were any irregular risks to the payment of the full dividend and failed to disclose the risks when discussing the Company's dividend in SEC filings and press releases.  ¶53.  Defendant Burgdoerfer repeatedly ignored the true impact of the weakened condition of the Company during investor

conferences and analyst calls, and painted a false rosy picture of the sustainability of the Company's dividend.  Defendants' refusal to acknowledge these risks to investors artificially inflated the price of L Brands common stock.  ¶50.  For example, Defendant Burgdoerfer made the following positive statements about the sustainability of the dividend:

**May 31, 2018 RBC Capital Markets Investor Conference:**

- "We think that dividend is very important";

- "[t]he company, in its history, has never reduced the dividend," and the "dividend is very safe.";

- "We have the cash flow needed and cash balances, et cetera, to sustain the dividend";

- "we believe that the dividend is important to shareholders and that we're able to, with current year cash flow, sustain our dividend."  ¶63.

**June 6, 2018 Robert W. Baird Investor Conference:**

- "The dividend is a very important source of return for many shareholders";

- "we're confident that we can maintain the dividend," "we're comfortable with the current dividend level in the business"; and "we're very comfortable with the dividend";

- "As you've looked at our cash flow results, the free cash flow of the business is sufficient to pay the dividend"; "And we've been carrying excess cash as a business beyond what's needed for the day-to-day working capital needs and financing needs of the business";

- "So we're comfortable with our cash position, our liquidity position, our capital structure.  And we're comfortable with the current dividend level in the business."  ¶66.

**August 22, 2018 Earnings Conference Call:**

- "We have the appropriate conversations with our board";

- "We're comfortable with [the dividend],";

- "We're comfortable with [the dividend] based on what we know at this point . . ."  ¶77.

- 8 -

These statements created the clear – and false – impression that investors could be confident they would earn a $2.40 per share annual dividend for the foreseeable future even though the Company's margins had been reduced, the Company had a large amount of debt, and the Company needed to reduce its debt to maintain or improve its credit ratings.  ¶37.  Contrary to Defendant Burgdoerfer's statements, the dividend was not "safe" and there was a substantial risk L Brands would need to reduce its dividend to pay down debt and finance operations.  ¶64.

In addition to making affirmatively false and misleading statements, Defendants omitted material information about the substantial risk to the dividend amount in the Company's Forms 10-Q filed on June 7, 2018 (¶¶71, 88-96) and September 7, 2018 (¶¶80, 88-96), and in a November 8, 2018 Company press release (¶86).  The press release and both SEC filings discussed the Company's dividend but failed to warn investors of the substantial risk it would need to be reduced.

Even *after* L Brands had already decided to reduce the dividend, Defendants hid the risk from investors.  ¶¶86-87.  Specifically, as Defendant Burgdoerfer admitted on November 20, 2018, the Company had decided, during the third quarter, to cut its dividend in half starting in March 2019, in order to reduce the Company's debt.  ¶104.  The Company's third quarter ran from August 5, 2018 to November 3, 2018, so Defendants knew, by at least November 3, 2018 – if not earlier – that the Company's board of directors decided to slash the dividend.  ¶87.  Nevertheless, Defendants failed to report the reduction in the dividend to investors on November 8, 2018, when it issued a press release discussing its financial performance and announcing the declaration of the Company's regular quarterly dividend of $0.60 per share.  ¶¶86, 105-06.  Unbeknownst to investors, they would only earn a $0.30 per share dividend starting in March 2019.

> **F.**     **L Brands Announces a Fifty Percent Reduction in Its Dividend and Substantial Changes to Its Business**

In a press release after the market closed on November 19, 2018, and during a conference call on November 20, 2018 before the opening of the market, the Company announced its financial

and operational results for the third quarter 2018, for the period ended November 3, 2018, and revealed that L Brands had decided to reduce its annual ordinary dividend from $2.40 to $1.20, beginning with the quarterly dividend to be paid in March 2019, in order to deleverage the Company's balance sheet. ¶¶102-03; 105-06. The Company acknowledged in the press release that the "dividend reduction will be utilized primarily to contribute to the deleveraging of the Company's balance sheet" and will "result in a dividend payout ratio that is more consistent with the company's past practice, and a dividend yield in line with relevant comparisons." ¶102.

During the November 20 conference call, Defendant Burgdoerfer admitted that L Brands had decided, during the third quarter of 2018, to reduce its dividend to deleverage the Company. ¶104. He stated that the "re-setting of the dividend" would "better match the operating results of the business." ¶105. Additionally, Defendant Burgdoerfer acknowledged that the $2.40 annual dividend amount was high relative to the financial performance of the Company and that "the ratios, whether it's the dividend payout ratio, the yield, [or] the adjusted leverage ratios, have gone out of the historic ranges for us." ¶106.

In response to the Company's announcements on November 19 and 20, the price of L Brands common stock declined approximately 18% on extremely heavy trading volume, from $34.55 per share on November 19, 2018, to $28.43 per share on November 20, 2018. ¶107. Analysts attributed the decline in L Brands common stock on November 20, 2018 to the reduction in the dividend. ¶108.

**G.      L Brands' Business Continues to Deteriorate After the End of the Class Period and L Brands Restructures Its Board of Directors**

After the end of the Class Period, Victoria's Secret's financial performance continued to deteriorate, including a steep decline in comparable store sales and earnings per share. ¶¶110-11; 114-15; 118. On April 18, 2019, in response to concerns about the composition of the Company's

board of directors raised by institutional investor Barington Capital Group, L.P., L Brands announced a slate of directors that included "three independent directors."  ¶116.

## II.    LEGAL STANDARD

On a Rule 12(b)(6) motion, a court "must construe the complaint in a light most favorable to the plaintiff and accept all factual allegations as true."  *Ind. State Dist. Council of Laborers v. Omnicare, Inc.* ("*Omnicare II*"), No. 12-5281, 2013 WL 2248970, at *3 (6th Cir. May 23, 2013).  To avoid dismissal, a complaint must simply allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortgage Corp.*, 830 F.3d 376, 383-84 (6th Cir. 2016); *accord Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 694 (6th Cir. 2017), *cert. denied*, *Cmty. Health Sys., Inc. v. New York City Emps. Ret. Sys., Inc.*, 139 S. Ct. 310 (2018).  A securities fraud claim must satisfy Rule 9(b) and the PSLRA.  *Ohio Pub. Emps.*, 830 F.3d at 384.  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  15 U.S.C. §78u-4(b)(1)-(2).  All other allegations are subject to *Twombly* and Rule 8(a).

- 11 -

The Complaint meets all pleading requirements and adequately alleges each element of Plaintiff's claims. Defendants' Motion should be denied.

## III.  ARGUMENT

### A.  The Complaint Alleges Defendants' Fraud with Particularity

The Exchange Act prohibits "the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). A plaintiff "[s]uccessfully plead[s] an actionable material misrepresentation or omission" when the complaint alleges facts showing: "(1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). "To plead 'the facts constituting the alleged violation,' the complaint 'must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *In re Miller Energy Res. Sec. Litig.*, No. 3:11-cv-386-TAV-CCS, 2014 WL 415730, at \*7 (E.D. Tenn. Feb. 4, 2014).

The Complaint details each of Defendants' materially false and misleading statements and omissions.

### 1.  Defendants Issued Materially False and Misleading Statements and Omissions

The Complaint particularizes Defendants' materially false and misleading statements and omissions in accordance with Rule 9(b) and the PSLRA by specifically identifying "what" statements are alleged to be false and misleading (¶¶63, 66, 69, 71-72, 77, 80-81, 83, 86); "who" made the statements (*i.e.*, L Brands (*e.g.*, ¶¶71-72, 81, 83, 86), Burgdoerfer (*e.g.*, ¶¶63, 66, 69, 77), Wexner (*e.g.*, ¶¶71, 80)); "when" and "where" they were made (*e.g.*, on May 31, 2018 during RBC Capital Markets Conference ¶63; in November 8, 2018 press release ¶86; *see also* ¶¶66, 69, 71-72,

77, 80-81, 83); and "why" the statements were materially false and misleading or what material information was omitted (s*ee, e.g.*, ¶¶64, 65, 67-68, 70, 71, 73, 78-79, 80, 82, 84, 87).[4]

The Complaint adequately alleges Defendants made materially false and misleading statements and omitted material information concerning, among other things: (i) the stability of the amount of the Company's dividend (*see, e.g.*, ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95); (ii) the risk that existed throughout the Class Period that the dividend may need to be reduced as a result of the Company's worsening financial performance and high debt level (*see, e.g.*, ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95); the negative impact competitors were having, and were expected to have, on L Brands' profitability (*see, e.g.*, ¶¶69-70); and (iii) that positive statements about the Company's ability to sustain the dividend amount lacked reasonable basis (*see, e.g.*, ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95).

