## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

RICKEY R. WALKER,

     Plaintiff,                 :       Case No. 2:19-cv-3186

     -vs-                      Judge Sarah D. Morrison
                                     Magistrate Judge Chelsey M. Vascura

L BRANDS, INC., *et al.*,

                             :

     Defendants,


KURT J. MITTS,

     Plaintiff,                 :       Case No. 2:19-cv-3961

     -vs-                      Judge Sarah D. Morrison
                                     Magistrate Judge Chelsey M. Vascura

L BRANDS, INC., *et al.*,

                             :

     Defendants.


## OPINION AND ORDER

This matter is before the Court upon Defendants L Brands, Inc., Leslie Wexner, and Stuart B. Burgdoerfer's Motion to Dismiss the Consolidated Amended Complaint (ECF No. 31), Lead Plaintiff Dennis O'Leary's Memorandum in Opposition (ECF No. 35), and Defendants' Reply (ECF No. 36). For the reasons that follow, the Court **GRANTS** Defendants' Motion.

## I. FACTUAL ALLEGATIONS

The well-pleaded facts in the Amended Consolidated Complaint (ECF No. 25) are considered true for purposes of the Motion to Dismiss. Court-appointed Lead

1

Plaintiff Daniel O'Leary alleges claims on behalf of himself and all purchasers of common stock of Defendant L Brands, Inc., between May 31, 2018 and November 19, 2018 (the "Class Period"). (Amend. Consol. Compl., ¶ 1.)

L Brands' common stock is listed and trades on the New York Stock Exchange. (*Id.* ¶ 14.) Defendant Leslie H. Wexner is L Brands' Chairman of the Board of Directors, Chief Executive Officer, and owner of 17% of L Brands' total outstanding shares. (*Id.* ¶ 15.) Defendant Stuart B. Burgdoerfer is L Brands' Executive Vice President, Chief Financial Officer, and owner of approximately 102,000 shares of L Brands' common stock during the Class Period. (*Id.* ¶ 16.) L Brands is a specialty retailer of women's intimate apparel, personal care, beauty, accessories, and home fragrance products, and previously included the brands Victoria's Secret, PINK, Bath and Body Works, La Senza, and Henri Bendel. (*Id.* ¶¶ 2, 27.) During the Class Period, Victoria's Secret accounted for more than one-half of L Brands' total revenue. (*Id.* ¶ 29.)

**A.    L Brands' Business Performance**

In the years leading up to the Class Period, Victoria's Secret and PINK began experiencing significant decline in financial performance due to the popularity of new lingerie brands. (*Id.* ¶ 38.) In 2016, L Brands announced that Victoria's Secret would be eliminating the Victoria's Secret catalog and exiting swim and apparel categories, resulting in an estimated loss of more than $400 million in annual sales. (*Id.* ¶ 39.) In an attempt to drive sales and retain market share, Victoria's Secret

and PINK engaged in heavy promotional activities, which mitigated sales decline but at the cost of L Brands' profit margins and cash flow. (*Id.* ¶ 43.)

Looking at the numbers, L Brands' shareholder deficit increased from $259 million in January 2016 to $753 million in February 2018, and working capital declined from $2.28 billion to $1.26 billion during the same time frame. (*Id.* ¶ 45.) The amount of cash flow available after payment of ordinary dividends declined from $1.44 billion in 2015 to $720 million 2017. (*Id.* ¶ 46.) In February 2018, L Brands' credit ratings were equivalent to that of junk bonds. (*Id.* ¶ 48.) In the years leading up to the Class Period, L Brands had one of the highest debt-to-EBITDA (earnings before interest tax depreciation amortization) ratios of any United States retailer. (*Id.* ¶¶ 35–36.)

Even as financial performance began to decline, L Brands continued to maintain and increase its dividend, which is set by L Brands' Board of Directors. (*Id.* ¶¶ 32, 54.) It was common knowledge both inside and outside of the Company that the dividend was a very important source of return for many shareholders and that the dividend—based on both the dividend yield and the dividend payout ratio[1]—was extremely high compared to other publicly-traded companies. (*Id.* ¶¶ 31, 33–34.)

On May 23, 2018, L Brands announced its financial and operational results for the first quarter ("Q1") of 2018 (ending on May 5). (Defs. Ex. C, ECF No. 31-4.)

---

[1] The dividend yield is the dividend expressed as a percentage of the current share price. (*Id.* ¶ 34.) The dividend payout ratio is defined as the dividend paid per share divided by the average share price. (*Id.* ¶ 33.)

The press release reported a decline from the previous year in earnings per share, operating income, and net income but reported an increase in net sales. (*Id.*) Consistent with previous quarters, a dividend of $.60 per share was issued. (Defs. Ex. A, ECF No. 31-2.)

On August 22, L Brands announced its financial and operational results for the second quarter ("Q2") of 2018 (ending on August 4). (Amend. Consol. Compl., ¶ 75.) The press release again reported a decline from the previous year in earnings per share, operating income, and net income but an increase in net sales. (Defs. Ex. H, ECF No. 31-9). However, Victoria's Secret's comparable sales during the 2018 Q2 continued to decline from the 2017 Q2 level, on a year-over-year basis. (Amend. Consol. Compl., ¶¶ 75–76.) Consistent with previous quarters, a dividend of $.60 per share was issued. (Defs Ex. J, ECF No. 31-11.) On September 13, L Brands announced that it was closing all Henri Bendel stores and the accompanying website "to improve [C]ompany profitability and focus on our larger brands that have greater growth potential." (Amend. Consol. Compl., ¶ 85 (alteration in original).)

After the market closed on November 19, L Brands' announced its financial and operational results for the third quarter ("Q3") of 2018 (ending on November 3). (*Id.* ¶ 102.) The press release again reported a decline from the previous year in earnings per share, operating income, and net income but an increase in net sales. (Defs. Ex. L, ECF No. 31-13.) Consistent with previous quarters, a dividend of $.60 per share was issued. (Defs. Ex. M, ECF No. 31-3.) However, the press release also

stated that, in order to deleverage the balance sheet, L Brands intended to reduce its annual ordinary dividend from $2.40 to $1.20 beginning with the quarterly dividend to be paid in March 2019. (Amend. Consol. Compl., ¶ 102.)

Until November 2018, L Brands had a history of offering a lucrative and often increasing dividend for 176 consecutive quarters. (*Id.* ¶ 30.) After the announcement to cut the dividend, the price of L Brands' common stock declined approximately 18%, from $34.55 per share on November 19 to $28.43 per share on November 20. (*Id.* ¶ 107.) Thereafter, Victoria's Secret financial performance continued to deteriorate and L Brands' earnings per share continued to decline. (*Id.* ¶¶ 109, 111.)