As a result of the Company's high debt level, poor credit ratings, and deteriorating operating performance and financial condition, analysts repeatedly asked Defendants about the sustainability of the Company's $2.40 per share annual dividend throughout the Class Period. ¶¶63, 77.  Instead of publicly acknowledging that there was a substantial risk and the Company may need to reduce its dividend, Defendants minimized the negative impact the Company's weakening financial condition, including its high debt, was having on the Company.  ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95.  Defendants either painted an inaccurate rosy picture of the Company's ability to maintain the dividend, or when providing facts about the dividend, failed to apprise investors of the substantial risk to the dividend amount.  ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95. The consistent and ongoing false positive statements about the dividend combined with material

---

[4]    ¶64 lists several reasons why the statements referenced in ¶63 were materially false and misleading.  Subsequent paragraphs in the Complaint describe why other statements were false and misleading and sometimes refer back to the reasons set forth in ¶64 in support thereof.  Due to an inadvertent typographical error, ¶¶73, 78, 82, 87 refer back to ¶63 instead of ¶64.

- 13 -

omissions about the risk to the dividend created the false impression that the dividend was safe and secure for the foreseeable future. In other words, Defendants' provided comfort to investors that if they purchased L Brands common stock during the Class Period, they would earn an annual dividend of $2.40 per share.

Specifically, Defendants misrepresented or failed to disclose: (a) that the Victoria's Secret and PINK businesses were having, and would continue to have, a material adverse effect on the Company's cash flow, liquidity and net debt levels; (b) that the financial strain put on the Company due to the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to cut its dividend; (c) that there was a substantial risk the Company would need to reduce its dividend to pay down debt and finance operations; (d) that the positive statements about the ability of the Company to sustain its dividend lacked a reasonable basis; and (e) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects. *See, e.g.*, ¶64.

### 2. Defendant Burgdoerfer's Materially False and Misleading Statements to Analysts and Investors

On the first day of the Class Period, May 31, 2018, in response to a question about the dividend from an analyst at the RBC Capital Markets Consumer and Retail Conference, Defendant Burgdoerfer stressed the importance of the Company's dividend and reassured investors the $2.40 annual dividend amount would not be reduced. ¶63. Defendant Burgdoerfer acknowledged, "a large number of shareholders place high value on the dividend," stressed that the "company, in its history, has never reduced the dividend," and falsely described the dividend as "very safe." ¶63.

At the Robert W. Baird Investor Conference on June 6, 2018, Defendant Burgdoerfer again falsely and misleadingly reassured investors the Company's dividend amount was sustainable. ¶66. He reiterated, "[t]he dividend is a very important source of return for many shareholders," and stated, without reasonable basis, "we're confident that we can maintain the dividend," and "we're

very comfortable with the dividend." ¶66. Similarly, Defendant Burgdoerfer, without reasonable basis, stated, "our cash flow results, the free cash flow of the business is sufficient to pay the dividend."

On August 23, 2018, L Brands held a conference call with analysts and investors to discuss the Company's operations and earnings for the second quarter of 2018. ¶77. During the conference call, a securities analyst questioned management about L Brands' dividend. ¶77. Similar to questions during the investor conferences in May and June, an analyst pointed out the Company's "very, very high dividend yield despite" disappointing financial results, and asked about "capital deployment." *Id.* And like he did at the investor conferences, Defendant Burgdoerfer minimized the risk the dividend would need to be reduced by pointing out that "a lot of our earnings and our cash come in the fourth quarter," and stating "[w]e're comfortable with [the dividend] based on what we know at this point. . ." *Id.* Therefore, in addition to failing to disclose the risk to the dividend, Defendant Burgdoerfer also created the false impression that the dividend would be maintained as long as the fourth quarter performs in line with expectations and falsely indicated that he was in possession of undisclosed information supporting his statements. ¶77.

As L Brands announced on November 19, 2018, third quarter adjusted earnings per share of $0.17 greatly exceeded the Company's guidance of $0.00 to $0.05 (as of the August 23 press release), and the Company increased full year 2018 earnings guidance. Exhibits K at 1; L at 1 of the Declaration of Anthony J. O'Malley in Support of Defendants' Motion to Dismiss (the "O'Malley Decl."). Contrary to Defendant Burgdoerfer's assurance the dividend would be maintained if the fourth quarter performs in line with expectations, L Brands reduced its dividend *before* the start of the fourth quarter and even though L Brands expected to *exceed* prior expectations. ¶87. Therefore, the risk to the dividend existed irrespective of L Brands performing in line with expectations.

- 15 -

Each of Defendant Burgdoerfer's materially false and misleading statements and omissions are actionable.

### 3. Defendants' Arguments Directed at Defendant Burgdoerfer's Statements Are Without Merit

Defendants argue that Defendant Burgdoerfer's positive statements about the dividend at the May and June 2018 investor conferences are not actionable because L Brands: (i) "did not actually reduce its dividend until March 2019 - roughly ten months after the Investor Conferences," and (ii) L Brands "maintained its dividend at the same level through December 7, 2018." MTD at 14. Defendants' arguments misconstrue Plaintiff's allegations and are without merit. First, Defendants' statement that the dividend was not reduced until March 2019 conflates the date of the announcement of the reduction to the dividend with the date of the payment of the reduced dividend. Defendants' disingenuous attempt to make it appear as if more time had passed between Defendants' false statements and the change to the dividend, however, is of no consequence to whether Defendants' statements were materially false and misleading and Defendants provide no authority to the contrary.[5] Plaintiff alleges Defendant Burgdoerfer's statements were materially false and misleading *at the time they were made*, which is all that is required under Rule 9(b) and the PSLRA. *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1148 (D. Ariz. 2017) (stating that Rule 9(b) requires a complaint to state why statements are false or misleading "'at the time they were made.'").

Additionally, contrary to Defendants' argument, the timing of the decision to reduce the dividend supports Plaintiff's claims. Defendants announced the reduction in the dividend on

---

[5] Defendants' citation of *In re International Business Machines Corp. Securities Litigation*, ("*In re IBM*"), 163 F.3d 102, 107 (2d Cir. 1998) is distinguishable on grounds that all of the statements that Plaintiff alleges were false and misleading were made *during* the class period (as opposed to being made *prior to* the class period, which was the case in *In re IBM*). Moreover, in contrast to *In re IBM*., Defendants here had already decided to reduce the dividend when certain misleading statements were made. ¶87.

- 16 -

November 19, 2018, not during March 2019. And, as Defendant Burgdoerfer admitted, L Brands had decided to reduce the dividend during the third quarter of 2018, which ran from August 5, 2018 to November 3, 2018. Due to the critical importance of the dividend to L Brands' stock price, it is not plausible that Defendants had not considered the risk to the reduction of the dividend during the entire Class Period or that it "simply materializ[ed] out of the blue." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 679 (6th Cir. 2005) (stating that a "major decision such as a recall by a Fortune 500 corporation is unlikely to simply materialize out of the blue."). Defendants' characterization of Plaintiff's claims as "fraud by hindsight" is also inapplicable to whether the statements are actionable because fraud by hindsight relates to scienter, and not whether statements are actionable. MTD at 15; *Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019) (". . .fraud-by-hindsight issues arise in the context of the scienter factor, not the misrepresentation factor.").

Defendants' argument that certain of Defendant Burgdoerfer's statements about the dividend during the investor conferences are inactionable "puffery" is unavailing, especially since courts typically "proceed cautiously" when considering arguments that alleged false statements are mere inactionable puffery. *See In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70 (S.D. Ohio 2006) ("Following the devastating corporate scandals occurring in the past decade, most courts now consider statements of corporate optimism with more hesitation" and should "proceed cautiously when examining [d]efendants' assertions that their enthusiastic statements . . . were 'puffery' as opposed to reckless or fraudulent statements.") (internal citations omitted).