## B. L Brands' Representations About the Dividend

Plaintiff alleges that "in an effort to artificially inflate L Brands common stock, Defendants misleadingly trivialized the risk that the Company may need to cut its dividend." (*Id.* ¶ 37.) According to Plaintiff, Defendants maintained throughout the Class Period that L Brands' dividend was sustainable for the foreseeable future even though they knew it was not. (*Id.*)

### 1. Mr. Burgdoerfer's Statements

Plaintiff alleges that Mr. Burgdoerfer misrepresented the future sustainability of the dividend during two investor conferences and an earnings call.

On May 31, 2018, Mr. Burgdoerfer presented at the RBC Capital Markets and Retail Conference on behalf of L Brands. The following exchange transpired:

Brian Jay Tunick (RBC Capital Markets, LLC, Research Division – MD and Analyst):

5

I guess there's a lot of dividend and yield investors in the room, and we've been getting a lot of calls on the 7% dividend yield. Can you maybe talk about, when you reduced your cash flow and you reduced your CapEx guidance for the year, how important is the dividend? And how do you guys think about capital allocation?

Mr. Burgdoerfer:

Well, we think that - - thanks for the question, Brian. ***We think that [the] dividend is very important.*** So we have returned capital through regular dividends. ***The company, in its history, has never reduced the dividend. We believe that a large number of shareholders place high value on the dividend.*** That's implicit to the question you're asking. ***We have the cash flow needed and cash balances, et cetera, to sustain the dividend.*** It is a very high payout ratio right now, I realize that, and a very high yield. ***But again, we believe that the dividend is important to shareholders and that we're able to, with current year cash flow, sustain our dividend.*** Certainly, we get questions from other investors and have debate[s] as we should about the magnitude of our share repurchase program. We are buying back some stock. You are aware we authorized a program, and we update every quarter about activity there. But one could say that, that's a modest program in relation to the capitalization of the company, but we think a balanced approach makes sense. We do believe there is a long record of companies that thought that they knew for sure it was a good buy, and time proved them wrong. We do believe that the value of the company is substantially greater than where it's trading at today, but we have to prove it. The company would seem - - has really - - and folks have written about this. The only thing management really focuses on is performance. When you look at that valuation, I mean it's at the very low end of a lot of ranges. ***So back to the dividend, the dividend is very safe.***

(*Id.* ¶ 63 (emphasis in original).) Plaintiff alleges that Mr. Burgdoerfer's statements

(emphasized above by bolded italics) were materially false and misleading because

they failed to disclose the following adverse facts, which Defendants knew or

recklessly disregarded:

(a) that the Victoria's Secret and PINK businesses were having, and would continue to have, a material adverse effect on the Company's cash flow, liquidity and net debt levels;

(b) that the financial strain put on the Company due to the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to cut its dividend;

(c) that there was a substantial risk the Company would need to reduce its dividend to pay down debt and finance operations;

(d) that the positive statements about the ability of the Company to sustain its dividend lacked a reasonable basis; and

(e) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects.

(*Id.* ¶ 64.) Plaintiff alleges that the statements made on May 31, 2018 were also false or misleading because, due to the Company's then-financial condition, Mr. Burgdoerfer was aware of the substantial risk the dividend would need to be reduced to pay down debt and fund operations. (*Id.* ¶ 65.)

On June 6, 2018, Mr. Burgdoerfer presented at the Robert W. Baird Global Consumer, Technology and Services Conference. Mr. Burgdoerfer stated:

> ***The dividend is a very important source of return for many shareholders***, we believe***. Our ability to maintain the dividend***, even in this time period where the payout ratio is very high and the yield is very high, ***we're confident that we can maintain the dividend***. ***As you've looked at our cash flow results, the free cash flow of the business is sufficient to pay the dividend. And we've been carrying excess cash as a business beyond what's needed for the day-to-day working capital needs and financing needs of the business. So we're comfortable with our cash position, our liquidity position, our capital structure. And we're comfortable with the current dividend level in the business.*** And we believe we're in an operating period where we're going to turn this business, and specifically the lingerie and PINK businesses within Victoria's. And those relationships would normalize to more typical levels that we've

7

seen historically and that you'd see in most major companies on a broad basis, but ***we're very comfortable with the dividend.***

(*Id.* ¶ 66 (emphasis in original).) Plaintiff alleges that these statements (emphasized above by bolded italics) were materially false and misleading for the same reasons as Mr. Burgdoerfer's May 31, 2018 statements. At the same conference, the following exchange also transpired:

> Mark R. Altschwager (Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst):
>
> Digging into Victoria's Secret a bit. On the Q1 call, management acknowledged that the recovery at VS is taking a bit longer than anticipated. How much of this is related to some of the internal disruptions or in terms of the changes that you've made versus some intensifying competitive pressures?

> Mr. Burgdoerfer:
>
> It's a very hard question to answer. I understand the spirit of the question, and I'll do my - - ***I think most of the majority of the result we're seeing at Victoria's Secret is a function of our own execution***, changes we've made and challenges or opportunities that we have in our own execution. ***Are there more competitors out there? There are. When you look at the size and significance of those competitors and really do the math on it, they're not that large at this time. And not suggesting from that, that we should be arrogant about competition or not pay attention to competition. We do, but I would have a view - - we have a view that most of our opportunity in performance is through executing our game plan more effectively.*** And due to the near-term impact, which has sustained longer than we expected, there are a lot of changes that we made in the spring of 2016: the category exits, the change in promotion, the reorganization of the business, reduction in headcount, elimination of the catalog. The combination of all those things, intended to focus the business on core categories and ultimately accelerate growth in the near term, had put a lot of pressure on the business.

(*Id.* ¶ 69 (emphasis in original).) Plaintiff alleges that these statements (emphasized above by bolded italics) were materially false and misleading when made because

"they minimized the negative impact competitors were having on the Company and its margins, profitability and cash flow." (*Id.* ¶ 70.)

On August 23, 2018, L Brands held a conference call with analysts and investors to discuss L Brands' operations and the Q2 earnings release. (*Id.* ¶ 77.) The following exchange transpired during the call:

> Michael Charles Binetti (Credit Suisse AG, Research Division – Research Analyst):
>
> > ***You guys have remained very committed to a very, very high dividend yield despite, I think, the operating results coming in below some of your hopes for a bit here***. I know you've worked hard to moderate CapEx down a few times here along the way. But could you help us with how you think about holding steady the approach to the capital deployment in contrast to the variances you've seen in the operating plans?
>
> Mr. Burgdoerfer:
>
> > Important subject, obviously, important source of return for shareholders. Obviously, the payout ratio is abnormally high. The yield is very high. ***We look at it regularly. Management does. We have the appropriate conversations with our board. Obviously a lot of our earnings and our cash come in the fourth quarter.*** We have conversations about this regularly . . . . But it's obviously something that should be looked at periodically, and we do. ***We're comfortable with it.*** We expect to - - one way to deal with the payout ratio is obviously to increase earnings. That's what we're focused on. ***Earnings increases would drive obviously an increase in the share price and get dividend yields and relationships like that in a more normal range.*** But with that said, our operating performance has lagged our expectations over the last several years. So we look at it periodically in a rigorous way. That will continue. ***We're comfortable with it based on what we know at this point, and we'll continue to look at it.*** Thank you.