Puffery is an attack on materiality, often raising fact-based contentions not susceptible to resolution on the pleadings. *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017). This is because "context matters when analyzing materiality." *Omnicare*, 769 F.3d at 478. "[E]ven superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Grae*,

2017 WL 6442145, at *14. "'What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.'" *Bridgestone*, 399 F.3d at 672. On a motion to dismiss, courts must construe "the Complaint in a light most favorable" to the plaintiff in determining whether a statement could be deemed a material misrepresentation by a reasonable fact-finder. *Id.* at 672-73.

Here, like in *Grae*, while the "allegedly false statements are numerous, they are offered . . . in service of a single, central theory of liability." 2017 WL 6442145, at *13. Specifically, by the start of the Class Period, analysts and investors were concerned about the ability of the Company to maintain its very high dividend due to its worsening profitability and large debt burden. Defendant Burgdoerfer knew the importance of the dividend to investors and the Company's stock price but misled investors about the risk – that existed at the time of his statements – that the dividend may need to be reduced. ¶¶63, 66.

Defendants' assertions take the exact approach the Sixth Circuit has held is improper. Statements "'must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery')." *Bridgestone*, 399 F.3d at 672. For example, when taken in full context, Defendants' argument that false and misleading statements such as the "dividend was 'very safe'" and "we're very comfortable with the dividend" need to be viewed in context with the financial problems facing the Company, keen interest by analysts and investors in the sustainability of the dividend amount, and Defendant Burgdoerfer's other statements, such as his comment that "the company, in its history, has never reduced the dividend," and his reference to the Company having the "cash flow needed and cash balances, et cetera, to sustain the dividend." ¶¶63, 66.

- 18 -

Defendant Burgdoerfer made concrete statements about the relationship between the capital structure, profitability and cash position of the Company and the ability of the Company to maintain its dividend. *Bridgestone*, 399 F.3d at 674 (rejecting statement as puffery because it was "an assertion of a relationship between data and a conclusion, one that a finder of fact could test against record evidence."). The suggestion that investors would view Defendant Burgdoerfer's overly positive statements about the dividend as mere puffery not only fails to view "the Complaint in the light most favorable" to Plaintiff, but cannot be reconciled with the fact that analysts acutely and repeatedly questioned Burgdoerfer about the sustainability of the dividend throughout the Class Period and he was aware of the importance of the dividend to investors. *Grae*, 2017 WL 6442145, at *11; ¶¶63, 66, 77.

Defendants do not dispute that the dividend and the maintenance of the dividend amount were material. In context, these statements together were intended to convince investors that there was no meaningful risk that the dividend would be reduced, which caused an artificial inflation in L Brands common stock. Defendants' attempt to convince the Court to excuse materially misleading statements to shareholders under the pretense of puffery should be rejected. *Bridgestone*, 399 F.3d at 674 (holding that "'opinion or puffery . . . in particular contexts when it is both *factual and material . . . may* be actionable.'") (citing *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).

Citing cases from outside the Sixth Circuit that are all distinguishable, Defendants mischaracterize Plaintiff's claims as focusing on "statements predicting future dividends" or "inactionable statements of corporate optimism." MTD at 15-16. Defendants' cases are distinguishable.

In *In re Seadrill Ltd. Securities Litigation*, No. 14 Civ. 9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016) and *Genna v. Potts*, No. HAR-94-3260, 1995 WL 222043 (D. Md. Apr.

13, 1995), the dividends at issue were reduced because of unforeseen events outside of the defendants' control that took place after their statements, but here Plaintiff alleges Defendants' statements were false and misleading based on the facts as they existed at the time of the statements. *Seadrill*, 2016 WL 3461311, at *7 (the court described the complaint as "fundamentally alleg[ing] a failure to warn sufficiently of sanctions . . . that were not within Defendants' control and about which they had no special insight or information"); *Genna*, 1995 WL 222043, at *5 (the court found, "there are no facts indicating that Defendants knew in advance or should have been aware that the largest increase in interest rates in 13 years was going to take place in November, the main cause of RMC's need to reduce the monthly dividend."). Here, contrary to the facts in *Seadrill* and *Genna*, Defendant Burgdoerfer misrepresented and omitted facts that existed at the time of his statements and the reduction in L Brands' dividend was not caused by an external event outside L Brands' control.

*Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721 (D. Md. 2001) and *Genna* are distinguishable because they involved statements that would not have been reasonably relied upon by investors and were therefore not material. In *Graff*, the court rejected the plaintiffs' attempt to hold the defendants liable for statements made by analysts about what the defendant company said about its dividend, but Plaintiff here alleges statements made by the Defendants. *Id*. at 725, 729. Additionally, the court held, "[t]he descriptions of the dividend as 'sacred' and 'sacrosanct' are so obviously exaggerated that a reasonable investor would not credit them as being a useful, reliable part of the mix of information available on Prime Retail." *Id*. at 729. Here, many of Defendants' statements were made in response to direct questions from analysts, so a reasonable investor would have considered them important. In *Genna*, the defendants' statements, such as "we're still optimistic that we can maintain the 26 cents dividend" and "that's our goal" were "mere expressions of optimism and too indefinite to be considered material." 1995 WL 222043, at *4. Here, Plaintiff alleges

- 20 -

Defendants were aware of the substantial risk to the Company's dividend at the time the statements were made.

*In re Duane Reade, Inc. Securities Litigation*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) involved vague purely forward-looking statements related to financial and earnings targets, and the court found there was "specific cautionary language" related to those statements. *Id*. at 6. Here, Defendant Burgdoerfer supported his statements with specific facts, the statements were false and misleading based on facts that existed at the time, and Defendants did not provide adequate cautionary language.

Furthermore, Defendants incorrectly argue that Defendant Burgdoerfer's statements "are not actionable" because, according to Defendants, they conveyed "soft" forward-looking information. MTD at 16. First, Plaintiff alleges claims based on the risk the dividend may not be maintained as those risks existed at the time of the statements. Plaintiff is not alleging Defendants misrepresented that the dividend **would** be reduced. Second, the Complaint contains detailed allegations of the financial strain experienced by the Company as a result of competition to Victoria's Secret (¶42), its large debt level (¶36), the impact the debt had on the Company's credit rating (¶37), and the risk the dividend would need to be reduced (¶¶46-53). These are facts and hard information that are verifiable. *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 WL 8199124, at *18 (S.D. Ohio Jan. 21, 2016) (holding that certain statements were materially false when made because "[d]efendants were aware at the time those statements were made . . . that the Company was experiencing difficulties," and further, because "this information [was] verifiable.").

Additionally, Defendants argue that Defendant Burgdoerfer's statement during the August 23 conference call that "[w]e're comfortable with [the dividend]" cannot support an inference that L Brands' dividend would be maintained at the same level because he also said Company management and the Board "periodically" evaluate the dividend. MTD at 20-22. Defendant Burgdoerfer's

- 21 -

statements are still materially misleading because he failed to disclose the negative conditions that existed at that time.  That the Company's board regularly reviews the dividend did not reveal to investors the truth that there was a substantial risk to the maintenance of the dividend.  MTD at 21. In fact, Defendant Burgdoerfer's statement that the board evaluated the dividend "periodically" could be viewed by a reasonable investor to have reinforced that the dividend would be maintained. Moreover, his statement regarding the board's periodical review of the dividend indicates that the board had already recently evaluated it and Defendant Burgdoerfer did not specify any potential areas of concern.  ¶77.

Defendants rely heavily on the Second Circuit's opinion in *In re IBM* to support their positions. MTD at 20-21.  *In re IBM*, however, is both inapplicable and distinguishable.  First, there is a considerable procedural difference because *In re IBM* was decided on summary judgment after the plaintiffs had taken discovery regarding the disclosures at issue while Defendants' motion here is directed to the pleading, in which inferences need to be drawn in favor of the Plaintiff.  *In re Ford Motor Co. Sec. Litig.*, 184 F. Supp. 2d 626, 630 (E.D. Mich. 2001) ("While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor . . . .").  Second, while the statements in *In re IBM* on the surface may appear similar because they relate to dividends, they are actually quite different, and Plaintiff here challenges Defendants' statements for different reasons than those alleged by the plaintiffs in *In re IBM*.