(*Id.* (emphasis in original).) Plaintiff alleges that these statements (emphasized above in bolded italics) were materially false and misleading for the same reasons as Mr. Burgdoerfer's May 31, 2018 statements. (*Id.* ¶ 78.)

### 2.    Relevant Form 10-Qs

In addition to Mr. Burgdoerfer's statements, Plaintiff alleges that Defendants made numerous false and misleading statements and omissions regarding the future of the dividend in its 2018 Form 10-Qs filed with the Securities Exchange Commission ("SEC") for the Q1 and Q2.

L Brands' "Dividend Policy and Procedures" in the relevant 2018 Form 10-Qs provides:

> Our Board of Directors will determine future dividends after giving consideration to our levels of profit and cash flow, capital requirements, current and forecasted liquidity, the restrictions placed upon us by our borrowing arrangements as well as financial and other conditions existing at the time. We use cash flow generated from operating activities to fund our ordinary dividends and a combination of cash flow generated from operating activities and financing activities to fund our special dividends.

(*Id.* ¶¶ 72, 81.) Plaintiff contends that these statements were materially false and misleading for the same reasons as the May 31, 2018 statements made by Mr. Burgdoerfer. (*Id.* ¶¶ 73, 82.) Additionally, these statements "created the false impression that the Company's dividend was safe and consistent and because they failed to disclose that there was a substantial risk that the dividend was not sustainable and that the Company would need to reduce the dividend to pay down debt and fund operations." (*Id.*)

10

The Q2 2018 Form 10-Q also contained a "Credit Ratings" section, which stated:

> Our borrowing costs under our Revolving Facility and Secured Foreign Facilities are linked to our credit ratings. If we receive an upgrade or downgrade to our corporate credit ratings, the borrowing costs could decrease or increase respectively.
>
> * * *
>
> Subsequent to August 4, 2018, S&P downgraded our Corporate rating to BB, our Senior Unsecured Debt with Subsidiary Guarantee rating to BB and our Senior Unsecured Debt rating to B+, and also updated our Outlook to Negative. Additionally, for commercial reasons, Fitch withdrew our ratings on August 29, 2018. In conjunction with the withdrawal, Fitch issued final ratings that downgraded our Corporate rating to BB, our Senior Unsecured Debt with Subsidiary Guarantee rating to BB and our Senior Unsecured Debt rating to BB-.

(*Id.* ¶ 83.) Plaintiff alleges that these statements were false and misleading when made because "they failed to disclose that the worsening condition of the Company's credit rating increased the risk that the Company's dividend amount was not sustainable." (*Id.* ¶ 84.)

Plaintiff alleges that the 2018 Form 10-Qs also contained materially false and misleading statements in the Management's Discussion and Analysis of Financial Condition and Results of Operation ("MD&A") and omitted material risk factor disclosures. (*Id.* ¶¶ 71, 80.) Specifically, the MD&A "failed to disclose material events and uncertainties associated with L Brands' cash requirements, liquidity and/or capital resources, which were then known to management and were reasonably likely to have a material effect on the Company's future cash requirements, liquidity and/or capital resources." (*Id.* ¶ 92.) Plaintiff contends that

11

the following were known trends, events, or uncertainties that L Brands was aware of during the Class Period and that were reasonably likely to have an impact on the Company but were not disclosed in the Form 10-Qs as required:

> (a) that the Victoria's Secret and PINK businesses were having, and would continue to have, a material adverse effect on the Company's cash flow, liquidity and net debt levels;

> (b) that the financial strain put on the Company due to the declining performance of Victoria's Secret and PINK increased the likelihood that the Company would need to cut its dividend;

> (c) that there was a substantial risk the Company would need to sustain its dividend to pay down debt and finance operations;

> (d) that the positive statements about the ability of the Company to sustain its dividend lacked a reasonable basis; and

> (e) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about L Brands' then-current business operations and future financial prospects.

(*Id.* ¶ 93.) Plaintiff also alleges that Defendants failed to disclose these risk factors as material changes since those previously disclosed in L Brands' 2017 Form 10-K. (*Id.* ¶¶ 94–95.)

Finally, with regards to L Brands' "Controls and Procedures," the relevant 2018 Form 10-Qs provided:

> *Evaluation of disclosure controls and procedures.* As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures . . . . ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective and designed to ensure that information required to be disclosed by us in reports we file or***

> ***submit under the Exchange Act*** is (1) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.
>
> *Changes in internal control over financial reporting.* The adoption of ASC 606 Revenue from Contracts and Customers, required the implementation of new controls and modification of certain accounting processes related to revenue recognition. There were no other changes in our internal control over financial reporting that occurred in the first quarter 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(*Id.* ¶ 98 (emphasis in original).) Plaintiff alleges that these statements were false and misleading because L Brands' disclosure controls were not operating effectively. (*Id.*) Plaintiff contends that these statements were then falsely certified by Mr. Wexner and Mr. Burgdoerfer. (*Id.* ¶¶ 99–100.)

### 3. Press Release

Plaintiff also alleges that L Brands' November 8, 2018 press release contained materially false representations. It stated that L Brands expected to report losses of $0.17 per share during the 2018 Q3. (*Id.* ¶ 86.) The press release also announced the declaration of L Brands' regular quarterly dividend of $0.60 per share, "the company's 176th consecutive quarterly dividend." (*Id.*)

Plaintiff alleges that these statements were materially false and misleading for the same reasons as Mr. Burgdoerfer's May 31, 2018 statements. (*Id.* ¶ 87.) Additionally, L Brands' statement that it was the 176th consecutive quarterly dividend, even if true, "created the false impression that the Company's dividend was safe going forward." (*Id.*) According to Plaintiff, the third quarter was

13

completed by the time these statements were made, "so Defendants had actual knowledge by this time that the Company made the decision to reduce the Company's dividend and commit to deleverage[,]" but failed to disclose this to investors. (*Id.*) In support, Plaintiff points to Mr. Burgdoerfer's statement at the November 20, 2018 conference call, "[w]e have made some important decisions in the [third] quarter, including . . . ***reducing our dividend and committing to deleverage*** to enable us to increase our focus on core businesses and strengthen our company in the long term." (*Id.* (alteration and emphasis in original).)