Defendants point to statements from *In re IBM* such as there was "no plan, no desire, and . . . no need to cut the dividend" and "[w]e have no plans nor need to do anything about the dividend." *In re IBM*, 163 F.3d at 105; MTD at 20-21.  The plaintiffs in *In re IBM* alleged those statements contained affirmative misrepresentations because "IBM did have a plan and a need to cut its dividend," which is a challenge to something that IBM planned to do in the future.  Here, Plaintiff does not allege Defendants are liable because they failed to disclose they planned to do something in

the future. Rather, Plaintiff alleges that Defendants failed to disclose that there was a substantial risk – existing at the time of the statements – that Defendants would need to reduce the dividend to pay down debt based on the then-existing financial condition of L Brands. ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95. In other words, the plaintiffs in *In re IBM* challenged what IBM planned to do in the future while Plaintiff here alleges Defendants failed to disclose facts as they existed at the time of the statements.

*In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367, 388 (S.D.N.Y. 2012), which distinguishes the holding in *In re IBM*, is much more closely related to Plaintiff's claims here and is instructive. The defendants in *In re GE*, similar to the statements made by Defendants here, repeatedly made statements that the dividend was "safe" and "secure" and supported them with similar types of facts such as "[w]e're running the company really focused on cash," and "the company really operationally is very well grounded to cover the dividend handily." *Id.* at 380-81, 387. As in *In re GE*, Defendants' statements here "are not the sort of wishy-washy statements at issue in IBM". *Id.* at 388. The court in *In re GE* stated:

> There, the company made mildly optimistic statements such as, "I will say again what I said before. I have no real plan, no desire, and I see no need to cut the dividend." This reference to the absence of a plan in IBM is a far cry from Immelt's "What can you count on?" hard-sell to shareholders. This distinction is important, as the Second Circuit, while affirming summary judgment for IBM, underscored that "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."

*Id.* at 388 (citing *In re IBM*, 163 F.3d at 107). Here, like in *In re GE*, Plaintiff plausibly alleges a reasonable investor would consider Defendant Burgdoerfer's statements to be "tantamount to a guarantee." His statements are supported by specific statements of fact (*i.e.*, ¶66, "the free cash flow of the business is sufficient to pay the dividend"), and he did "not genuinely or reasonably believe them," (*see, e.g.*, ¶64(d) ("the positive statements about the ability of the Company to sustain its

- 23 -

dividend lacked a reasonable basis"); ¶64(e) ("Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects.").

Contrary to Defendants' argument that Defendant Burgdoerfer's statement, "based on what we know at this point," was somehow "cautionary language" (MTD at 21), that statement was itself misleading because it supported the other false and misleading statements about the security of the dividend. ¶78-79. Finally, the statements concerning the importance of the Company's fourth quarter performance indicated that Defendants expected a strong fourth quarter and further supported the notion that the dividend was safe. MTD at 21; ¶77. In fact, L Brands ultimately decided to cut the dividend during the third quarter, so the fourth quarter's results were irrelevant to the safety of the dividend.

### 4. Defendants' Materially False and Misleading Statements and Omissions in L Brands' SEC Filings and Press Release

Plaintiff alleges that Defendants omitted "material fact[s] necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b); ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95. Defendants omitted material facts from the Company's June and September Form 10-Qs and the November 8 press release. ¶¶71, 80, 87, 88-96. "A duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure', or . . . 'an inaccurate, incomplete or misleading prior disclosure.'" *Bridgestone*, 399 F.3d at 669.

L Brands' Forms 10-Q for the first quarter of 2018 filed on June 7, 2018, and second quarter of 2018 filed on September 7, 2018, contained a "Dividend Policy and Procedures" section which provided background information about the setting of the Company's dividend and listed the dividends paid during those quarters and the same quarters the prior year. ¶¶72, 81. The Form 10-Q filed on September 7 also contained a "Credit Ratings" section which discussed the downgrading of the Company's credit ratings by the credit rating agencies. ¶83.

The Forms 10-Q were materially false and misleading when made because, among other reasons, they failed to disclose there was a substantial risk the Company would need to reduce its dividend to pay down debt and finance operations. ¶¶73, 82, 84. The listing of the procedures for the setting of the dividends as well as the dividends paid, without the disclosure of the risks facing the maintenance of the dividend at the time, made the Company's dividend amount appear much safer than it really was. ¶¶73, 82. "Our securities laws . . . 'require an actor to "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'"" *Bridgestone*, 399 F.3d at 670; *see also Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at *18 (S.D. Ohio Sept. 19, 2002); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) ("[A] company that chooses to speak on an issue must provide complete and non-misleading information."). Once Defendants chose to speak about the dividend, they were under a duty to disclose full and accurate information about the dividend, including the risks associated with the potential reduction of the dividend.

Defendants Wexner and Burgdoerfer falsely certified under Sarbanes-Oxley ("SOX") that they "[e]valuated the effectiveness of [L Brands'] disclosure controls and procedures" and that the Company's disclosure controls were effective. ¶¶71, 80, 97-101. Contrary to Defendants' argument, Plaintiff adequately alleges material omissions from L Brands' SEC filings, and therefore the SOX certifications were false and misleading. MTD at 28.

On November 8, 2018, L Brands issued a press release providing sales figures for October 2018, increasing earnings guidance for the third quarter of 2018 to approximately $0.15 per share, compared to its previous guidance of $0.00 to $0.05, "principally driven by outperformance at Bath & Body Works." ¶86; O'Malley Decl. Ex. K at 1. In the press release, L Brands also declared its regular quarterly dividend of $0.60 per share payable on December 7, 2018, which it characterized as "the company's 176th consecutive quarterly dividend." *Id.* The press release presented a

favorable picture of the Company's financial condition and, consistent with Defendants' other Class Period disclosures, made it appear as if there was little risk the dividend would not be maintained for the foreseeable future. Contrary to the appearance from the press release that L Brands was performing well and there was minimal risk to dividend amount going forward, Defendants had already decided to cut the dividend in half, starting with the March 2019 payment, in order to assist in the deleveraging of the Company's balance sheet over time. ¶¶87, 104.

Defendants are wrong that the press release was not materially false or misleading because it did not "say anything about the amount of any future dividends." MTD at 28. Since the press release discussed the Company's dividend, stressed that the Company paid 176 consecutive quarterly dividends, and made other positive statements about the financial performance of the Company, Defendants were under a duty to speak fully and truthfully. Furthermore, Defendants knew by the time of the press release the dividend would be reduced, so they were under a duty to disclose that material fact to investors. The silence on this matter, along with Defendants' other statements during the Class Period, created the impression to reasonable investors that the dividend was safe and secure, when the opposite was true. *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-cv-1293 (CFD), 2011 WL 494753, at *7 (D. Conn. Feb. 7, 2011) ("The company wished to paint a rosy picture of its new business model, but it neglected to depict some of the thorns.").

### 5. Defendants Minimized the Negative Impact of Competition

During the Class Period, increased competition to Victoria's Secret caused the Company to engage in heavy promotional activities, including giving items away for free. ¶43. This in turn, negatively impacted L Brands' profitability and cash available to service the Company's debt and operate the business, leaving less cash available to pay a hefty dividend. ¶37. During the Robert W. Baird conference on June 6, 2018, Defendant Burgdoerfer was asked whether the delay in the recovery at Victoria's Secret was related to "internal disruptions" or "intensifying competitive

pressures." ¶69. Instead of acknowledging the pressure that competition was having on margins, Defendant Burgdoerfer minimized the impact of competition by describing competitors as "not that large at this time." *Id.* He attributed the "pressure on the business" to internal execution issues and stated that "most of [Victoria's Secret's] opportunity in performance is through executing our game plan more effectively." *Id.*

Contrary to Defendants' argument, Plaintiff is not alleging that Defendants failed to simply disclose "Victoria's Secret faced competition" or that Defendant Burgdoerfer was "required to disclose rudimentary economic principles." MTD at 17-18; ¶¶69-70. Rather, Plaintiff alleges those statements were materially false and misleading because they ignored fundamental problems with customer demand for products from Victoria's Secret and minimized the negative impact competitors were having on the Company and its margins, profitability and cash flow. ¶70.

### 6. Defendants Had a Duty to Disclose the Omitted Material Information

The securities laws proscribe both affirmatively false statements and statements that are rendered misleading by the omission of facts that create an impression of a state of affairs that differs in a material way from the one that actually exists. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001). Contrary to Defendants' argument (MTD at 18-19), they were under a duty to disclose the omitted material information necessary for investors to evaluate the risk of investing in L Brands common stock. The statements made by Defendant Burgdoerfer, along with the statements issued by the Defendants in the Company's SEC filings and press releases, created the strong – and false and misleading – impression that there was minimal risk the dividend would need to be reduced for the foreseeable future.