### C. Procedural History

Relevant to the Motion currently before the Court, Plaintiffs filed their Amended Consolidated Complaint in these cases on December 20, 2019. (ECF No. 25.) Plaintiffs allege one count of violating Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated thereunder against all Defendants, and one count of violating Section 20(a) of the Exchange Act against the individual Defendants. On February 18, 2020, Defendants filed a Motion to Dismiss the Consolidated Amended Complaint. (ECF No. 31.) Lead Plaintiff filed his Memorandum in Opposition on May 4 (ECF No. 35), and Defendants filed a Reply on June 3 (ECF No. 36). The Court heard oral argument on the Motion on September 23. The Court now issues the following decision.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is

and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a)

standard may be dismissed if it fails to state a claim upon which relief can be

granted. Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is
> plausible on its face. A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged. The
> plausibility standard is not akin to a probability requirement, but it asks
> for more than a sheer possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are merely consistent with a
> defendant's liability, it stops short of the line between possibility and
> plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations

omitted).

While courts are typically limited to deciding Rule 12(b)(6) motions on the

complaint, on a motion to dismiss grounded in the Exchange Act, the Court "may

consider the full text of the SEC filings, prospectus, analysts' reports and

statements integral to the complaint, even if not attached, without converting the

motion into one for summary judgment under Fed. R. Civ. P. 56." *Bovee v. Coopers

& Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001) (internal quotations

omitted).

A securities fraud claim must also satisfy the heightened pleading standards

delineated under Federal Rule of Civil Procedure 9(b) and the Private Securities

Litigation Reform Act of 1995 ("PSLRA"). Pursuant to Fed. R. Civ. P. 9(b), "a party

must state with particularity the circumstances constituting fraud or mistake." The

PSLRA further requires that the plaintiff "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1),(2).

## III.  ANALYSIS

### A.  Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act provides a private cause of action to purchasers of securities. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (finding that a right of action is implied in the words of 15 U.S.C. § 78j(b) and its implementing regulation, 17 C.F.R. § 240.10b-5). It prohibits the "use or employ, in connection with the purchase or sale of any security . . .  any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Section 10(b) is implemented through Rule 10b-5, which forbids "the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341 (2005) (quoting 17 C.F.R. § 240.10b-5).

In order to state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383–84 (6th Cir. 2016) (internal quotations omitted). Defendants argue that the Amended Consolidated Complaint is inadequate with respect to the first two elements.

A plaintiff successfully pleads an actionable misrepresentation or omission when he alleges facts demonstrating: "(1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). While seemingly straightforward, courts "must apply a different analytical framework to cases based on affirmative misrepresentations, as opposed to omissions" and "different rules apply when the misrepresentation or omission concerns hard, as opposed to soft, information." *Id.*

The Sixth Circuit describes an actionable misrepresentation as:

> an affirmative statement that is misleading or false. When an alleged misrepresentation concerns hard information—typically historical information or other factual information that is objectively verifiable—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. When an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity[.]

*Id.* (internal quotations and citations omitted). When reviewing the latter type of alleged misrepresentation, the Sixth Circuit has adopted the First Circuit's approach—evaluating the materiality and whether the statement was misleading or false under the first prong and saving the subjective inquiry for the scienter

17

analysis—in order to avoid conflating the first two elements of the cause of action.

*Id.* at 471 (citing *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48–49 (1st Cir.

2005), overruled on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308 (2007)).

"[I]t bears emphasis that § 10(b) and Rule 10b-5 do not create an affirmative

duty to disclose any and all . . . information." *Matrixx Initiatives, Inc. v. Sircusano*,

563 U.S. 27, 44 (2011). Rather, an actionable omission is described as:

> [a] failure to disclose information when it had a duty to do so. A duty to
> affirmatively disclose may arise when there is insider trading, a statute
> requiring disclosure, or . . . an inaccurate, incomplete[,] or misleading
> prior disclosure. To complicate matters further, when a person or
> corporation comes into possession of information that makes a prior
> statement inaccurate, incomplete, or misleading, different duties to
> disclose the new information arise, perhaps unsurprisingly, depending
> on whether the new information is hard or soft. If the new information
> is hard, then a person or corporation has a duty to disclose it if it renders
> a prior disclosure objectively inaccurate, incomplete, or misleading. If
> the new information is soft, then a person or corporation has a duty to
> disclose it only if [it is] virtually as certain as hard facts and contradicts
> the prior statement.

*In re Omnicare*, 769 F.3d at 471. The Sixth Circuit explains, "the new information

must be so concrete that the defendant must have actually known that the new

information renders the prior statement misleading or false and still did not

disclose it." *Id.* "A company is also obligated, once it chooses to speak on a subject, to

do so fully and fairly[.]" *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d

683, 700 (E.D. Mich. 2010). "Our securities laws therefore, require an actor to

provide complete and non-misleading information with respect to the subjects on

which he undertakes to speak." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) (internal quotations omitted).

Both actionable misrepresentations and omissions must also satisfy a materiality component. "Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir.1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). Omitted information is immaterial if it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance." *City of Monroe*, 399 F.3d at 680 (internal quotations and emphasis omitted).

"'Immaterial statements include vague, soft, puffing statements or obvious hyperbole' upon which a reasonable investor would not rely." *In re Ford Motor Co. Secs. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re K–tel Int'l, Inc. Secs. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002)). Additionally, "[c]ourts have consistently found immaterial a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." *Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009). Still, the Sixth Circuit warns that courts "must tread lightly at the motion-to-dismiss stage, engaging carefully with

19

the facts of a given case and considering them in their full context," when considering materiality. *In re Omnicare*, 769 F.3d at 472.

Finally, even if a statement was misleading or false and material, a safe harbor excuses liability for certain forward-looking statements, whether written or oral. *In re Cardinal Health Inc. Secs. Litigs.,* 426 F. Supp. 2d 688, 746 (S.D. Ohio 2006). The PSLRA defines "forward-looking statement" to include:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C) . . . .

15 U.S.C. § 78u–5(i)(1). This safe harbor is only overcome "if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward looking' or lacked meaningful cautionary statements." *Ind. State Dist. Council of Laborers,* 583 F.3d at 943.

With that backdrop in mind, the Court will examine each statement or group of statements Plaintiff alleges to be a misrepresentation or omission regarding the future of L Brands' dividend.

### 1.    Mr. Burgdoerfer's Statements

Plaintiff alleges that Mr. Burgdoerfer made several false and misleading statements during two investor conferences and an earnings call within the Class Period. Defendants argue that the complained of statements were not false or misleading, and even if they were, they were immaterial or forward-looking with sufficient cautionary language. The Court will examine each set of statements separately.

### a.    May 31, 2018

Plaintiff alleges that statements made by Mr. Burgdoerfer at the May 31, 2018 RBC conference were false and misleading because they failed to identify the substantial risk that L Brands would need to reduce its dividend. At oral argument, Plaintiff added that Mr. Burgdoerfer should have qualified his statements with a warning that there was a risk of dividend reduction in the foreseeable future, which Plaintiff qualified as the following six to 12 months.

Initially, the Court disagrees with Plaintiff's characterization of Mr. Burgdoerfer's May statements. In large part, the complained of statements[2] consist of hard information that was not objectively false or misleading as alleged. At that point, it is undisputed that L Brands had never reduced its dividend and shareholders did value the high dividend. (Amend. Consol. Compl., ¶¶ 30–31.) Mr.