When a statement is made misleading by omissions, as were defendants' statements concerning the dividend during the Class Period, "'[t]he question . . . is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to

- 27 -

speak . . . concerning material details . . . , without revealing certain additional known facts necessary to make his statements not misleading.'" *Bridgestone*, 399 F.3d at 670. Investors had no way to discern the true risk to the dividend since Defendant Burgdoerfer affirmatively misrepresented the safety of the dividend, minimized the impact promotions to combat competitors had on Victoria's Secret's margins and operations, and refused to acknowledge there was a substantial risk the Company may need to reduce the dividend to free up cash to deleverage its balance sheet. ¶¶63, 66, 77. *Bridgestone*, 399 F.3d at 672 (assessing a puffery argument and concluding "[a] reasonable juror could also conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation"); *Helwig*, 251 F.3d at 561 ("a company may choose silence or speech . . . but it may not choose half-truths").[6] Here, since Defendants chose to repeatedly speak about the Company's dividend during the investor conferences, the August 23 conference call, in SEC filings and the November 8 press release, they were under a duty to speak fully. As alleged in the Complaint, Defendants failed to disclose the adverse conditions at the Company put substantial pressure on the sustainability of the Company's dividend. ¶53.

Furthermore, Plaintiff does not allege that Defendants needed to "speculate about the hypothetical effect" of its future operations or "predict[] future events relating to its dividend." MTD at 19. Rather, Plaintiff simply alleges that Defendants should have disclosed the facts necessary for investors to appreciate that – at the time of Defendants' statements – there existed a

---

[6] *See also S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled . . . that [even] so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors"); *see also In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (no puffery where statements are "'misrepresentations of existing facts' made even though the speaker 'knew that the contrary was true'").

significant undisclosed risk the full dividend may not be paid. ¶¶63-64, 66-67, 72-73, 77-78, 81-82, 86-87, 92-93, 94-95.

### 7.      Defendants' Materially False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor

None of Defendants' alleged misstatements and omissions fall within the PSLRA's Safe Harbor provision, as: (1) Defendants' statements were not forward-looking; (2) Defendants failed to provide meaningful cautionary language; and (3) Defendants had actual knowledge that those statements were false and misleading when made. *See Helwig*, 251 F.3d at 554-65; MTD at 9-14.

### a.      Defendants' Statements Were Not Forward Looking

Statements about "events that were currently occurring" or expressing "the speaker's current belief" are not forward-looking. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1014-15 (S.D. Ohio 2008). Without specifically identifying each of the particular statements, Defendants argue that some of Plaintiff's challenged statements are inactionable forward-looking statements. MTD at 16-17, 19, 23. The essence of Defendants' argument is, because some of the challenged statements related to the amount of future dividends, those statements are forward-looking. MTD at 23. Defendants are wrong. "Although it is true that [L Brands'] statements concern an event in the future, that alone does not automatically make them forward-looking statements." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). When a defendant makes "mixed statement[s] of present fact and future prediction" and the "statement of present or historical fact is specifically challenged as fraudulent, it can be separated from surrounding forward-looking statements that remain within the safe harbor." *Id.* at 984 (citing *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 678-679 (6th Cir. 2003)).

The statements challenged by Plaintiff relate to the financial and business conditions at the Company and the risks faced by L Brands as they existed at the time the statements were made. *Dougherty*, 905 F.3d at 983 (stating, the "safe harbor does not extend to 'a statement of present or

historical fact.'"). For example, Defendants stated: "[t]he company, in its *history*, *has never* reduced the dividend"; "we *have* the cash flow needed and cash balance…to sustain the dividend"; "*we're able* to, with current year cash flow, sustain our dividend"; "the *dividend is* very safe (¶63); "we *can* maintain the dividend" (¶66); "*we're comfortable* with our cash position, our liquidity position, our capital structure" (¶68); "we're comfortable with [the dividend] based on what we know *at this point*" (¶77). "Because the statement[s]" – among others (*see, e.g.*, ¶¶72, 81, 83, 86, 92, 94) – "plainly relate[] to past or current, rather than future, performance, the statement cannot be considered forward-looking."[7]  *Fidel*, 2002 WL 31545952, at *19.[8]

The Sixth Circuit's holding in *Dougherty* is instructive.  In *Dougherty*, the defendant Esperion stated, "[w]e know that [the drug in question] will not require a CV outcomes trial to be completed prior to approval in patients with [HeFH] and ASCVD."  Dougherty, 905 F.3d at 977. The court in *Dougherty* held that statement and others like it "are not forward-looking" because "the truth or falsity of [the] statements was discernible at the time they were made." *Id.* at 983.  Here, the truth or falsity of the considerable risk that existed to the sustainability of the dividend and the weakened financial condition of the Company existed at the time of Defendants' statements.

---

[7]     This fact alone – that Plaintiff alleges numerous misstatements and omissions of historical and present fact made *independently* of any projection, distinguishes this action from those cited by Defendants.  MTD at 23; *see Helwig*, 251 F.3d at 554 (statements concerning an inability to *predict* the *future* impact of *pending* legislation on stated projections); *Miller*, 346 F.3d at 676-77 (statements concerning "*projections and objectives*" provided as the basis for defendants' financial projections); and *In re Duane Read Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) (did not discuss whether statements were forward-looking).

[8]     *See also Huffy*, 577 F. Supp. 2d at 1013-14 (finding statements that "'sales . . . have improved substantially,'" "[w]e are beginning to see our margins improve," "[w]e anticipate continued expansion," "'[e]arnings . . . are currently tracking to the higher end of . . . estimates,'" and regarding defendants' "continued optimism" not forward-looking); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 544 (S.D. Ohio 2000); *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 860-861 (E.D. Mich. 2001) ("misrepresentations about . . . current and historical corporate strategy . . . ability to effectuate that strategy, and the success of the company up to that point" not forward-looking).

- 30 -

In addition, the Safe Harbor, by definition, does not apply to omission of present facts.  15 U.S.C. §78u-5; *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM)(THK), 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (collecting cases).  Defendants' statements, including those in the Forms 10-Q and November 8 press release about the dividend, omitted then-existing material adverse facts known to or recklessly disregarded by Defendants concerning the then-existing risk to the dividend.  Defendants' omissions of then-existing material adverse facts are not within the Safe Harbor.  *Aeropostale*, 2013 WL 1197755, at *12 (finding defendants' "failure to disclose" adverse facts is "unprotected by the safe harbor, regardless of whether the statements thereby rendered misleading were forward-looking").

### b. Defendants' Boilerplate Cautionary Language Was Neither Meaningful nor Adequate

Defendants' use of boilerplate risk disclosures failed to provide the "meaningful cautionary language" necessary to "convey substantive information about factors that realistically could cause results to differ materially from those projected."  15 U.S.C. §78u-5(c)(1)(A); *Helwig*, 251 F.3d at 558-59.  Defendants' claim that they "expressly identified" Safe Harbor protection for some of their false statements does not render such language meaningful.  MTD at 23; *see* 15 Uf.S.C. §78u-5(c)(1)(A).

Defendants' citation to language in L Brands' Form 10-Q that identified the "ability to pay dividends" as "subject to change" is an example of "a boilerplate litany of generally applicable risk factors" that cannot invoke Safe Harbor protection.  *Cardinal*, 426 F. Supp. at 749; MTD 22-23.  Further, Defendants' boilerplate language ignores that as of the date of the disclosure, L Brands had *already* experienced margin contractions, weakened cash flow, and high debt levels which created the substantial risk the dividend would need to be reduced.  Disclosing a mere "possibility as opposed to an actuality . . . does not qualify as *meaningful* cautionary language." *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004) (emphasis in original).  Defendants simply

- 31 -

told investors what investors already knew – items, including the ability to pay dividends, are subject to change based on "various factors" and that the board of directors will determine future dividends after giving consideration to a number of factors – while concealing what investors did not know – namely, that conditions *already existed at that time* that created a substantial risk the dividend would need to be reduced. "[C]autionary language [that] is general and fails to disclose the 'actual risks' known" does not trigger Safe Harbor protection. *FirstEnergy*, 316 F. Supp. 2d at 596 & n.9; *Cardinal*, 426 F. Supp. 2d at 750.