---

[2] When the Court refers to "complained of statements" within a larger group or section of identified representations, the Court is referring to the bolded, italicized statements Plaintiff highlighted as actionable throughout the Amended Consolidated Complaint.

21

Burgdoerfer's statement, "[w]e have the cash flow needed and cash balances, et cetera, to sustain the dividend" (*Id.* ¶ 63), is a statement of present fact that was true at the time it was made; L Brands had the flow cash to maintain the dividend and did maintain the dividend at its prior level for the Q1, Q2, and Q3 after this statement was made. *See In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (explaining that the statements about the safety of the dividend were neither false nor misleading because the defendant maintained the dividend at its prior level after the statements were made).

To the extent that Mr. Burgdoerfer's statement, "the dividend is very safe" (Amend. Consol. Compl., ¶ 63) can be interpreted as soft information, as opposed to present fact, it is too vague to be considered material and is easily distinguishable from cases like *In re Gen. Elec. Co. Secs. Litig.,* 857 F. Supp. 2d 367 (S.D.N.Y. 2012), which Plaintiff relies on to support that the statement is actionable. In *General Electric*, the dividend was not just described as "safe," the defendant's optimistic statements were worded as specific guarantees or promises: "Lastly, the GE dividend is secure for investors. The Board has approved management's plan to maintain the current dividend through '09 even in these relatively uncertain economic times at $1.24 a share." *Id.* at 380. That defendant continued with more specific statements about the dividend: "What can you count on? You can count on a great dividend, $1.24 board approved at the board meeting last Friday, $1.24 in 2009, $.31 a share in the first quarter. . . . We're running the company really focused on cash. And so we have about a $3 billion coverage on the dividend . . . .

22

And so the company really operationally is very well grounded to cover the dividend handily and to be in good shape as we think about next year." *Id.* The facts of *General Electric* are a far cry from cases like *In re IBM,* where the court found the statement "'I will say again what I said before. I have no real plan, no desire, and I see no need to cut the dividend'" to be the kind of mild, wishy-washy optimistic statement that is an inactionable prediction or opinion. *Id.* at 388 (quoting *In re IBM*, 163 F.3d at 107).

Here, the term "safe" is not tethered to any kind of objective standard and lacks specificity. *See In re TransDigm Grp., Inc. Secs. Litig.*, 440 F. Supp. 3d 740, 764 (N.D. Ohio 2020). Similar to *In re IBM*, Mr. Burgdoerfer's statement "the dividend is very safe," was a "loose prediction" or "highly qualified expression of corporate optimism" that "in no way promises to maintain the dividend at any stated level" and as a result is "not sufficiently material, as a matter of law, to support a claim for securities fraud." *In re IBM,* 163 F.3d at 109. And as the Court previously noted, following Mr. Burgdoerfer's statements, L Brands did issue three more quarterly dividends at the same level it had previously.

Moreover, in the context of Mr. Burgdoerfer's entire statement on May 31 and the financial information available to the public at that point, no reasonable investor would rely on "the dividend is very safe" to mean the dividend is sustainable at the same level for the next six to 12 months. While the Court is to draw reasonable inferences in favor of Plaintiff at this stage in the litigation, the Court does not find Plaintiff's requested inference reasonable, particularly given the

total mix of information available regarding L Brands' very high dividend payout ratio and dividend yield. There is no dispute that the 2017 Form 10-K, the Q1 earnings guidance, and the Q1 earnings report were available to the public prior to, during, and after the RBC Conference. (*See* Defs Exs. B, C, O, ECF Nos. 31-3, 4, 16.) The 2017 Form 10-K, filed in March 2018, disclosed an extensive look at the Company's financial performance, as well as a disclaimer as to how such performance could affect the future of the dividend. (Defs. Ex. O, ECF No. 31-16.) Similarly, L Brands' Q1 earnings report, published on May 23, 2018, disclosed a decline in earnings per share, operating income, and net income, as well as decreased guidance for 2018 full-year earnings. (Defs. Ex. C, ECF No. 31-4.) As illustrated extensively in the Amended Consolidated Complaint, it was widely known that L Brands' financial performance had declined steadily for several years leading up to the Class Period. (¶¶ 38–53.) Asking the Court to find that a reasonable investor would rely on the statement the "dividend is very safe" to mean the dividend would be maintained beyond the Q3, in light of the information available, is unreasonable and thus, immaterial.

Finally, Plaintiff's argument that Mr. Burgdoerfer had a duty to provide complete and non-misleading information with respect to the foreseeable future of the dividend because he chose to speak about the dividend is unavailing. The Sixth Circuit has rejected this kind of broad-sweeping duty to disclose. *Pension Fund Grp. v. Tempur-Pedic Int'l. Inc.,* 614 F'Appx 237, 246 (6th Cir. 2015) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001), overruled on other grounds by

24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). Here, the analyst requested Mr. Burgdoerfer address how important the dividend was in the context of how L Brands was looking at capital allocation. In responding to the question, Mr. Burgdoerfer was not obligated disclose all future possibilities regarding the dividend. "Such a rule would require almost unlimited disclosure on any conceivable topic related to an issuer's financial condition whenever an issuer released any kind of financial data." *Id.* (internal quotations omitted).

Mr. Burgdoerfer's statements on May 31, 2018 are not actionable.

### b.    June 6, 2018

On June 6, 2018, Mr. Burgdoerfer made several statements at the Baird Conference regarding L Brands' "ability to maintain the dividend" and the Company's comfort with and confidence in "the current dividend level in the business." (Amend. Consol. Compl., ¶ 66.) Plaintiff argues that Mr. Burgdoerfer "falsely and misleading reassured investors the Company's dividend amount was sustainable" and stated that the Company's cash flow was sufficient to pay the dividend without a reasonable basis. (Mem. Opp., 14, ECF No. 35.)

As an initial matter, Mr. Burgdoerfer's statement, "our cash flow results, the free cash flow of the business is sufficient to pay the dividend" is hard information that is not objectively false or misleading. (Amend. Consol. Compl., ¶ 66.) L Brands maintained the dividend thereafter at its prior level for the Q2 and Q3.

The other complained of statements are classically forward-looking. The statements "[o]ur ability to maintain the dividend" and "we're confident we can

maintain the dividend" (*Id*.) imply projections or objectives, falling squarely within the definition of forward-looking statements found in 15 U.S.C. § 78u-5(i)(1). *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 677–78 (6th Cir. 2003). The statements explaining why L Brands is "comfortable with the current dividend level in the business," (Amend. Consol. Compl., ¶ 66) while certainly implying some present circumstances, are also the basis for the forward-looking statements regarding the Company's ability to maintain the dividend, thus qualifying as an "assumption underlying" a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(D); *Champion*, 346 F.3d at 677.