Underscoring the unacceptable and generic nature of Defendants' warnings is their cut-and-paste nature. For example, each of Defendants' misleading releases include *identical* "disclosures" about forward-looking statements and remained *unchanged* from their pre-Class Period "disclosures" despite material changes in risk. *See* Declaration of Joseph F. Murray in Support of the Opposition to the Motion to Dismiss (the "Murray Decl."), Ex. A at 11 (L Brands 2016 Form 10-K) ("Our ability to pay dividends will depend on our ability to generate sufficient cash flows from operations in the future. This ability may be subject to certain economic, financial, competitive and other factors that are beyond our control."); Murray Decl. Ex. B at 11 (L Brands 2015 Form 10-K) (same). The Sixth Circuit has recognized that, as here, "[s]ubstantially similar language" appearing in multiple SEC filings may in and of itself render cautionary language inadequate for Safe Harbor purposes. *Helwig*, 251 F.3d at 559. Such "blanket statements" do not trigger immunity as they are not "'tailored to the specific future projections, estimates, or opinions'" which they purport to insulate. *Id.* Defendants' inadequate disclosures are insufficient to invoke the Safe Harbor.

Finally, opinions, predictions and other forward-looking statements are actionable if the speaker does not genuinely and reasonably believe them when made or is "'aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.'" *Helwig*, 251 F.3d at 557, 561 ("With regard to future events [and] uncertain figures, . . . a company may choose silence or speech

- 32 -

elaborated by the factual basis as then known – but it may not choose half-truths."); *see also Bridgestone*, 399 F.3d at 675.[9]  While none of Defendants' statements were forward-looking, Defendants issued their materially false and misleading statements with actual knowledge about the financial condition of the Company and the substantial risk to the dividend.  Analysts repeatedly asked Defendant Burgdoerfer whether there was a risk to the sustainability of the Company's dividend because of the financial problems suffered by L Brands leading up to the start of the Class Period.  ¶¶63, 77.  Instead of admitting what was obvious to Defendants, Defendant Burgdoerfer, without reasonable basis, denied there was any reason for concern about the dividend.

### 8.    L Brands' SEC Filings Failed to Include Significant Risk Factors Required to Be Disclosed Therein

Pursuant to Item 1A of Form 10-Q, L Brands' Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in L Brands' 2017 Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503].  ¶¶94-96.  Even though the 2017 Form 10-K contained purported warnings that the Company's board may decrease the dividend, the warnings were general and boilerplate and not specifically tailored to the risks facing L Brands during the Class Period.  The language did not warn investors that there existed, during the Class Period, a substantial risk that L Brands would need to decrease its dividend.  ¶96.  Indeed, as discussed above, L Brands used the identical purported cautionary language about the dividend before the Class Period.  Additionally, other public companies included nearly identical boilerplate risk disclosure language and descriptions of the setting of the dividend, further supporting that L Brands' language was boilerplate.  *See, e.g.*, Murray Decl. Exs. C at 18 (Home Depot, Inc. 2018 Form 10-K) ("While we currently expect a cash dividend to be paid in the future, future dividend payments will depend on our earnings, capital requirements, financial condition, and

---

[9]    *See also Cardinal*, 426 F. Supp. 2d at 756; *SmartTalk*, 124 F. Supp. 2d at 544; *Fidel*, 2002 WL 31545952, at *21 (denying motion to dismiss as to forward-looking statements based on facts "support[ing] an inference that Defendants knew statements . . . would convey a false impression").

other factors considered relevant by our Board of Directors."); *see also*, Ex. D at 22, (Carters, Inc. 2017 Form 10-K) (similar); Ex. E at 44-45 (Guess, Inc. 2018 Form 10-K) (similar); Ex. F at 22 (Domino's Pizza, Inc. 2018 Form 10-K) (similar).

Additionally, L Brands failed to disclose that competition had put pressure on margins and cash flow, which in turn created the risk of L Brands' being unable to finance operations and pay down debt without a reduction to the hefty dividend. ¶95. The risk disclosures identified by Defendants did not adequately warn investors of the risk from competition because it simply discussed, in general terms, competition and the impact to the Company's business. MTD at 27.

### 9. L Brands Omitted Material Facts Required to Be Disclosed Under Item 303

Pursuant to Item 303, L Brands was required to disclose information concerning any "known trends, events or uncertainties" that "are reasonably likely to cause" the Company's financial information not to be indicative of future operation results. ¶88. Item 303 discusses that a company should disclose information concerning "liquidity and capital resources." ¶91. Here, the potential reduction in the dividend in order to deleverage the Company was a "known uncertaint[y]" that Defendants were required to but failed to disclose under Item 303; ¶¶92, 93(c). Even though the Sixth Circuit may not have decided the issue of whether an Item 303 violation can provide the basis for Section 10(b) liability, it did indicate in *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 402-03 (6th Cir. 1997), that a duty of disclose may potentially arise from Item 303. *Id.* at 403 (stating, "Perhaps so" in connection with question of whether "defendants' disclosure duty under the Rule 10b-5 claim may stem from Item 303.").

Defendants' reliance on *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) is misplaced. MTD at 26. *Oran* only held that, because the materiality standards of Rule 10b-5 and Item 303 differ significantly, "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5." *Id.* at 288. But where, as here, the Item 303 omission was

- 34 -

material under Rule 10b-5, *Oran* is consistent with section 10(b) liability. *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101-02 (2d Cir. 2015) (holding Item 303 violation can give rise to liability under Rule 10b-5 for material omissions); *Shah v. Zimmer Biomet Holdings, Inc.*, 2019 WL 762510, at *5-6 (N.D. Ind. Feb. 20, 2019) (adopting the Stratte-McClure holding). Here, there is no serious dispute that the sustainability of the Company's dividend was material so the omitted facts provide a basis for liability.

### B. The Complaint Pleads a Strong Inference of Scienter

A plaintiff pleads the requisite "strong inference" of scienter where the "facts argued collectively . . . give rise to a strong inference of at least recklessness." 15 U.S.C. §78u-4(b)(2); *Frank v. Dana Corp.* ("*Dana II*"), 646 F.3d 954, 959 (6th Cir. 2011). Though higher than negligence, "reckless behavior is not intentional or knowing behavior because the danger need not have been actually known." *SmarTalk*, 124 F. Supp. 2d at 539. In evaluating scienter, courts must: (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety" to determine "whether ***all*** the facts alleged, taken collectively, give rise to a strong inference of scienter"; and (3) take into account "plausible opposing inferences and decide whether 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Dougherty*, 905 F.3d at 979 (emphasis in original) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007)); *Dana II*, 646 F.3d at 959. Thus, in a tie, "*Tellabs* instructs that the complaint should be permitted to move forward." *Frank v. Dana Corp.* ("*Dana I*"), 547 F.3d 564, 571 (6th Cir. 2008).

Citing the Supreme Court's directive in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011), to review scienter pleadings "holistically," the Sixth Circuit held that district courts can no longer "sort[] through each allegation individually before concluding with a collective approach," as such a method "risks losing the forest for the trees." *Dana II*, 646 F.3d at 961

- 35 -

(reversing the district court's dismissal of an action alleging securities fraud for the second time).

Instead, the "*only* appropriate approach" is to "address[] the allegations collectively, [to do] so quickly, and, importantly . . . not parse out the allegations for individual analysis." *Id.* [10]

The Sixth Circuit has identified nine non-exhaustive factors (the "*Helwig* factors") that courts have considered in determining whether a strong inference of scienter has been pled:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dana II*, 646 F.3d at 958 n.2 (citing *Helwig*, 251 F.3d at 552).  Not all factors need to be met. *Bridgestone*, 399 F.3d at 685 (finding a strong inference of scienter despite four of the nine factors not being applicable).  The *Helwig* court itself emphasized that this list was not exhaustive, and was only meant to "point to fixed constellations of facts that courts have found probative of securities fraud." *Helwig*, 251 F.3d at 552; *see also Cardinal*, 426 F. Supp. 2d at 718 n.43 (noting that a plaintiff "should draw upon these factors where applicable").[11]

Ignoring *Tellabs'* command, Defendants attempt to minimize Plaintiff's scienter allegations by suggesting that they only address "three of [the] factors" the Sixth Circuit enumerated in *Helwig* (a pre-*Tellabs* decision) as "usually relevant" to the scienter analysis.  MTD at 30.  Where, however,

---

[10]   Thus, *Dana II*, 646 F.3d at 961 overruled the piecemeal approach to analyzing scienter pleadings used in *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396-97 (6th Cir. 2009); and *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004).