Mr. Burgdoerfer's statements regarding L Brands' ability to maintain the dividend were also accompanied by two layers of cautionary language. First, L Brands' June 4, 2018 press release preceding the Baird Conference contained a formal warning about forward-looking statements. (Defs. Ex. F, ECF No. 31-7.) Second, Mr. Burgdoerfer explained at the Conference that

> Our ability to maintain the dividend, even in this time period where the payout ratio is very high and the yield is very high, we're confident that we can maintain the dividend. As you've looked at our cash flow results, the free cash flow of the business is sufficient to pay the dividend. And we've been carrying excess cash as a business beyond what's needed for the day-to-day working capital needs and financing needs of the business. So we're comfortable with our cash position, our liquidity position, our capital structure. And we're comfortable with the current dividend level in the business.

(Amend. Consol. Compl., ¶ 66.) These statements clearly identify the important factors that could cause confidence and comfort in the dividend level to change. *In re Cardinal Health,* 426 F. Supp. 2d at 746. In other words, "[i]t would be

26

unreasonable, as a matter of law, for an investor to rely on these projections as long-term guarantees because these statements contain sufficient cautionary language to indicate that they were only short-term predictions." *In re IBM,* 163 F.3d at 108.

Plaintiff also alleges that Mr. Burgdoerfer made several false and misleading statements in an exchange with an analyst at the same conference. Plaintiff argues that the complained of statements were false and misleading because they "minimized the negative impact competitors were having on the Company and its margins, profitability and cash flow." (Amend. Consol. Compl., ¶ 70.) The Court does not find any merit in that assertion.

The context of the analyst's question is important here. In pointing out Victoria's Secret's slow recovery, Mr. Altschwager specifically asked that Mr. Burgdoerfer compare internal pressures at the Company to intensifying competition. Mr. Burgdoerfer then proceeded to do just that—giving what can only be characterized as his opinion on the two competing forces. In doing so, he directly addressed the challenges L Brands faced due to competition in the market—"Are there more competitors out there? There are. When you look at the size and significance of those competitors and really do the math on it, they're not that large at this time. And not suggesting from that, that we should be arrogant about competition or not pay attention to competition. We do, but I would have a view - - we have a view that most of our opportunity in performance is through executing our game plan more effectively." (Amend. Consol. Compl., ¶ 69.)

Even if the Court were to find that these statements downplayed the impact of competition on the Company's financial performance, they fall under the umbrella of "loosely optimistic statements . . . clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Ford,* 381 F.3d 563, 570–71 (6th Cir. 2004) (internal quotations omitted). The total mix of information available to investors included the 2017 Form 10-K, which was incorporated through the Q1 Form 10-Q. (Defs. Exs. A, O, ECF Nos. 31-2, 16.) The risk factors in the 2017 Form 10-K explicitly warned that "[s]ales volumes and retail traffic may be adversely affected by factors that we cannot control, such as . . . consumer trends away from brick-and-mortar retail toward online shopping, competition from internet and other retailers[.] . . . These risks could have material adverse effect on our ability to grow and our results of operations, financial condition and cash flows." (Defs. Ex. O, 8, ECF No. 31-16.) A reasonable investor was aware that the Board of Directors determines future dividends, not Mr. Burgdoerfer, "after giving consideration to [L Brands'] levels of profit and cash flow." (Defs. Ex. A, 37, ECF No. 31-2.)

Moreover, expressions of opinion only become actionable "if the speaker does not believe the opinion and the opinion is not factually well grounded." *In re Ford*, 381 F.3d at 572 (internal quotations omitted). Plaintiff fails to allege sufficient facts to show that Mr. Burgdoerfer did not believe the complained of statements or knew them to be false. Plaintiff acknowledged at oral argument that the decision to reduce the dividend was made during the Q3.

The statements made by Mr. Burgdoerfer on June 6, 2018 are not actionable.

### c.    August 23, 2018

Finally, Plaintiff takes issue with several statements made by Mr. Burgdoerfer during the August 23, 2018 earnings call. In particular, that "a lot of our earnings and our cash come in the fourth quarter" and "we're comfortable with [the dividend] based on what we know at this point[.]" (Amend. Consol. Compl., ¶ 77.) Plaintiff asserts that these statements minimized the risk that the dividend would have to be reduced in the future and created the false impression that the dividend would be maintained as long as L Brands performed in line with expectations.

In looking at the full context of Mr. Burgdoerfer's statement to Mr. Binetti, the Court does not agree with Plaintiff's characterization of Mr. Burgdoerfer's statements. Nowhere does Mr. Burgdoerfer minimize the risk that the dividend might have to be reduced in the future or make guarantees about the future of the dividend. By contrast, he tells Mr. Binetti that the Company will continue to look at the dividend "in a rigorous way" based on the information available. (*Id*.) The statement, "we're comfortable with [the dividend] based on what we know at this point" is a statement of present fact, or hard information. (*Id*.) The Court does not find that it is objectively false or misleading. Again, L Brands maintained the dividend at its prior level for the Q3.

Moving to the statement, "a lot of our earnings and our cash come in the fourth quarter," the Court interprets this statement as one of historical fact, looking

back at L Brands' past fourth quarter performances. (*Id*; *see* Defs. Ex. O, 7, ECF No. 31-16 ("We experience major seasonal fluctuations in our net sales and operating income, with a significant portion of our operating income typically realized during the fourth quarter holiday season.").) Plaintiff does not allege that L Brands did not historically overperform in prior fourth quarters. However, to the extent that this statement can be interpreted as a prediction regarding the 2018 fourth quarter, the statement is forward-looking to the Company's future economic performance with the appropriate cautionary language to keep it within the safe harbor. First, the Q2 earnings report provided the formal warning[3] about forward-looking statements preceding the August 23 earnings call. (Defs. Ex. H, ECF No. 31-9.) Second, and more pointedly, Mr. Burgdoerfer qualified: "Earnings increases would drive obviously an increase in the share price and get dividend yield and relationships like that in a more normal range. But that said, our operating performance has lagged our expectations over the last several years. So we look at it periodically in a rigorous way. That will continue. We're comfortable with it based on what we know at this point, and we'll continue to look at it." (Amend. Consol. Compl., ¶ 77); *cf. Pension Fund*, 614 F'Appx at 247–48 (finding the forward-looking statement within the safe harbor even without the issuance of a formal warning where the corporate officer generically stated "[a]s usual—we may say something that's forward-looking, so it's under the safe harbor provisions").

---

[3] The Sixth Circuit has "never held that a company's repeated use of similarly worded warnings renders them meaningless." *Pension Fund*, 614 F'Appx at 248.

The statements made by Mr. Burgdoerfer on August 23, 2018 are not actionable.