[11]   The *Helwig* factors are not a checklist; courts have often found scienter adequately alleged even where (unlike here) most of the factors are absent. *See, e.g.*, *Grae*, 2017 WL 6442145, at *20-*21 (finding scienter adequately alleged despite listing only two *Helwig* factors); *Cardinal*, 426 F. Supp. 2d at 740-41 (finding scienter based on three *Helwig* factors).

- 36 -

a complaint sufficiently pleads scienter under a holistic review, as is the case here, ticking off the *Helwig* factors is an unnecessary exercise. *See, e.g.*, *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809, at *13-*15 (M.D. Tenn. Mar. 9, 2009) (foregoing *Helwig* factors and refusing "to scrutinize each allegation in isolation," but finding that when "viewing the Complaint as a whole," Plaintiff adequately pleaded scienter). To the extent the "non-exhaustive" *Helwig* list remains relevant after *Tellabs*, the Complaint satisfies at least four *Helwig* factors, specifically, factors (2), (3), (6), and (9). *Dougherty*, 905 F.3d at 981 (holding complaint adequately alleged scienter when three of the *Helwig* factors weighed in plaintiffs' favor); *Dana II*, 646 F.3d at 958 n.2; *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 710 (E.D. Mich. 2010) (*Helwig* factors are "'helpful' but not exhaustive").

Here, the Complaint gives rise to a strong inference of Defendants' scienter.

### 1.  While Unnecessary, the Complaint Pleads Defendants' Actual Knowledge

Defendants argue that certain of the statements challenged by Plaintiff are forward-looking so, according to Defendants, "those statements cannot be the basis for any claim of scienter." MTD at 29. Defendants are wrong. As discussed above, the challenged statements are either statements of present or historical fact, or are otherwise objectively verifiable. *Supra* at §B.1. Plaintiff therefore need not plead "actual knowledge," only recklessness.

But under either standard, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Instead, "it must be cogent and compelling, thus strong in light of other explanations." *Id.* To be sure, a "plaintiff may use circumstantial evidence to support an inference of actual knowledge." *In re Nat'l Century Fin. Enters. Inc. Inv. Litig.*, 541 F. Supp. 2d 986, 1015 (S.D. Ohio 2007). As in any case, "a fact-finder may infer actual knowledge based both on 'circumstantial evidence' and 'the very fact that the risk was obvious.'" *Warren v. Prison Health*

*Servs. Inc.*, 576 F. App'x 545, 559 (6th Cir. 2014); *see also Cagan v. Anchor Savs. Bank FSB*, No. CV-88-3024, 1990 WL 73423, at *7 (E.D.N.Y. May 22, 1990).

The Complaint contains allegations sufficient for a fact-finder to conclude that Defendants did have actual knowledge that their statements and omissions were false and misleading. Scienter is therefore adequately pled under any standard.

**2.      Defendants Knew During the Third Quarter of 2018 that L Brands Had Decided to Reduce Its Dividend for the Period Starting March 2019**

Defendant Burgdoerfer admitted on November 20, 2018 that L Brands had decided – during the third quarter of 2018 – to cut its dividend in half beginning in March 2019. ¶106. Therefore, at some point between August 5, 2018 and November 3, 2018, Defendant Wexner, Defendant Burgdoerfer, and L Brands knew the dividend would be reduced to enable L Brands to deleverage. Plaintiff alleges that L Brands' November 8, 2018 press release was misleading because it failed to disclose the risk the dividend would be reduced and misrepresented that the dividend amount was safe going forward. ¶87. Since the November 8 press release was issued after the end of the third quarter, it cannot be seriously disputed that Defendants possessed actual knowledge of the misrepresented and omitted facts, thereby establishing a strong inference of scienter, and therefore also satisfying the reckless standard. ¶128. *In re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, at *160 (M.D. Tenn. Mar. 31, 2009) ("[a] complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions").[12]

---

[12]      *See also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) ("the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly"); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008) ("'[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter'").

Defendant Burgdoerfer's post-class period admissions, then, own up to a "divergence" between the information that he (and Defendant Wexner as a member of the Company's board) received internally and Defendants' external statements, as well as a "disregard of the most current factual information before making statements," satisfying two of the *Helwig* factors.  *Helwig*, 251 F.3d at 552; *Dougherty*, 905 F.3d at 981 ("[w]e have described divergence as the 'key factor' to a finding of scienter."); *Bridgestone*, 399 F.3d at 683-84.  Indeed, as directly involved with the review and setting of the Company's dividend, Defendants Wexner and Burgdoerfer could not have been unaware of what "had actually [been] done" in connection with the reduction of the dividend.  *See, e.g.*, *Dana II*, 946 F.3d at 962; *Dougherty*, 905 F.3d at 981 (rejecting a "formalistic definition" of internal reports related to the second *Helwig* factor and stating, "[i]n *Bridgestone*, for instance, we viewed the contents of meetings at which senior corporate officers were present as 'internal reports.'"); *Cardinal*, 426 F. Supp. 2d at 724.

Furthermore, while Defendant Burgdoerfer admitted the decision was made to cut the dividend and deleverage during the third quarter, the precise date of the decision is a fact currently in the possession of Defendants.  If the decision was made before the September 7 Form 10-Q or the August 23, 2018 conference call, by the same reasoning as above, Plaintiff will be able to establish actual knowledge for those false and misleading statements and omissions as well.

### 3. Defendants' Positions at the Company and Involvement with the Review and Setting of the Dividend Support Scienter

It cannot be seriously disputed that Defendants Wexner and Burgdoerfer were fully aware of the ongoing problems with Victoria's Secret, including the reduction in margins, profitability and cash flow leading up to the start of the Class Period.  ¶¶122-26.  Similarly, they were obviously aware of the level of the Company's debt, its junk bond credit ratings, and the extremely high yield of the dividend.  ¶122-26.  And, as Defendant Burgdoerfer acknowledged during the Class Period, he was aware of the importance of the dividend to investors.  ¶¶63, 66.

- 39 -

Furthermore, each of the Individual Defendants possessed undisclosed facts concerning the revaluation and setting of the Company's dividend.  Defendant Wexner's scienter is also supported by the fact that he was a member of the Company's board of directors and had close connections with its members.  ¶124.  Defendant Wexner would have been present at meetings in which the dividend was discussed and was aware of the factors that the board considered when evaluating the dividend amount, as well as the risk that the dividend may need to be reduced.  ¶124.  Additionally, Defendant Burgdoerfer's scienter is supported by the fact that he was the Company's CFO and would have been directly involved in recommendations about the size of the dividend to the Company's board of directors.  ¶124.

Defendants do not dispute that Defendant Wexner was fully informed about the review or setting of the dividend but characterize Plaintiff's allegations of this knowledge attributed to Defendant Burgdoerfer as conclusory.  Defendants, however, fail to credit Plaintiff's multiple factual allegations showing his knowledge.  Defendant Burgdoerfer repeatedly held himself out during investor conferences and on conference calls as being knowledgeable about the dividend, the performance of the business, and the impact of the Company's financial condition on the sustainability of the dividend level.  ¶¶63, 66, 69, 77, 104-05.  *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (holding that, "[g]iven the specificity and repetition of the analysts' questions, McGuire's position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that McGuire's behavior reached this threshold of recklessness," and stating that "the content and context of [defendant]'s statements themselves" were "the most powerful evidence of scienter").  The Complaint, which is based in part on interviews with a "number of former Company employees and other individuals" (¶26), alleges Defendant Burgdoerfer "would have been directly involved in recommendations about the size of the dividend to the Company's board of directors."  ¶124.  Furthermore, an inference can be drawn that

as CFO and a public face of the Company during investor conferences and analyst conference calls, he would have been instrumental in the review and setting of the dividend.

It is not plausible that Defendants Wexner and Burgdoerfer did not know, or recklessly disregard, that Defendants' statements and omissions were materially false and misleading.