### 2. Relevant Form 10-Qs

Plaintiff alleges that Defendants also made false and misleading statements and omitted material information they were required to disclose in filings made with the SEC, specifically the Q1 and Q2 2018 Form 10-Qs. Defendants argue that the statements made in the relevant Form 10-Qs were not false or misleading, and in the alternative, they contained forward-looking statements with appropriate cautionary language. Defendants also dispute that any regulation required them to disclose the omitted information complained of.

### a. Dividend Policy and Procedures

Plaintiff alleges that the identical "Dividend Policy and Procedures" sections in the Q1 and Q2 Form 10-Qs filed with the SEC were misleading because they "created the false impression that the Company's dividend was safe and consistent and because they failed to disclose that there was a substantial risk that the dividend was not sustainable and that the Company would need to reduce the dividend to pay down debt and fund operations." (Amend. Consol. Compl., ¶¶ 73, 82.)

The "Dividend Policy and Procedures" section of the Form 10-Qs explains how the Board of Directors determines future dividends. It says nothing about the safety or sustainability of future dividends. And Plaintiff does not allege that this section falsely describes how the Board of Directors determines dividends. To the extent

Plaintiff argues L Brands was required to include additional information about the risk to the dividend, both Form 10-Qs reference the 2017 Form 10-K, which described the circumstances that could affect the future of the dividend. (*See* Defs. Exs. A, J, K, ECF Nos. 2, 11, 16.) Thus, this section is neither false nor misleading.

### b.     Credit Ratings

Plaintiff alleges that the "Credit Ratings" section in the Q2 Form 10-Q was false and misleading because it "failed to disclose that the worsening condition of the Company's credit rating increased the risk that the Company's dividend amount was not sustainable." (Amend. Consol. Compl., ¶ 84.) Even assuming there was a duty to disclose such information, the Court agrees with Defendants—"[a] statement explaining that the credit ratings downgrade undermined L Brands' ability to sustain its dividend . . . would have been inaccurate and misleading." (Motion, 25, ECF No. 31.) L Brands did sustain the dividend at prior levels for the Q2 and Q3. This section is neither false nor misleading by misrepresentation or omission.

### c.     Regulation S-K

Plaintiff next alleges that Defendants omitted material information and made false statements in the relevant Form 10-Q's MD&A regarding significant risk factors that were required to be disclosed under SEC Regulation S-K.

### i.     Item 303

First, Plaintiff argues that pursuant to Item 303 of Regulation S-K, Defendants were required to disclose known trends, events, or uncertainties that L

Brands was experiencing and that were reasonably likely to have an impact on the Company's continuing operations in its Q1 and Q2 Form 10-Qs but did not. That is, the Company should have disclosed that Victoria's Secret and PINK's declining financial performance was likely to affect the future sustainability of its dividend.

"Item 303 of SEC Regulation S-K requires companies to '[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations' in their Form 10-Q filings." *Iron Worker Local Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, Nos. 3:17CV63, 3:17CV275, 3:17CV276, 2018 WL 10152459, at *15 (M.D. Tenn. Mar. 8, 2018) (quoting 17 C.F.R. § 229.303(a)(3)(ii)). However, a violation of Item 303 is not automatically actionable; it "must still satisfy the requirements of Section 10(b): the information must be material, and the failure to disclose must make a statement misleading." *Id.*

While it is unclear whether the Sixth Circuit recognizes a private right of action under Item 303, Plaintiff has nevertheless failed to state an actionable violation. *Id.* at *15 n.3 (citing *In re Sofomar*, 123 F.3d at 402–03). The Court agrees with Defendants that four of the five "known trends," (Amend. Consol. Compl., ¶ 93(b)-(e)), complained of focus on whether Victoria's Secret and PINK's declining financial performance would affect the amount of the ordinary dividend issued to shareholders rather than "net sales or revenues or income," as called for by the regulation. 17 C.F.R. § 229.303(a)(3)(ii); *cf. Stratte-McClure v. Morgan Stanley*, 776

F.3d 94, 104 (2d Cir. 2015) (finding that the plaintiffs adequately alleged an Item 303 violation where defendants faced a deteriorating subprime mortgage market that, in light of the company's exposure to the market, was likely to cause trading losses and failed to make that disclosure). But even if they did discuss business operations, paragraphs 93(b) through (e) of the Amended Consolidated Complaint consist of "forward-looking information" rather than "presently known data which *will* impact future operating results, such as *known* future increases in costs of labor or materials." *In re Sofamor,* 123 F.3d at 402 (internal quotations omitted). Forward-looking information is not required to be disclosed pursuant to Item 303. *Id.* The Court also agrees with Defendants that with regard to the remaining "known trend" (Amend. Consol. Compl., ¶ 93(a)), concerning the impact of Victoria's Secret and PINK's businesses on L Brands' cash flow, liquidity, and net debt levels, that information was included extensively in the relevant Form 10-Qs. (*See* Defs. Exs. A, J, ECF Nos. 31-2, 11.)

### ii.    Item 503

Second, Plaintiff argues that pursuant to Item 503 of Regulation S-K, Defendants were required to "[s]et forth any material changes from risk factors as previously disclosed" in L Brands' 2017 Form 10-K in the relevant Form 10-Qs but did not. (Amend. Consol. Compl., ¶ 94 (alteration in original).) Plaintiff contends that the purported warnings contained in the 2017 Form 10-K regarding the dividend were not specifically tailored to the risks facing L Brands during the Class Period. Plaintiff cites as the relevant risk factors Defendants failed to disclose, the

same items he lists as "known trends" in support of his assertion that Defendants violated the disclosure requirements of Item 303. More specifically, he alleges that "L Brands failed to disclose that competition had put pressure on margins and cash flow, which in turn created the risk of L Brands' being unable to finance operations and pay down debt without a reduction to the hefty dividend." (Mem. Opp., 34.)

"Item 503 requires that offering documents 'provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky.'" *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (quoting 17 C.F.R. § 229.503(c)). The few courts that have examined Item 503 have generally found such violations to track Rule 10-b violations, analyzing the sufficiency of the Item 503 disclosures with the materiality standard. *Id.* (listing cases).

The 2017 Form 10-K standing alone, and by incorporation through the 2018 Q1 and Q2 Form 10-Qs, provided robust disclosures that were company-specific and related to the direct risks that L Brands uniquely faced. (*See* Defs. Ex. A, 42, ECF No. 31-2; Ex. J, 49, Ex. 31-11, Ex. O, 6–14, ECF No. 31-16.) As to competition, the 2017 Form 10-K states:

> **Our ability to compete favorably in our highly competitive segment of the retail industry could impact our results.**
>
> The sale of women's intimate and other apparel, personal care products and accessories is highly competitive. We compete for sales with a broad range of other retailers, including individual and chain specialty stores, department stores and discount retailers. In addition to the traditional store-based retailers, we also compete with direct marketers or retailers that sell similar lines of merchandise and who target customers through online channels. Brand image, marketing, design, price, service,

35

assortment, quality, image presentation and fulfillment are all competitive factors in both the store-based and online channels.