### 4. The Importance of the Dividend Supports Scienter

Securities analysts routinely asked questions and raised concerns about the Company's ability to maintain its high dividend during investor conferences and on analyst conference calls. ¶¶63, 77. The importance of the dividend to investors, analysts and the support of L Brands' common stock price supports a strong inference of scienter. ¶¶63, 66. *In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001) (a company's CEO who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise a strong inference of scienter); *Miller Energy*, 2014 WL 415730, at *20 ("where companies and the individuals who run them are under unusual pressure to achieve certain financial goals, that pressure, 'coupled with other factors, can provide motive'"). As does the fact that Defendants Wexner and Burgdoerfer all signed SOX certifications (falsely) attesting to the accuracy of L Brands' disclosures. *See, e.g.*, *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, at *56 (M.D. Tenn. Mar. 31, 2011) ("The Sarbanes-Oxley certifications signed by Jacobs and Polson establishes their awareness of PSI's rising malpractice expenses and declining staffing levels and budgets as well as the increasing costs of the regulatory investigations at Riveredge."); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("SOX certifications give rise to an inference of [defendants'] scienter.").

### 5. The Temporal Proximity of Defendants' Statements to the Reduction of L Brands' Dividend Supports Scienter

The temporal proximity between Defendants false and misleading statements and omissions and the disclosure of the dividend cut and efforts to deleverage the Company supports scienter.

¶128. *See Helwig*, 251 F.3d at 552.; *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 687 (M.D. Tenn. 2000) (short proximity between alleged misrepresentations and disclosure indicative of scienter). Although there is no bright line for when timing contributes to an inference of scienter, courts have held that a matter of weeks or even months apart may support the inference. *See, e.g.*, *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("[G]iven the short time frame from [a] December offering, through the opening of [defendants' project] in late April 1996, to the revelations of mammoth problems beginning on July 22, 1996, it is reasonable to infer that management was on notice of these problems during the Class Period."); *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at \*22 (M.D. Tenn. Apr. 26, 2011) (noting the "speed with which defendants" changed their story, from reaffirming financial results on February 2 and 10, 2010, to admitting those results to be questionable on February 25 and restating the results on March 15, 2010).

Defendants quibble with Plaintiff's use of the term "weeks" to describe the time between Defendants' statements and the announcement of the dividend decrease. MTD at 33. The November 8 statements were less than two weeks before the November 19 announcement and it is appropriate to describe the less than three-month period between the August 23 statement and the announcement as weeks. MTD at 34; *Dougherty*, 905 F.3d at 981 (holding that "six-week gap" between statement and revelation of truth satisfies the *Helwig* "closeness in time" factor). In fact, it is Defendants who are attempting to distort the timeline by arguing that the March 2019 payment date of the dividend is relevant to the timeline instead of the date of the announcement of the reduction. MTD at 1 (characterizing the challenged statements as ten months before the March 2019 payment date of the dividend).

Furthermore, although L Brands announced the reduction of the dividend on November 19, 2018, Plaintiff respectfully submits that the temporal proximity should be evaluated from an even

earlier date – when Defendants became aware of the Board's decision to make the cut, which would have been on November 3, 2018, at the latest.  This was before November 8 and a little more than ten weeks after the August 23 false and misleading statements and omissions.  ¶86-87.  Even if the length of time between Defendants' statements and date of the announcement of the dividend cut is used for this analysis, only a few weeks are added.  And even though the May and June statements and omissions were a bit longer at approximately five months, the conditions and causes for the reduction in the dividend at the time of the reduction were very similar to those that existed at the time of the May and June statements, and Defendant Burgdoerfer's statements in May and June were similar to those he made at the end of August.

### 6.    Defendants' Motives Support Scienter

Contrary to Defendants' argument that Plaintiff fails to allege the Individual Defendants "attempted to profit" from the fraud (MTD at 35), the Complaint clearly alleges Defendants possessed substantial motives for misrepresenting the sustainability of the dividend and the expected performance of the Company.  ¶130-31.  A substantial portion of their net worths were tied up in Company stock.  ¶131. Approximately 34% of Defendant Wexner's assets were in Company stock. *Id*.  He owned nearly 17% of the Company's outstanding shares, worth approximately $1.59 billion on the first day of the Class Period.  ¶130.  Defendant Burgdoerfer owned more than 102,000 of the Company's outstanding shares, worth approximately $3.48 million on the first day of the Class Period.  *Id*.  Since such a large amount of their personal assets were tied up in Company stock, the Individual Defendants were motivated to hide the true risk of the sustainability of the dividend from investors to maintain L Brands' artificially inflated stock price.  *Id*.  Indeed, L Brands' stock decline caused by the announcement of the cut in the dividend cost Defendant Wexner more than $280 million and Defendant Burgdoerfer more than $628,000 in value.  *Id*.

Defendants inappropriately point to facts outside the Complaint to argue that L Brands' purported purchase of Company stock during the Class Period undermines scienter.  MTD at 35.  *See Malin v. XL Capital Ltd.*, 499 F. Supp.2d 117, 156 (D. Conn. 2007) (declining to consider effect 10b5-1 trading plans had on defendants' scienter at motion to dismiss on grounds that "issues of fact remain with regard to the trading plans").

It is improper for the Court to consider the truth of the matter asserted concerning those stock purchases.  In any event, Defendants concede those shares were purchased "as part of its regular share purchase program," which raises a host of issues, including that the plan to purchase those shares was approved by the Company's board of directors no later than March 2018, which was before the start of the Class Period and therefore has no impact on scienter.  O'Malley Decl. Exs. J at 10, M at 13.  Furthermore, share purchases are commonly used to support the price of a Company's stock, which would have served the interests of the Individual Defendants and the decline in Defendant Wexner's share value vastly exceeded the money spent by L Brands on the stock.

Viewed holistically, Plaintiff adequately pled a strong inference of scienter which is much stronger than any possible opposing inferences in favor of Defendants.  Where, as here, a defendant fails to come forward with any plausible inferences, "the inference of scienter is cogent, indeed." *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1264 (M.D. Fla. 2007).

## IV.    IF THE COURT GRANTS DEFENDANTS' MOTION IN ANY RESPECT, LEAD PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND

While Plaintiff is confident the Complaint more than satisfies the applicable pleading requirements, should the Court conclude that any of the allegations in the Complaint are not sufficient, Plaintiff requests leave to amend the Complaint to cure any defect identified by the Court. The Sixth Circuit has held that "leave to amend is 'freely given when justice so requires.'" *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002); *accord Anderson v. Young Touchstone Co.*, 735 F. Supp. 2d 831, 833 (W.D. Tenn. 2010).  This is because cases "should be tried on their merits rather

- 44 -

than the technicalities of pleadings." *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982).  Moreover, "[i]n the securities litigation context, leave to amend is particularly appropriate where the complaint does not allege fraud with particularity." *Morse*, 290 F.3d at 800.

## V.    CONCLUSION

Because Plaintiff has adequately pled securities fraud under the Exchange Act, the PSLRA and Rule 9(b), Defendants' Motion should be denied in its entirety.[13]

DATED:  May 4, 2020                                  MURRAY MURPHY MOUL + BASIL LLP
                                                     JOSEPH F. MURRAY (0063373)


                                                     */s/ Joseph F. Murray*
                                                     JOSEPH F. MURRAY

                                                     1114 Dublin Road
                                                     Columbus, OH 43215
                                                     Telephone:  614/488-0400
                                                     614/488-0401 (fax)
                                                     murray@mmmb.com

                                                     BRENNAN, MANNA & DIAMOND, LLC
                                                     DAVID M. SCOTT (0068110)
                                                     KRISTA D. WARREN (0097842)
                                                     250 Civic Center Drive, Suite 300
                                                     Columbus, OH 43215
                                                     Telephone:  614/246-7514
                                                     614/246-7515 (fax)
                                                     dscott@bmdllc.com
                                                     kdwarren@bmdllc.com

                                                     *Local Counsel*

---

[13]    Defendants' sole argument for dismissal of Plaintiff's Section 20(a) claim is that Plaintiff has failed to allege a primary violation.  MTD at 36.  As demonstrated above, however, Plaintiff has adequately alleged violations of Section 10(b) by Defendants.  Accordingly, Plaintiff's Section 20(a) claim should be sustained.

- 45 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Lead Counsel for Lead Plaintiff and the Class*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

*Additional Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, Joseph F. Murray, hereby certify that on May 4, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Joseph F. Murray*
JOSEPH F. MURRAY