Some of our competitors may have greater financial, marketing and other resources available. In many cases, our competitors sell their products in stores that are located in the same shopping malls and centers as our stores. In addition to competing for sales, we compete for favorable site locations and lease terms in shopping malls and centers.

Increased competition could result in price reductions, increased marketing expenditures and loss of market share, any of which could have a material adverse effect on our results of operations, financial condition and cash flows.

(Def. Ex. O, 10, ECF No. 31-6 (emphasis in original).) It goes on to explain:

**If we are unable to pay quarterly dividends at intended levels, our reputation and stock price may be harmed.**

Our dividend program requires the use of a portion of our cash flow. Our ability to pay dividends will depend on our ability to generate sufficient cash flows from operations in the future. This ability may be subject to certain economic, financial, competitive and other factors that are beyond our control. Our Board of Directors may, at its discretion, decrease the level of dividends or entirely discontinue the payment of dividends at any time. Any failure to pay dividends after we have announced our intention to do so may negatively impact our reputation, investor confidence in us and our stock price.

(*Id.* at 11. (emphasis in original).)

While Plaintiff complains that Defendants failed to note any "material changes" in the risk factors affecting the dividend, the Q1, Q2, and Q3 dividends were maintained at prior levels, negating the need for changed disclosures as to the sustainability of the dividend in the Q1 and Q2 Form 10-Qs. With regard to the 2017 Form 10-K more generally, the Court does not agree that the purported warnings as to the future of the dividend, based on these extensive disclosures, were

boilerplate statements insufficient to satisfy Item 503. And Plaintiff fails to cite to any authority that supports his assertion that Item 503 required more detail. In fact, that the SEC recently considered changing Item 503 to require registrants disclose with more specificity undermines Plaintiff's position. *Howard v. Arconic, Inc.*, 395 F. Supp. 3d 516, 574 (W.D. Penn. 2019).

### iii.    Item 307

Finally, Plaintiff alleges that the "Controls and Procedures" sections of the relevant Form 10-Qs were misleading because they indicated that L Brands' disclosure controls were operating effectively when they were not. Plaintiff also asserts that Mr. Wexner and Mr. Burgdoerfer then proceeded to falsely certify these statements. Item 307 requires the principal executive and principal financial officers to disclose conclusions regarding the effectiveness of the Company's disclosure controls and procedures. 17 C.F.R. § 229.307. As the Court just discussed, Plaintiff fails to identify any material omissions committed by Defendants in the MD&A of the relevant Form 10-Qs. Accordingly, this argument also fails.

The statements and omissions alleged in the SEC filings are not actionable.

### 3.    Press Release

Finally, Plaintiff alleges that L Brands' November 8, 2018 press release contained a misleading representation when it announced the declaration of L Brands' regular quarterly dividend of $0.60 per share as "the company's 176th consecutive quarterly dividend." (Amend. Consol. Compl., ¶ 86.) Plaintiff alleges that even if this is true, this statement was misleading because it "created the false

impression that the Company's dividend was safe going forward." (*Id.* ¶ 87.) Defendants argue that Plaintiff's claim fails because the statement complained of is "'literally true.'" (Motion, 28, (quoting Amend. Consol. Compl., ¶ 87).)

The Court agrees with Defendants. The statement complained of is a fact, hard information that must be *objectively* false or misleading. It is not. It is, as Plaintiff acknowledges, quite literally true. To the extent Plaintiff argues that Defendants were required to disclose to investors that the Company had made the decision during the Q3 to reduce the Company's dividend in the future and commit to deleverage, Plaintiff fails to allege any affirmative duty to disclose. "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner, Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). And plaintiff's press release is not the kind of incomplete disclosure or half-truth that would require additional information in order to clarify the representation. *Howard,* 395 F. Supp. 3d at 545. The integrity of the announcement of the Q3 dividend is unaffected by Defendants failure to share the Company's plans for the fourth quarter dividend.

The November 8, 2018 press release is not actionable.

In sum, Plaintiff has failed to meet his burden in pleading an actionable misrepresentation or omission. Because Plaintiff cannot satisfy this element of his § 10(b) and Rule 10b-5 claim, Count One of the Amended Consolidated Complaint must be dismissed and a discussion regarding the remaining elements is unnecessary.

**B.      Section 20(a)**

In Count Two of the Amended Consolidated Complaint, Plaintiffs also assert

a claim under Section 20(a) of the Exchange Act. In order to plead a violation of §

20(a) for control person liability, the plaintiff must allege facts "demonstrating that

the defendant controlled another person who committed an underlying violation of

the [Exchange] Act, and that the defendant culpably participated in that underlying

violation." *In re Transdigm*, 440 F. Supp. 3d at 773 (internal quotations and

emphasis omitted). Because it is clear that Plaintiff must plead a primary violation

of the Exchange Act in order to adequately claim control personal liability, Count

Two is necessarily deficient and must also be dismissed. *Id.*

**C.      Leave to Amend the Complaint**

In his Memorandum in Opposition, Plaintiff requests leave to amend the

Complaint if the Court identifies any deficiencies. Defendants respond that the

PSLRA requires the Court to deny Plaintiff's request and dismiss the Amended

Consolidated Complaint with prejudice.

In *Miller v. Champion Enterprises*, the Sixth Circuit considered Fed. R. Civ.

P. 15(a), which allows leave to amend as a typical practice, with the mandatory

language of 15 U.S.C. § 78u-4(b)(3), which requires that a court dismiss the

complaint if the pleading requirements are not met. 346 F.3d at 689–92. The Sixth

Circuit concluded that the mandatory language in the PSLRA requires courts to

restrict "the ability of plaintiffs to amend their complaint" and thus "limit[s] the

scope of Rule 15(a)." *Id.* at 692. The Court went on to explain that "the purposes of

the PSLRA would be frustrated if plaintiffs were allowed to repeatedly amend their complaints in order to meet the particularity requirements of the statute." *Cole v. Harris*, No. 4:09CV1270, 2010 WL 11681664, at *6 (N.D. Ohio Jan. 4, 2019) (citing *Champion*, 346 F.3d at 692).

Moreover, Plaintiff already had one opportunity to amend the complaint. Even more compelling, it is clear to the Court that the deficiencies in this case cannot be cured; the facts are what they are and they are not sufficient to establish securities fraud. Even if Rule 15(a) applied without qualification, amendment would be futile. Accordingly, Plaintiff's leave to amend the Complaint is **DENIED** and the case is dismissed with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss the Amended Consolidated Complaint. (ECF No. 31.) The Amended Consolidated Complaint is **DISMISSED** with prejudice. (ECF No. 25.) The Clerk is **DIRECTED** to **TERMINATE** Case Nos. 2:19-cv-3186 and 2:19-cv-3961 from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
SARAH D. MORRISON
UNITED STATES DISTRICT JUDGE